**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>IN RE *EX PARTE* APPLICATION OF ELECTRIC SOLIDUS INC. D/B/A/ SWAN BITCOIN FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782</td><td>Case No. 1:26-mc-00124<br><br>**MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* APPLICATION FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782**</td></tr>
</table>

Applicant Electric Solidus Inc. d/b/a Swan Bitcoin ("**Swan**") respectfully submits this Memorandum of Law in support of its Application (the "**Application**") pursuant to 28 U.S.C. § 1782 ("**Section 1782**") for an Order authorizing it to obtain limited discovery from Cantor Fitzgerald, L.P. ("**Cantor**") and its former Chairman and CEO Howard Lutnick ("**then-CEO Lutnick**"). Cantor and then-CEO Lutnick "reside[] in" or are "found in" this District. The discovery will be used in legal proceedings in (1) the Eastern Caribbean Supreme Court, In the High Court of Justice, Virgin Islands, Commercial Division (the "**BVI Court**"), in which Applicant is seeking the BVI Court's permission to bring a derivative claim in England on behalf of a former joint venture between Swan and Tether Holdings El Salvador S.A. de C.V. ("**Tether**"), 2040 Energy Ltd. ("**2040 Energy**"); and (2) the High Court of Justice, Commercial Court (the "**English Court**"), in which Applicant intends to bring the derivative claim if permission is granted. These proceedings are collectively referred to herein as the "**Foreign Proceedings**." The facts giving rise to this Application are set forth in the Declaration of Jerry DeShield Samuel ("**Samuel Decl.**"), a partner of the law firm of Conyers, Dill & Pearman ("**Conyers**"), located in the British Virgin Islands, and the Declaration of Khaled Khatoun ("**Khatoun Decl.**"), a partner of the law firm Quinn Emanuel Urquhart & Sullivan UK LLP, located in England.

1

In December 2025, Applicant applied for, and subsequently obtained, judicial assistance under Section 1782 from the U.S. District Court for the District of Delaware in aid of the same Foreign Proceedings. *See In re Application of Electric Solidus, Inc.*, No. 1:25-cv-01509-UNA (D. Del.) ("Delaware App."), Dkt. 1, 10. In granting that application, which sought discovery from Synteq Digital, Inc., another non-party entity involved in the events giving rise to the Foreign Proceedings, the court found that the statutory requirements of 28 U.S.C. § 1782 were satisfied, and the factors identified by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), weighed in favor of granting the application. Delaware App., Dkt. 10. The Court should reach the same conclusion here.

**PRELIMINARY STATEMENT**

1.　　In mid-2024, Swan was the subject of an elaborate fraud involving the cryptocurrency enterprise Tether Holdings and a group of Swan's own personnel that resulted in the illegal diversion of valuable Bitcoin mining operations.

2.　　Tether and Swan were initially partners. In July 2023, Swan and Tether (acting through a subsidiary) entered into an agreement involving a BVI-incorporated Bitcoin mining joint venture known as 2040 Energy, a name which was provided by Cory Klippsten ("**Klippsten**"),[1] Swan's CEO, who serves as a director of 2040 Energy along with Giancarlo Devasini ("**Devasini**") and Jean-Louis Van der Velde ("**Van der Velde**") (Devasini and Van der Velde are collectively the "**Tether-Appointed Directors**"). Swan conceived the idea, developed the strategy, named the business, and pitched Tether for funding. The idea behind the partnership was that Tether would provide funding for the activities of 2040 Energy while Swan would provide the expert personnel

---

[1] "2040" was a reference to the jersey numbers of Klippsten's favorite basketball players, Gary Payton and Shawn Kemp of the 1990s Seattle Supersonics.

and earn its sweat equity from managing and operating Bitcoin mining sites, which involve managing high-powered computer systems with complex logistical operations and ongoing optimizations.

3. In the months after the formation of the 2040 Energy joint venture, the Swan mining team developed a number of strategies, tools, models, and operating systems to assess and engage mining sites, develop uniquely structured contracts, optimize mining performance at such sites, and manage mining activities and operations with extraordinary efficiency.

4. The mining operations that Swan managed for 2040 Energy soon exceeded expectations and began to manifest the prospect of tremendous growth. As such, Swan and Tether began to negotiate a new partnership, which they agreed to call 2140 Energy at the suggestion of Klippsten. These negotiations began in early 2024, and by mid-2024 the parties had agreed in principle to new terms to promote rapid expansion.

5. In mid-2024, Swan was abruptly forced out of 2040 Energy, when the Tether-Appointed Directors and their then-representative and now-Chief Investment Officer **Zachary Lyons** ("Lyons") were deeply involved with a group of then-Swan personnel (who were each either employed by or contracted to Swan) who hatched a plan to illegally divert valuable Bitcoin mining business assets ("**Mining Assets**") away from 2040 Energy to Tether and/or Tether-controlled entities (the "**Mining Assets Diversion**").

6. The Mining Assets included: computer equipment (the "**Machine Assets**", and their diversion to Tether and/or or its controlled entities, collectively, is referred to below as the "**Machine Asset Diversion**");[2] contracts; techniques, models, tools, items of software, and other

---

[2] "Machine Assets" refers to specialized cryptocurrency mining assets, specifically the specialized hardware purposefully designed to mine Bitcoin known as ASICs, or application-specific integrated circuits.

3

proprietary or confidential information which were developed and/or deployed by Swan personnel in the course of their management and operation of 2040 Energy's mining business ("**Confidential and Proprietary Mining Assets**"); mining sites that were identified for potential mining activity by 2040 Energy and/or which came to Swan personnel's notice in the course of or as a result of their involvement in or with 2040 Energy's business. The scheme also involved the premeditated solicitation and poaching of Swan personnel, unsanctioned downloading from Swan's systems of Confidential and Proprietary Mining Assets, and threats to "blow everything up" at Swan with "legal cover from Tether." These plans were laid bare in contemporaneous notes taken by then-Swan CIO Raphael Zagury on Swan's corporate servers with statements such as "Rain and hell fire needs to start" (the "**Rain and Hell Fire Plan**").

7.     Below are various extracts from contemporaneous records which evidence the conception and execution of the Rain and Hell Fire Plan:

4

Better together or Alex leaves first?
. Send list of points
. Post - termination
**. Walks away together - no solicitation? Resign en masse. Makes it easier for Alex.**
. Alex sends the e-mail. Terminates agreement.
**. Alex sends e-mails to invite everyone. New opportunity - join us. Only one inviting others.**
**. Over non-solicit; non-compete.**
**. Confidentiality and IP - we would be exposed. Something in writing. If we do this staged walk out. Legal cover from Tether.**
. Call a meeting and appoint Proton Management
. Alex send e-mail out. Announcing Proton Management is the management company.
. Then Alex sends out e-mail to team. Join Proton.
. No leverage to include releases.


**Tether needs to send default notice.**
___


Team is getting to a point where is getting untenable. Bill is being put at risk. Dangerous to team to stay around. **Team resignation and move with Tether needs to be on tandem.**

████████████

**Last week you said you'd unleash hell on this guy.**

. Alex leaves
**. Breach**
**. Proton is assigned manager of 2040 assets**
**. All communications go to new management company**
. ROFR gone if Alex resigns
. Written communications. Alex terminated his agreement. We don't need a board resolution.

. Bring the heat
**. Giancarlo side convs. ?**

████████████████████████████████████████

They cannot go and say we didn't do it by the book.

**Rain and hell fire needs to start. Needs to be an exit, not a nice transaction.**


The Tether-Appointed Directors would later help Tether and its business associate Synteq acquire the Machine Assets at steeply discounted prices (the "**Related Party Sale**").

8.      The Rain and Hell Fire Plan episode took place shortly after Swan provided Cantor and then-CEO Lutnick with confidential valuation information about its business. On May 29, 2024, Devasini created a group chat on WhatsApp for the purpose of introducing Lutnick to Klippsten for a possible initial public offering ("IPO") of Swan led by Cantor. The title of the group was "*Swan Cantor Tether*." At the time, Swan was preparing an IPO and Cantor was extremely interested in obtaining the mandate to be Swan's lead investment banker. Following a June 10, 2024 call between then-CEO Lutnick and Klippsten, Swan shared with Cantor a highly confidential and proprietary slide deck, plus a mining presentation and data room access.

9.      Then, on August 8, 2024, the Rain and Hell Fire Plan was executed. Thirteen of Swan's employees resigned within hours. The Rain and Hell Fire Plan was put into motion through the unauthorized download from Swan's systems of thousands of Confidential and Proprietary Mining Assets and continued later that year, with the first of several Machine Asset Diversions in the Related Party Sale.

10.     Through this Section 1782 Application, Swan seeks information regarding the knowledge and role of Cantor and then-CEO Lutnick in the Rain and Hellfire Plan, including the Mining Assets Diversion to support the Foreign Proceedings. Swan brought the Foreign Proceedings to address (among other matters) its serious concern that the Tether-Appointed Directors violated their fiduciary duties to 2040 Energy.

11.     It is Swan's position that no "*intelligent and honest man in the position of a director*" of 2040 Energy would have believed the Related Party Sale to be in the best interests of 2040 Energy and consummated the Related Party Sale in the same circumstances. Swan anticipates that it will establish that the actual value of the diverted assets was about 4.5 times their actual

6

sales price, resulting in Swan's loss of over $1.1 billion.[3] The Machine Asset Diversion caused direct harm to 2040 Energy and Swan seeks to bring derivative proceedings on 2040 Energy's behalf to recover for that harm.

12. As described below, the close pattern of contacts between Tether, Cantor, then-CEO Lutnick, and Swan shortly prior to the Mining Assets Diversion, paired with the larger investment banking and political relationship between top Tether and Cantor figures, provides sufficient basis for narrowly targeted discovery to determine if Cantor and then-CEO Lutnick hold evidence relevant to the question of whether and to what extent the Mining Assets Diversion from 2040 Energy was a pre-planned and coordinated violation of BVI corporate law. In that regard, the following points bear emphasis.

13. First, Tether, the company behind the USDT stablecoin, which is headquartered in El Salvador, is a key client and business partner of Cantor. A top Tether banker who works closely with Cantor was a central figure in the complex transactions around the Machine Asset Diversion. Cantor and then-CEO Lutnick acted as Tether's investment banker and advisor in Tether's aggressive drive to take over the Bitcoin mining industry – which would be further advanced by the Mining Assets Diversion from 2040 Energy to Tether. Devasini had also informed Klippsten that he wanted to use software known as "BNOC" that was developed by Swan in another Tether-affiliated mining company, Northern Data (*see* paragraph 67, below). While Swan operated it, Devasini was a high frequency user of BNOC and stated that he wanted to "own" BNOC. Given

---

[3] The extent of the undervaluation of Swan's assets is illustrated by the following: In June 2024, just months before the Related Party Sale, Zagury—the same individual Tether retained to prepare a report valuing the Machine Assets— prepared a memorandum for fundraising purposes in which he valued Swan's 20% interest in 2040 Energy's mining business at in excess of $1.2 billion. The total sale price in the Related Party Sale for a significant percentage of 2040 Energy's mining assets was approximately $55.6 million. Even on the most conservative net production analysis, the enterprise value of the ASICs was approximately 4.5 times their sale price. Following the Related Party Sale, Tether and Proton deployed those same ASICs to generate revenue in mining operations that compete directly with 2040 Energy.

their importance to Devasini, it is likely that then-CEO Lutnick knew of the importance of the Confidential and Proprietary Mining Assets to Tether's broader Bitcoin mining ambitions. Lutnick and his son and current Cantor chairman Brandon Lutnick also met with Tether principals and Swan personnel on multiple occasions to discuss Swan-related matters, and they received confidential Swan business information shortly before the diversion of assets from 2040 Energy.

14.      Second, Raphael Zagury ("**Zagury**"), Swan's former Chief Investment Officer, who now works with Tether-affiliated entities and has close ties to Cantor, is believed to have secretly plotted with Tether to execute the Mining Assets Diversion. As noted above, Zagury dubbed this a "rain and hellfire" scheme to steal Swan's personnel who were involved in Bitcoin mining for 2040 Energy, download thousands of confidential documents from Swan's servers, and cut Swan out of a lucrative partnership with Tether. Zagury documented his plan in detailed business proposals, copies of which Swan has retained and which Zagury sent to Tether leadership. Zagury was in close covert communication with Tether's key investment manager in the mining venture, a banker named Zachary Lyons ("**Lyons**"), then of Marlin Capital, a Bahamas investment firm with close ties to both Cantor and Tether. Lyons is now Chief Investment Officer of Tether. On July 19, 2024, Zagury held a meeting with Devasini, Lyons, and other Tether representatives and pitched to them the concept of forcing Swan out of the joint venture. It was this same Zagury who was then commissioned by the Tether-Appointed Directors to prepare the valuation report used to justify the Related Party Sale—having months earlier valued Swan's 20% stake in the same mining business at over $1.2 billion.

15.      According to text messages Zagury exchanged with Klippsten in June 2024, Zagury also appears to have provided Cantor and then-CEO Lutnick with information about the value of Swan's Bitcoin mining business during a potential Series C capital raise in June 2024, which was

8

to have been led by Tether and marketed to investors by Cantor. There is therefore reason to believe that Cantor and then-CEO Lutnick knew of and/or were somehow involved in the surprise Rain and Hell Fire Plan.

16.     Another reason why Cantor and then-CEO Lutnick are likely to have known of the Rain and Hellfire Plan, including the Mining Assets Diversion, is because its relevance to a larger Tether-Cantor strategic initiative to expand Tether's presence in the United States through acquisitions in the Bitcoin mining industry and to cultivate political influence, which most recently succeeded in enabling Tether to penetrate the United States banking system via Cantor's newly established partnership with Anchorage Digital Bank ("**Anchorage**").[4] Through this partnership, Tether has invested $100 million into Anchorage in order to use it to issue a new "regulated" Tether-branded digital dollar in the U.S.[5]

17.     Like many foreign companies before it, Tether for years found itself excluded from the United States financial system because of questions about its opaque ownership and controversial operations.[6]

18.     As Tether sought to enter the U.S. market as a Bitcoin mining player, it sought the advice of then-CEO Lutnick, who is now the U.S. Secretary of Commerce.

19.     Then-CEO and now-Secretary Lutnick was and is a prominent advocate for cryptocurrency markets and the U.S. Department of Commerce is one of the industry's regulators, particularly on Bitcoin mining.

---

[4] Press Release, Cantor Fitzgerald, *Cantor Fitzgerald Partners with Digital Asset Custodians Anchorage Digital and Copper.co to Support Bitcoin Financing Business* (Mar. 11, 2025), https://www.cantor.com/cantor-fitzgerald-partners-with-digital-asset-custodians-anchorage-digital-and-copper-co-to-support-bitcoin-financing-business/.
[5] Edwin Ziheng Wang, *Tether Invests $100 Million in Anchorage Digital*, Yahoo Fin. (Feb. 5, 2026), https://finance.yahoo.com/news/tether-invests-100-million-anchorage-155533938.html.
[6] Bitcoin Magazine, *Howard Lutnick: U.S. To "Turbocharge" Bitcoin Mining with Investment Accelerator*, YouTube (Apr. 29, 2025), https://www.youtube.com/watch?v=T4DT1ivM4IM&t=77s.

20.    As Secretary of Commerce, now-Secretary Lutnick has vowed to "turbocharge" U.S. Bitcoin mining.[7]

21.    Illustrating the close relationship between himself and Tether, after becoming Secretary of Commerce, apparently in part to insulate himself from the conflict posed by his role as a key advisor to Tether, Secretary Lutnick took steps to sell his holdings in Cantor and related entities to trusts controlled by his family members. As shown below (paragraph 25), Tether played a key role in these asset sales, which took place shortly after it moved to enter the U.S. banking system under a new law signed by President Trump with Mr. Lutnick and Tether CEO Paolo Ardoino ("**Ardoino**") looking on.[8] These events illustrate the close connection between now Secretary and then-CEO Lutnick and Tether and support the conclusion that he and Cantor possess material and relevant information Mining Assets Diversion.

22.    To begin the diversification process, in or about May 2025, then-CEO Lutnick caused the creation of an entity known as "Dynasty Trust A."[9]

23.    Filings with the U.S. Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA") show that Dynasty Trust A was created for the benefit of the Lutnick family and for the purpose of acquiring now Secretary Lutnick's assets. Per those filings, the Dynasty Trust A is a non-controlling majority owner of, among other things, Cantor.[10]

---

[7] Frank Corva, *U.S. Secretary of Commerce Howard Lutnick Has a Bitcoin Vision for America*, Bitcoin Mag. (Apr. 28, 2025), https://www.nasdaq.com/articles/us-secretary-commerce-howard-lutnick-has-bitcoin-vision-america.

[8] Paolo Ardoino (@paoloardoino), X (July 18, 2025, 2:34 PM), https://x.com/paoloardoino/status/1946292409068834935; Walker (@WalkerAmerica), X (July 19, 2025, 12:18 AM), https://x.com/WalkerAmerica/status/1946424288719868415.

[9]    Purchase    Agreement    dated    as    of    May    16,    2025, https://www.sec.gov/Archives/edgar/data/1865602/000121390025096626/ea026030604ex99-6_cantor.htm; https://www.sec.gov/Archives/edgar/data/2027708/000121390025096634/0001213900-25-096634-index.html.

[10] FINRA BrokerCheck Report, Cantor Fitzgerald & Co., https://files.brokercheck.finra.org/firm/firm_134.pdf.

24.     During the same period, i.e., June and July 2025, and prior to the transfer of now Secretary Lutnick's assets to the Dynasty Trust A, Congress was engaged in final consideration of the GENIUS Act, a stablecoin law that benefited Tether and received final passage and presidential approval in July 2025. Now Secretary Lutnick was involved in consideration and enactment of the GENIUS Act as Secretary of Commerce and a member of the President's Council on Digital Assets

25.     During the period the GENIUS Act was considered and enacted, now Secretary Lutnick appears to have remained a large shareholder of Cantor, and the Lutnick family appears to have been negotiating to obtain financing from Tether to facilitate the transfer of Lutnick's assets to the Dynasty Trust A.

26.     In September 2025, during the finalization of the transfer of assets to the Dynasty Trust A, Cantor negotiated an agreement with Softbank and Ark Invest to vastly increase the valuation of Tether by investing $20 billion, which would also then greatly increase the value of Cantor's stake in Tether.[11]

27.     On September 12, 2025, again prior to the transfer of now Secretary Lutnick's assets to the Dynasty Trust A, Tether and Cantor announced the introduction of a new stablecoin for the U.S. market and Tether made the simultaneous hiring of Bo Hines from the President's Council on Digital Assets to head its U.S. operation.[12]

28.     On October 6, 2025, the sale of then-CEO Lutnick's assets to the Dynasty Trust A was executed.[13]

---

[11] Jai Hamid, *SoftBank and Ark Invest are in early talks to invest up to $20 billion in Tether*, Cryptopolitan https://www.msn.com/en-us/money/other/softbank-and-ark-invest-are-in-early-talks-to-invest-up-to-20-billion-in-tether/ar-AA1NntUT (September 26, 2025).

[12] Tanaya Macheel, *Tether reveals USAT stablecoin, appoints Bo Hines, former White House advisor, to lead U.S. business*, CNBC (Sept. 12, 2025), https://www.cnbc.com/2025/09/12/tether-reveals-new-stablecoin-appoints-bo-hines-to-lead-us-business-.html.

[13] Cantor Fitzgerald, L.P. et al., Amendment No. 20A to Schedule 13D (Oct. 6, 2025), https://www.sec.gov/Archives/edgar/data/1094831/000121390025096566/0001213900-25-096566-index.html.

29. The next day, on October 7, 2025, a public Uniform Commercial Code ("UCC") Financing Statement was filed in New York State showing that Tether was designated as the collateral agent for the Dynasty Trust A (the "Tether UCC Statement"). The Tether UCC Statement covers the following collateral: "All assets of the [the Dynasty Trust A] whether now owned, existing or hereafter arising or acquired, including all proceeds thereof."[14]

30. Evidencing the above-referenced close ties between Tether, Cantor, and then-CEO Lutnick, if the Lutnick family trust defaulted, then Tether, an El Salvadoran entity of opaque and undisclosed ownership,[15] would become the majority owner of Cantor, a U.S. financial institution that has about $20.2 billion[16] in assets under management (in addition to more than $100 billion it holds in custody for Tether[17]).This lien also indicates that Tether holds significant economic influence over Howard Lutnick's adult children, which are the beneficiaries of this trust.

31. In the period leading up to the Rain and Hell Fire Plan including the Mining Assets Diversion, Klippsten had extensive contacts by telephone and via text messages with Tether Chairman and controlling shareholder Devasini. Klippsten preserved or otherwise memorialized the substance of these communications in detailed contemporaneous notes.

32. In these exchanges, Klippsten was informed that then-CEO Lutnick may have functioned as an unregistered lobbyist for Tether in Washington in 2023-2024. In particular, then-CEO Lutnick claimed to have thwarted legislation in Congress that was prejudicial to Tether's business interests. Klippsten was also informed that Cantor's implicit compensation for acting as Tether's advocate in Washington and in the media was what Devasini described as a "bloody

---

[14] UCC Financing Statement, Filing 202510070396361, New York Department of State, Oct. 7, 2025.
[15] David, *Behind Tether's 500 Billion Valuation, the Hidden Wealth Stories of Shareholders*, Binance Square (Sept. 24, 2025), https://www.binance.com/en/square/post/30462661799537 ("[a]s a privately held company registered in the British Virgin Islands, Tether has never proactively disclosed its equity structure").
[16] Cantor Fitzgerald Asset Management, https://www.cantorassetmanagement.com (last visited March 18, 2026).
[17] Steven Stradbrooke, *Tether May Raise Billions as Non-Dollar Stablecoin Appeal Grows*, CoinGeek (Sept. 24, 2025), https://coingeek.com/tether-may-raise-billions-as-non-dollar-stablecoin-appeal-grows/.

12

cheap" $600 million convertible debt investment Cantor made in Tether in April 2024, which, it is believed, has since exploded in value.[18]

33.    According to media accounts, and the information Klippsten was provided, it was around this time, i.e., 2023-2024, that then-CEO Lutnick became an advocate for Tether in the financial and crypto markets and became a confidant of Devasini, who boasted to friends of then-CEO Lutnick's efforts to help Tether in Washington.[19]

34.    After the Rain and Hell Fire Plan's execution, including the Mining Assets Diversion, then-CEO Lutnick and Cantor never inquired with Swan about the circumstances of the dispute or sought to pursue the previously proposed IPO, simply breaking off contact with Swan and Klippsten without explanation.

35.    The extraordinarily close financial relationship between Tether and then-CEO Lutnick and his family, coupled with their mutual involvement and continuing interest in bitcoin mining acquisitions, as well as Cantor's role as the investment banker in a series of related-party transactions by Tether, provide ample basis for Swan's limited inquiries into the knowledge and involvement of Cantor and then-CEO Lutnick in the Mining Assets Diversion from 2040 Energy to Tether, and the Rain and Hellfire Plan more generally. Cantor and then-CEO Lutnick are reasonably expected to have possession, custody, or control of information relevant to the derivative claim which Swan has recently sought permission to bring in 2040 Energy's name against Tether and others.

---

[18] *See, e.g., Bitfinex Net Worth, Revenue, and Market Cap 2025*, Quantumrun Foresight (Oct. 18, 2025), https://www.quantumrun.com/consulting/bitfinex-net-worth/.
[19] Angus Berwick et al., *Howard Lutnick's Other Top Client: Crypto Giant Tether*, Wall St. J. (Nov. 23, 2024), https://www.wsj.com/finance/currencies/howard-lutnick-giancarlo-devasini-tether-cryptocurrency-3d0a961c.

**ADDITIONAL BACKGROUND: TETHER'S LONG HISTORY WITH CANTOR**

I.    **Tether's History and Expansion from Stablecoin Issuer to Multinational Empire**

32.    Tether is the world's largest stablecoin issuer, with over $192.9 billion in assets and an investment portfolio exceeding $20 billion. Devasini, an Italian former plastic surgeon turned electronics trader, established Tether Holdings in the British Virgin Islands along with Phil Potter in 2014. The 2017 Paradise Papers leak exposed overlapping control between Tether and the Bitfinex cryptocurrency exchange.[20]

33.    Tether has a significant regulatory history. In February 2021, Tether paid $18.5 million in fines to the New York State Attorney General's office to resolve claims that Tether and Bitfinex concealed $850 million in lost funds by commingling client and company assets.[21] In October 2021, Tether paid $41 million in fines to the Commodity Futures Trading Commission ("CFTC") to settle claims of "making untrue or misleading statements and omissions of material fact in connection with the U.S. dollar tether token," to wit, Tether's claim that its stablecoin was backed by U.S. dollars during the period from June 1, 2016 to February 25, 2019, when it was not.[22]

34.    Nevertheless, Tether continued to gain market share and has grown into a multinational and multi-faceted operation with significant political influence.[23] As Tether's

---

[20] Int'l Consortium of Investigative Journalists, *Tether Holdings Limited*, ICIJ Offshore Leaks Database, https://offshoreleaks.icij.org/nodes/82024464 (last visited March 18, 2026); "Appleby, an offshore law firm, helped Mr. Potter and Mr. Devasini, the Bitfinex operators, set up Tether in the British Virgin Islands in late 2014." Nathaniel Popper, *Warning Signs About Another Giant Bitcoin Exchange*, N.Y. Times (Nov. 21, 2017), https://www.nytimes.com/2017/11/21/technology/bitcoin-bitfinex-tether.html.

[21] Press Release, N.Y. Att'y Gen., *Attorney General James Ends Virtual Currency Trading Platform Bitfinex's Illegal Activities in New York* (Feb. 23, 2021), https://ag.ny.gov/press-release/2021/attorney-general-james-ends-virtual-currency-trading-platform-bitfinexs-illegal.

[22] Press Release, Commodity Futures Trading Comm'n, *CFTC Orders Tether and Bitfinex to Pay Fines Totaling $42.5 Million*, No. 8450-21 (Oct. 15, 2021) https://www.cftc.gov/PressRoom/PressReleases/8450-21.

[23] Ryan Weeks, Todd Gillespie & Annie Massa, *Tether's Lutnick Ties and Hoard of Gold, Treasuries Win DC Crypto Support*, Bloomberg (Mar. 13, 2026), https://www.bloomberg.com/features/2026-tether-usa-crypto-ambitions/?srnd=homepage-americas.

14

business has expanded, it has operated increasingly as a self-sovereign "network state" or shadow central bank and less as a traditional company, expanding into multiple non-cryptocurrency verticals and increasing its political influence tremendously.[24]

35.    With a rapidly expanding international footprint, Tether has an interest in relying on its significant Bitcoin holdings to act as its reserve currency, outside the control of the national governments it may seek to influence.

36.    To protect its right to secure and spend the Bitcoin as it wishes, Tether has substantial reason to invest in Bitcoin mining—which places its partnership with Swan, and its subsequent diversion of 2040 Energy's mining assets, in the context of a broader strategic imperative that it shared with Cantor and then-CEO Lutnick.

## II.    Tether's Foothold in the U.S. – Cantor and Lutnick

37.    Tether was introduced to Cantor around 2020 or 2021 by the head of a small investment firm in the Bahamas called Marlin Capital, founded by two former Deltec Bank traders named Richard Heathcote ("**Heathcote**") and Lyons. Heathcote and Lyons met Tether's top two executives Devasini and Ardoino in 2018, when Tether was banked by Deltec.[25]

38.    Both Heathcote and Lyons have close ties to Cantor. From November 10, 2010, to May 31, 2011, Heathcote was a trader in London at Cantor's scandal-wracked BGC Brokers LP.[26] Until March 12, 2026, he was Tether's Chief Investment Officer and has been the principal liaison between Cantor and Tether on Bitcoin mining acquisitions and all of Tether's other M&A work. Lyons, Heathcote's former deputy (and since March 12, 2026, Heathcote's successor as Tether's

---

[24] *See, e.g.,* Oliver Bullough, *How Tether Became Money Launderers' dream currency*, The Economist, July 4, 2025.
[25] *See, e.g.*, Ryan Weeks, *Tether's $150 Billion Managed by Unknown Brit in the Bahamas*, Bloomberg (May 13, 2025), https://www.bloomberg.com/news/articles/2025-05-13/tether-s-150-billion-managed-by-unknown-brit-in-the-bahamas-usdt.
[26] Fin. Conduct Auth. (FCA), Register Entry for Mr. Richard John Keith Heathcote (last visited Mar. 23, 2026), https://register.fca.org.uk/s/individual?id=003b000000LVqZYAA1.

15

Chief Investment Officer),[27] corresponded directly with Cantor on Swan's M&A matters in June 2024, and is on the boards of a Cantor-Tether Special Purpose Acquisition Company ("SPAC") and Tether-owned Juventus Football Club SPA.[28]

39.     On June 11, 2024, Klippsten told Lyons in a text message, "I'll take your queue [sic] for when and how to get started with Howard/Cantor potentially bringing some folks for the Series C. We shared the overview deck, managed mining prez, and dataroom with him after yesterday's call."

40.     At the time of Tether's introduction to Cantor, given the above-referenced regulatory issues, Tether was under severe pressure by U.S. regulators to retain a credible asset manager with access to the safe U.S. treasury bonds it was increasingly expected to hold to back customers deposits. Cantor became crucial to Tether because it is one of only 25 primary dealers that are authorized to trade U.S. government securities with the Federal Reserve Bank of New York.[29] This is an exclusive group of financial institutions that the Federal Reserve has specifically approved to participate directly in government bond auctions and trading, giving such firms privileged access to U.S. government debt instruments and the ability to convert those securities into dollars as needed by customers. At times of heavy redemptions, Tether's need to redeem its U.S. government bonds for large amounts of U.S. currency can be severe.

41.     In late 2021 and early 2022, soon after the $41 million settlement by Tether with the CFTC, then-Cantor CEO Lutnick made two quick trips to the Bahamas, including a one-day

---

[27] Matthew Challis, *Tether Appoints Lyons as CIO*, Digital Assets Edge (Mar. 13, 2026), https://www.digitalassetsedge.com/digitalassetsedgenews/peoplemovesarticle.php?article_id=228589.

[28] Letter from Tether Investments S.A. de C.V. to Juventus Football Club S.p.A., Slate of Candidates for the Appointment of Juventus F.C. S.p.A.'s Board of Directors (Oct. 13, 2025), https://www.juventus.com/images/image/private/fl_attachment/dev/lwnghfeuhcf1jis9j3jm.pdf.

[29] Fed. Rsrv. Bank of N.Y., Primary Dealers List (Jan. 31, 2025), https://www.newyorkfed.org/newsevents/news/markets/2025/an250131p.

16

trip from New York to Nassau on December 2, 2021, on his private jet,[30] and another one-day trip on February 16, 2022.[31] These meetings evidence his personal involvement in the Tether relationship.

42.    By late 2021, Cantor managed most of Tether's treasuries.[32]

43.    In April 2022, according to FINRA records, then-CEO Lutnick's son Brandon Lutnick left his position as a junior credit analyst at Oak Hill Advisors for an analyst position at Cantor.[33] He received his securities licensing between August and October 2022.

44.    On information and belief, he then spent a significant period of time in Lugano, Switzerland to learn about cryptocurrency from Ardoino. At a 2025 Tether-sponsored conference held in Lugano, Brandon Lutnick told Ardoino that "Lugano has become a second home to me a little bit because of you," and stated that he had been out to dinner with Ardoino in Lugano "over 100 times." Further, Brandon Lutnick stated that he had known "nothing about the digital world" prior to going to Lugano but then had met Andoino and was able to "learn from his brilliant Tether team." As Brandon Lutnick put it, his "goal was to learn about Tether."[34]

45.    According to Brandon Lutnick, he brought the knowledge he acquired from Tether and Ardoino "back to Cantor, to Wall Street and Cantor became the place really trying to bridge traditional finance with the digital world."[35]

---

[30] ADS-B Exchange, Historical Flight Trace, ICAO Hex a6a2f7 (Dec. 2, 2021, Leg 3), https://globe.adsbexchange.com/?icao=a6a2f7&lat=32.388&lon=-72.290&zoom=4.0&showTrace=2021-12-02&leg=3.

[31] ADS-B Exchange, Historical Flight Trace, ICAO Hex a6a2f7 (Feb. 16, 2022), https://globe.adsbexchange.com/?icao=a6a2f7&lat=28.982&lon=-72.388&zoom=5.0&showTrace=2022-02-16.

[32] Peter Rudegeair & Ben Foldy, *Cantor Fitzgerald Helps Oversee Tether's $39 Billion in Treasury Holdings*, Wall St. J. (Feb. 10, 2023), https://www.wsj.com/finance/currencies/wall-street-firm-oversees-billions-of-dollars-backing-tether-b56c68c1.

[33] FINRA BrokerCheck Report for Brandon G. Lutnick (last visited March 18, 2026), https://files.brokercheck.finra.org/individual/individual_7606498.pdf.

[34] Brandon Lutnick, Remarks at Plan ฿ Forum 2025, Lugano, Switz. (Oct. 24–25, 2025), https://www.youtube.com/watch?v=b6-aH0UBG7A.

[35] *Id.*

46.     Recently, Cantor provided a SPAC for the purpose of acquiring Tether's Twenty One Capital (now XXI) company, a public company with a significant Bitcoin treasury controlled by Tether. The "independent" board members installed at the new company included Zagury and Lyons.[36]

47.     Swan submits that Brandon Lutnick's education in Bitcoin from Tether and the career elevations bestowed on Zagury and Lyons further support its reasonable basis to believe Cantor and then-CEO Lutnick had intimate knowledge of Tether's plans for acquiring Bitcoin through mining and other means and therefore may have known in advance about the destruction of the Tether-Swan joint venture.

48.     Around 2023-2024, the relationship between Devasini and Klippsten had grown increasingly warm, and Devasini began to regale Klippsten regarding his dealings with then-CEO Lutnick. For example, in February 2024, Devasini told Klippsten how he brought then-CEO Lutnick to dinner with Salvadoran president Bukele and they discussed Cantor creating a new securities exchange for the country. Bukele then offered to allow Cantor to draft the law. This dinner probably occurred on February 13, 2024. Flight data shows that then-CEO Lutnick's private jet flew from New York to San Salvador on that date.[37] In addition, Bukele released a photo the following day.[38]

---

[36] *Id.*

[37] ADS-B Exchange, Historical Flight Trace, ICAO Hex a6a2f7, New York to San Salvador (Feb. 13, 2024, Leg 2), https://globe.adsbexchange.com/?icao=a6a2f7&lat=26.394&lon=-86.765&zoom=5.0&showTrace=2024-02-13&leg=2; ADS-B Exchange, Historical Flight Trace, ICAO Hex a6a2f7, San Salvador to New York (Feb. 14, 2024), https://globe.adsbexchange.com/?icao=a6a2f7&lat=26.394&lon=-86.765&zoom=5.0&showTrace=2024-02-14.

[38]     The    Bitcoin    Office    (@bitcoinofficesv),    X    (formerly    Twitter)    (Feb.    14,    2024), https://x.com/bitcoinofficesv/status/1757816402285633649.



The Bitcoin Office @bitcoinofficesv

President Bukele met last night with the CEO of Cantor Fitzgerald.

Howard Lutnick came and verified for himself that there is a Renaissance happening in El Salvador.

12:17 PM · Feb 14, 2024 · 61.1K Views

49. Devasini also confided in Klippsten his political goals and strategies, as well as his frustrations with the disadvantage Tether faced as a foreign company prohibited from making campaign contributions in the U.S. and under stricter foreign-influence lobbying laws.

50. According to Klippsten's notes, Devasini reported: "[Coinbase] and Circle have bought off so much of Congress. Midterms coming already. Tether can't donate, but Coinbase can. The stablecoin bill is very anti-Tether. Lutnick is working full time for Tether." Devasini also told Klippsten about meeting with then-CEO Lutnick in Lugano regarding the congressional stablecoin legislation opposed by Tether: "I spent the last two days with Howard. He came to visit in Lugano. according to Howard, he managed to kill every bill about stablecoins, crypto, etc. There's still some days before Congress comes to a halt. Howard says don't expect anything upsetting."

51. While then-CEO Lutnick was not in government at that time, he was a major Republican campaign contributor and headed a substantial corporate lobbying operation through Cantor that provided him substantial influence.

52.    In written answers to the Senate Committee on Commerce on Jan. 29, 2025, then-CEO Lutnick responded evasively to questions about his undisclosed political work for Tether in this period,[39] with the true nature of that work, and the close ties between then-CEO Lutnick and Tether, reflected in Klippsten's notes of his conversations with Devasini.

### III.    The Asset Diversion

53.    On July 3, 2024, Zagury relayed privately to Swan's then-President, Guilherme Gomes ("Gomes"), a summary of a discussion Zagury had with Lyons, explaining that Lyons apparently believed Swan's Bitcoin mining business was "in a good position" and was "crushing it." Zagury then discussed with Gomes the possibility of forming a new company that would replace Swan as the operator of 2040 Energy.[40]

54.    On July 15, Zagury and Lyons informed Gomes by "back channel" that they were proceeding with the plan.  *(Translated from Portuguese)*

```
[2024-07-15 16:53:19 UTC] <raphael> I'm with Zach
[2024-07-15 16:53:25 UTC] <gui> And?
[2024-07-15 16:53:30 UTC] <gui> Back channel here
[2024-07-15 16:53:31 UTC] <raphael> It's not good
[2024-07-15 16:53:36 UTC] <gui> Holy shit
[2024-07-15 16:53:59 UTC] <gui> What??
[2024-07-15 16:54:17 UTC] <raphael> He wants to sue
[2024-07-15 16:54:25 UTC] <gui> What??
[2024-07-15 16:54:28 UTC] <raphael> Talking with him here
[2024-07-15 16:54:30 UTC] <gui> He needs to stop
[2024-07-15 16:54:36 UTC] <gui> Destruction of value
[2024-07-15 16:54:41 UTC] <gui> Tell him to stop everything
[2024-07-15 16:54:46 UTC] <gui> Let's go to London this week
[2024-07-15 16:55:06 UTC] <raphael> Walking him back
[2024-07-15 16:55:07 UTC] <gui> Sue on what basis??
[2024-07-15 16:55:21 UTC] <gui> Dude, the brand is strong, the team is spectacular
[2024-07-15 16:55:25 UTC] <gui> The culture is unique
```

---

[39] Written Responses of Howard Lutnick, Nominee for Secretary of Commerce, to the Senate Committee on Commerce, Science, and Transportation (Jan. 29, 2025). Mr. Lutnick has also been accused of dissembling on other particulars, including his relationship to the convicted pedophile Jeffrey Epstein.

[40] Amended Complaint ¶ 122, *Electric Solidus, Inc. v. Proton Management Ltd et al.*, No. 2:24-cv-08280 (C.D. Cal. Jan. 27, 2025).

20

[2024-07-15 16:55:35 UTC] <gui> The success is undeniable
[2024-07-15 16:55:47 UTC] <gui> The focus is what needed to be aligned
[2024-07-15 16:55:54 UTC] <gui> And we'll fix it
[2024-07-15 16:56:03 UTC] <gui> It's a fucking process
[2024-07-15 16:56:12 UTC] <gui> The guy was processing it
[2024-07-15 16:57:48 UTC] <gui> Very hard to digest
[2024-07-15 16:57:57 UTC] <raphael> I hung up
[2024-07-15 16:57:57 UTC] <gui> But NO MAL intention

55.     According to internal records maintained by Swan, on July 19, 2024, Zagury covertly established a separate channel on the messaging platform Telegram with Devasini and Lyons. Zagury proceeded to send multiple detailed business proposals to Tether.

56.     According to the same records, on July 22, 2024, Zagury laid out to Tether leadership the various tasks that accompanied his plan. On July 30, 2024, Zagury held a meeting with Devasini, Lyons, and other Tether representatives wherein he pitched to them the concept of two new interlocking entities, "**Proton**" (a reference to Proton Management Ltd.) and "**Elektron**" (a reference to various companies using the name Elektron).

57.     Proton would replace Swan as the manager and operator of 2040 Energy's mining operations while Elektron would then replace 2040 Energy as the entity that would hold the assets and interests of the mining operation—effectively transitioning 2040 Energy's mining operations away from 2040 Energy and Swan and to Proton and Elektron.

58.     Zagury and his co-conspirators' scheme came to pass, just as planned.

59.     On August 8, 2024, Swan mining's operations were ripped out from underneath Swan when Zagury—alongside nearly all of Swan's mining team—resigned and launched a competing Bitcoin mining management company, Proton Management Ltd. Every Swan employee and consultant that Zagury had promised Tether—12 in total—resigned over the course of two days. Tellingly, Tether exhibited no surprise at these sudden and chaotic events, instead wasting

21

no time in replacing Swan with Proton as the manager and operator of 2040 Energy and making clear to Swan that the 2040 Energy deal was dead.

60. In the days leading up to and during the mass resignations of August 8-9, 2024, defendants in the Foreign Proceedings misappropriated 2040 Energy's Confidential and Proprietary Mining Assets — developed by Swan on 2040 Energy's behalf — for use in their competing enterprise. In particular: on July 25, 2024, a Swan worker who was planning to defect to Proton downloaded the source code of 2040 Energy's proprietary mining operations dashboard, known as "BNOC," from 2040 Energy's GitHub repository; during the first week of August, Zagury (still employed as Swan's Chief Investment Officer) exported confidential business and deal data from Swan's internal platform; during the same week, two other Swan workers downloaded more than 47 documents from Swan's Google Drive, including monthly mining performance data, proprietary financial records, contracts with mining sites, earnings reports, and a spreadsheet containing 2040 Energy's proprietary techniques; and on August 8, 2024 — the day of the mass resignations — Zagury downloaded to external hard drives 2040 Energy's intellectual property and trade secrets, including contracts with mining sites and a key deal memorandum.

61. On December 7, 2024, the Tether-Appointed Directors—Devasini and Van der Velde, acting alone—approved and consummated the Related Party Sale by written resolution. The resolution, which only Devasini and Van der Velde signed, transferred approximately 26,048 stored and undeployed ASIC Bitcoin mining machines, together with related infrastructure and other assets, from 2040 Energy to Tether Investments S.A. de C.V. ("TINV")—the majority shareholder of 2040 Energy and an entity in which Devasini is the sole controlling member with a voting interest greater than 50%—for a total consideration of $55,620,489.50. The ASICs were sold for purported secondary wholesale market prices over the objections of Klippsten based on

22

conflicts of interest, inadequate third party valuations, and violations of fiduciary duty by the Tether directors. The sole basis for the sale price was a report by Proton, the entity incorporated five months earlier by Zagury to replace Swan.

62. One of the most significant of Swan's proprietary contributions to 2040 Energy's operations was BNOC, a custom-built mining operations management system whose source code was misappropriated by the defendants in the Foreign Proceeding and that Devasini had earlier stated he wanted to "own" after Swan personnel developed it and while they operated it.

63.    Swan is in possession of voluminous correspondence reflecting that Marlin Capital and Lyons worked closely with Tether and Zagury to execute the Mining Assets Diversion to a series of entities using the name Elektron.

64.    During much of this period, Cantor began running a massive Tether acquisition drive focused on Bitcoin mining assets and politically connected U.S. companies. In May 2025, Ardoino publicly announced that Tether intended to become "the biggest bitcoin miner in the world."[41] Cantor appears to be central to this plan.

## IV.    Cantor-Tether-Rumble

66.    Shortly after the December 2024 Machine Asset Diversion, Cantor acted as the investment banker in a series of related-party transactions by Tether involving the same former Swan employees involved in the diversion of the Bitcoin mining business. These transactions provide further basis for Applicant's request for discovery into Cantor's knowledge of or involvement in the diversion and disposition of the Bitcoin mining assets.

---

[41] Oscar Zarraga Perez, *CEO Paolo Ardoino Said, "Tether Will Be the Biggest Bitcoin Miner in the World"*, Bitcoin Mag. (May 29, 2025), https://www.nasdaq.com/articles/ceo-paolo-ardoino-said-tether-will-be-biggest-bitcoin-miner-world.

67.    On November 10, 2025, Tether-controlled Northern Data AG disclosed to the SEC that it sold its bitcoin-mining subsidiary Peak Mining to Highland Group Mining Inc (BVI), Appalachian Energy LLC (Delaware), and 2750418 Alberta ULC (Canada) as part of Tether's plan for selling Northern Data AG to Rumble.[42] Corporate registry searches reveal that those entities had either Devasini or Devasini and Ardoino as directors (a fact that was not disclosed in the related filings), making it a related party sale of Northern Data AG assets to Tether related companies at an "inexpensive," "disappointing," and "50% compared to precedent transactions" undervalue as noted by an independent report by Edison Group.[43] Such an undervalued related party sale likely harmed Northern Data minority shareholders and establishes a pattern of activity also seen in the alleged Related Party Sale(s) of the Foreign Proceedings. On information and belief, Tether and the former Swan employees working for Elektron-named entities were involved in the planning of this operation. As the related investment bank, Cantor may have information about this transaction relevant to Swan's litigation. Given that Swan's own mining assets were diverted to unknown recipients by Tether and the same former Swan personnel were involved in these transactions, there is a reasonable basis for Swan to seek information regarding whether the Northern Data transactions involved any assets diverted from Swan or 2040 Energy.

68.    According to documents in Swan's possession, in the wake of the asset diversion, former Swan personnel and Tether executives have created at least twelve entities containing the name Elektron in various jurisdictions, from Delaware to BVI. Some Elektron entities were created

---

[42]  https://www.sec.gov/Archives/edgar/data/1830081/000121390025109362/ea026497501ex10-2_rumble.htm.  On August 11, 2025, Northern Data AG had previously announced a term sheet to sell Peak Mining to a previously unknown firm called Elektron Energy LP for up to $235 million, with $175 million upfront and contingent payments of up to $60 million based on performance milestones. Corporate records in the BVI show that Elektron Energy LP is controlled by its general partner Elektron Operations Management Ltd, whose sole director is Devasini, the controlling director of Tether. See Bitcoin Office El Salvador (@bitcoinofficesv), X (formerly Twitter) (Feb. 14, 2024), https://x.com/bitcoinofficesv/status/1757816402285633649.

[43]  *Northern Data Group — Sale of Peak Mining Finalised*, Edison Grp. (Nov. 5, 2025), https://www.edisongroup.com/research/sale-of-peak-mining-finalised/BM-2371/.

and are managed by former Swan personnel, while others were created by Tether personnel, which further indicates a close degree of coordination between Tether and the ex-Swan employee group. Cantor may have information about the formation of these entities relevant to the Swan litigation.

## THE FOREIGN PROCEEDINGS

69.     On July 25, 2025, Conyers, on behalf of Applicant, sent a letter before action ("LBA"), or demand letter, to 2040 Energy providing "Notice of Intended Derivative Proceedings and Breach of Fiduciary Duty (Related Party Sale to Tether Investments Ltd)." In the LBA, Conyers advised that Swan "intends to seek leave from the BVI Court to bring derivative proceedings on behalf of [2040 Energy] pursuant to section 184C of the BVI Business Companies Act, 2004 ('the Act'). Samuel Decl. Ex. 2, LBA ¶ 2. The proposed derivative claim will be brought [in the English Court] against [the Tether-Appointed Directors] for breaches of their fiduciary and/or statutory duties owed to [2040 Energy]." *Id.* The 16-page letter explained the factual and legal bases for the claims. 2040 Energy responded to the letter (via its counsel, Forbes Hare), but the parties have not resolved the claims set forth therein.

70.     The Applicant has very recently filed an application seeking the BVI Court's permission to bring derivative proceedings, on behalf of 2040 Energy, in the English Court in relation to, *inter alia*, breach of fiduciary duty claims against the Tether-Appointed Directors pursuant to sections 120, 121, and/or 122 of the BVI Companies Act based on the Related Party Sale to Tether of the Machine Assets and other harms to 2040 Energy. Samuel Decl. ¶ 7.

71.     In determining whether to grant permission, the BVI Court considers various factors, including whether the proceedings are likely to succeed. *Id.* ¶ 10. The Court will make the determination as to whether to grant permission following written evidentiary submissions by the parties and a hearing. *Id.* ¶ 12. Applicant intends to use the evidence sought through this Application to support its argument that the proposed derivative claims are likely to succeed. *Id.* ¶

13. In addition, following the grant of permission, Applicant intends to initiate the derivative proceedings in the English Court, and the same evidence will be relevant to Applicant's claims in that proceeding. Khatoun Decl. ¶¶ 10–13.

## THE DISCOVERY SOUGHT THROUGH THIS SECTION 1782 APPLICATION

72.    Applicant seeks to obtain evidence from Respondents in this District to support the Foreign Proceedings. Specifically, Applicant seeks discovery from Cantor and then-CEO Lutnick in order to show that the Tether-Appointed Directors breached their duties under sections 120, 121, and/or 122 of the Act by, *inter alia*: i) conspiring with Tether and others to strip 2040 Energy of its Mining Assets for improper purposes; ii) failing to procure an independent valuation of 2040 Energy's assets; iii) approving the Related Party Sale as part of a broader scheme to divert assets from 2040 Energy for the benefit of Tether and its affiliates; iv) acting for an improper purpose in connection with the Related Party Sale. Samuel Decl. ¶¶ 14, 17; *Id.* Ex 2, LBA ¶ 42; Khatoun Decl. ¶¶ 12–13; v) determining whether Cantor or then-CEO Lutnick had communications with Zagury, Proton, Tether, or the Tether-Appointed Directors in connection with the December 2024 Related Party Sale or the subsequent 2025 asset sales; vi) determining whether Cantor served in an advisory capacity or received compensation in connection with the Related Party Sale or the structuring of the transactions by which 2040 Energy's assets were transferred to TINV and then deployed through Proton, Elektron, and Strange-Quark; vii) determining whether Cantor or then-CEO Lutnick received any information derived from or related to 2040 Energy's Confidential and Proprietary Information — including BNOC or the data room materials — in connection with their subsequent advisory and investment banking work for Proton, Elektron, Twenty One Capital, or any related entity; and viii) determining whether Cantor's due diligence in connection with the Twenty One Capital SPAC, the Northern Data transaction, or any other Tether-related engagement involved or revealed information derived from 2040 Energy's misappropriated trade secrets.

26

73.    Cantor served as Tether's primary investment banker and advisor and was deeply involved in Tether's strategic expansion into the Bitcoin mining industry. As set forth above, Cantor received highly confidential and proprietary information about Swan's mining business in connection with discussions regarding a potential Swan IPO or private fundraising round, and both then-CEO Lutnick and Brandon Lutnick met with Tether principals and Swan personnel on a number of occasions to discuss Swan-related matters in and around the time of the key events of the Mining Assets Diversion. Cantor subsequently served as investment banker in a series of post-diversion transactions involving the same former Swan employees involved in the Tether-backed diversion of 2040 Energy's mining business, including acting as placement agent for Tether's investment in Rumble and providing a SPAC for Tether's Twenty One Capital—which installed the principal architects of the asset diversion scheme as directors.

74.    Given these facts, Cantor and Lutnick are likely to possess documents and information relevant to the Foreign Proceedings, including: i) communications with Tether, its principals, and the former Swan employees regarding the Mining Asset Diversion and the events surrounding it; ii) information received from Swan in connection with the potential IPO that may have been shared with or made available to Tether; iii) records of meetings and communications between Cantor Fitzgerald, Tether, and former Swan personnel around the time of the diversion and the subsequent Related Party Sale; and iv) records of post-diversion transactions involving former Swan assets and personnel. Because Cantor and Lutnick are located in New York and are not proposed parties to the Foreign Proceedings, they are not at present subject to the jurisdiction of the BVI Court or the English Court. Samuel Decl. ¶ 19; Khatoun Decl. ¶ 16.

**OTHER PROCEEDINGS**

75.    Some of the events relevant to the Foreign Proceedings are also at issue in *Tether Investments S.A. de C.V. and 2040 Energy Limited v. Electric Solidus*, currently pending before

the English Court. Khatoun Decl. ¶ 14. While the evidence sought in this Application is currently contemplated only for use in the Foreign Proceedings, the same evidence may also become relevant to Swan's defense of Tether's claims in the pending proceeding, or in a potential future counterclaim brought by Swan in that proceeding. *Id.* ¶ 15.

76.    Swan also commenced related proceedings in the U.S. District Court for the Central District of California; however, that proceeding has been stayed indefinitely pending arbitration and is in the process of being withdrawn. Samuel Decl. ¶ 9.

77.    Finally, there is a pending proceeding initiated by Klippsten in the BVI Court in which Klippsten seeks to avail himself of his right as a director under BVI law to inspect and take copies of certain documents, books, and records of 2040 Energy. *Id.*

78.    Respondents are not parties to and have not provided any discovery in these pending proceedings. These pending proceedings also do not impact Applicant's ability to initiate the Foreign Proceedings. *Id.*; Khatoun Decl. ¶ 14.

## JURISDICTION AND VENUE

79.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this application arises under 28 U.S.C. § 1782, a federal statute.

80.    This Court has personal jurisdiction over Respondents because they reside in this judicial district.

81.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because all Respondents reside in this district. Alternatively, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this application occurred here.

28

## LEGAL ARGUMENT

**I.    The Application is Appropriately Considered *Ex Parte***

82.    This Section 1782 Application should be considered and granted on an ex parte basis. There is no "impropriety in the *ex parte* nature of the § 1782 application," *In re Hornbeam Corp.*, 722 F. App'x 7, 10 (2d Cir. 2018), because, should a respondent wish to oppose the application, it may seek relief once discovery is served, including by moving to quash the discovery or requesting entry of a protective order limiting its scope. *Id.* at 11.

**II.    The Application Should Be Granted Because the Statutory Requirements and the Discretionary Factors are Satisfied**

83.    Under 28 U.S.C. § 1782, district courts are permitted to grant applications for discovery for use in foreign proceedings when certain statutory and discretionary factors are satisfied.  The statute has, over the years, been given "increasingly broad applicability." *See Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) (internal citation omitted).

84.    If the petition meets three statutory requirements, courts further consider four discretionary factors established by the Supreme Court in *Intel*, 542 U.S. at 264–65, bearing in mind Section 1782's twin aims of providing "equitable and efficacious discovery procedures in United States courts for the benefit of tribunals and litigants involved in litigation with international aspects . . .  and to encourage[e] foreign countries by example to provide similar means of assistance to [United States] courts." *Lancaster Factoring Co. Ltd. v. Mangone.* 90 F.3d 38, 41 (2d Cir. 1996) (internal quotations and citations omitted).

85.    Here, the Application satisfies the three statutory requirements of Section 1782, and the discretionary factors all weigh in favor of granting the Application.

**III.    The Application Meets the Statutory Requirements of 28 U.S.C. § 1782**

86.    The Application meets the statutory requirements of Section 1782.  The statute requires that: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Brandi-Dohrn*, 673 F.3d at 80. The Application easily meets these requirements.  The Respondents reside in or are found in the Southern District of New York, the discovery is for use in a proceeding in the BVI and a contemplated proceeding in England, and the Application is made by an interested person, namely the claimant in the contemplated proceedings.

*a.    The Respondents "Reside" and are "Found in" this District*

87.    Respondent Howard W. Lutnick "resides in" New York, New York, within this District. Declaration of Arthur D. Middlemiss ("Middlemiss Decl.") ¶¶ 3–5. An entity "resides or is found" in a district if a court can exercise personal jurisdiction over it. *See In re del Valle Ruiz*, 939 F.3d 520, 527–28 (2d Cir. 2019) ("the statutory scope of 'found' extends to the limits of personal jurisdiction consistent with due process."). Respondent Cantor Fitzgerald, L.P. is a limited partnership organized and registered in New York, with its principal place of business at 110 East 59th Street, New York, New York 10022, within this District. Middlemiss Decl. ¶ 2 and Ex. 1. The Application therefore meets Section 1782's first statutory requirement.

*b.    The Requested Discovery is "For Use" in BVI and*
*English Court Proceedings*

88.    Applicant seeks the discovery "for use in" the Foreign Proceedings brought in the BVI Court, by way of an application for permission to bring a derivative claim, and thereafter in the English Court, as a derivative action on behalf of 2040 Energy against the Tether-Appointed

30

Directors for breach of fiduciary duty. Samuel Decl. ¶¶ 12–13; Khatoun Decl. ¶¶ 3, 11. The Foreign Proceedings have now been initiated, and Applicant has retained and instructed counsel to send the letter before action, prepare and file the application for permission to the BVI Court, and draft a statement of claim to be filed against the Tether-Appointed Directors in England if permission is granted to do so. Khatoun Decl. ¶¶ 6–10. This evidence meets the "for use" requirement of Section 1782 because it is "something that will be employed with some advantage or serve some use in the proceeding." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017).

### c.   Applicant is an "Interested Person" in the Foreign Proceedings

90.     Swan is an "interested person" for purposes of Section 1782 because it is the Applicant in the BVI Court and will bring the derivative claim on behalf of 2040 Energy in the English Court, if permission is granted. See *Intel*, 542 U.S. at 256 (holding "litigants are included among, and may be the most common example of, the 'interested person [s]' who may invoke § 1782") (alteration in original). The third statutory requirement is therefore satisfied.

## IV.     The *Intel* Discretionary Factors Weigh in Favor of Granting the Application

91.     The Supreme Court in *Intel* articulated four factors to consider in exercising discretion under Section 1782: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign [tribunal] to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies"; and (4) whether the request is "unduly intrusive or burdensome." 542 U.S. at 264–65. All weigh in favor of granting the Application.

31

### A.    *First Intel Factor: The Discovery is Sought from Non-Participants in the Foreign Proceedings who are Beyond the Reach of the BVI and English Courts*

92.    First, courts consider whether the person from whom discovery is sought is a participant in the foreign proceeding, in which case, "the need for § 1782(a) aid generally is not as apparent." *Intel*, 542 U.S. at 264. Whereas a foreign tribunal has jurisdiction over those appearing before it and can itself order them to produce evidence, non-parties "may be outside the foreign tribunal's jurisdictional reach," and "their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Id*.

93.    Applicant does not expect Cantor or Lutnick to be parties to the Foreign Proceedings. As a New York-based entity and individual, Respondents are outside the jurisdictional reach of the BVI Court and the English Court, necessitating Section 1782 aid from this Court. Samuel Decl. ¶ 19; Khatoun Decl. ¶ 16. Because Respondents are not expected to be parties to the Foreign Proceedings, this factor weighs in favor of granting the Application.

### B.    *Second Intel Factor:  There is no Evidence that the BVI or English Courts Would Reject Discovery Obtained Through the Application*

94.    Second, the Court may consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264.

95.    Each of the Foreign Proceedings is an appropriate subject of U.S. judicial assistance. This factor is satisfied so long as there is no "authoritative proof" that the foreign tribunal would reject the evidence obtained through Section 1782. *See Euromepa S.A. v. R. Esmerian, Inc.,* 51 F.3d 1095, 1100 (2d Cir. 1995). Here, there is no authoritative proof, or in fact any proof, that the BVI or English Courts would be hostile to U.S. judicial assistance. To the contrary, U.S. courts have found that BVI and English courts are receptive to U.S. federal court assistance and they have granted Section 1782 applications in aid of such court proceedings. *See*

32

*In re Hornbeam Corp.*, 722 F. App'x at 9 (affirming authorization of discovery for use in anticipated BVI proceedings); *In re Application of Bracha Found.*, 663 F. App'x 755 (11th Cir. 2016) (same); *In re Att'y Gen. of Brit. Virgin Islands*, No. 1:21-mc-00768-JGK, 2021 WL 5361073, at *1 (S.D.N.Y. Oct. 29, 2021) ("[T]he [Eastern Caribbean Supreme Court at the BVI] is a foreign tribunal receptive to U.S. federal court assistance."); *In re BM Brazil 1 Fundo de Investimento em Participacoes Multistrategia,* No. 23 MISC. 208 (JGLC) (GS), 2024 WL 555780, at *11 (S.D.N.Y. Jan. 18, 2024), *report and recommendation adopted ,* No. 23MC208JGLCGS, 2024 WL 554302 (S.D.N.Y. Feb. 12, 2024) ("Courts in this District applying the second Intel factor routinely find that 'courts in the United Kingdom ... are [ ] receptive to Section 1782 discovery.'"). Finally, Applicant's BVI and English counsel have declared that there is no reason to believe that the BVI or English Courts would be unreceptive to evidence obtained through this Application. Samuel Decl. ¶ 20; Khatoun Decl. ¶ 17.

96.     Therefore, the second discretionary factor weighs in favor of granting the Application.

### C.     *Third Intel Factor: **The Application does not Circumvent BVI or English Evidentiary Restrictions***

97.     Third, *Intel* provides that a district court may consider whether the Section 1782 request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." 542 U.S. at 265. The Intel Court expressly rejected the notion that Section 1782 requires that the evidence sought must be discoverable in the foreign proceeding itself, and the Second Circuit has added that the specific documents or testimony discovered need not be admissible abroad.  See *Intel*, 542 U.S. at 260–61; *Brandi-Dohrn*, 673 F.3d at 82.  Nor is there any requirement that an applicant must exhaust his remedies in the foreign court first.  *See In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997) ("[A] 'quasi-exhaustion

requirement' finds no support in the plain language of the statute and runs counter to its express purposes.").

98.    This Application does not circumvent any prohibitions on proof-gathering. It seeks non-privileged information about Respondents' communications and transactions with Tether, its principals, and former Swan employees. There is no policy in BVI or English law that would prohibit use of this type of record. To the contrary, this is the type of information that would ordinarily be used to support a commercial claim like Applicant's. Samuel Decl. ¶ 21; Khatoun Decl. ¶ 18.

### D.    *Fourth Intel Factor: The Requests are Narrowly Tailored to Seek Evidence that Is Highly Relevant*

99.    Fourth, courts consider whether the discovery is unduly intrusive or burdensome. *Intel*, 542 U.S. at 264–65. For this, the familiar proportionality standard under Fed. R. Civ. P. 26 applies. See *Mees*, 793 F.3d at 302 ("[A] district court evaluating a § 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure."). Under that standard, the discovery sought here is neither unduly intrusive nor burdensome.

100.    The proposed discovery, including the document requests attached to the Middlemiss Decl. as Exhibit 2, seeks records relating to Respondents' communications and transactions with Tether, its principals, and Swan and former Swan employees regarding the Mining Assets Diversion, the Related Party Sale, and related events. The requests are narrow, the relevant records are likely electronic and easily searchable, and the time period is limited.

101.    Thus, the discretionary *Intel* factors articulated by the Supreme Court all weigh in favor of granting the Application.

34

**V.    Section 1782 Discovery Against Respondent Lutnick is Proper and Should Be Permitted**

102.    Though then-CEO Lutnick was a senior executive of Cantor during the relevant time period, he is a proper target of discovery, including deposition discovery. The "Apex Doctrine" provides some protection to senior executives, but a senior executive is properly deposed where, as here, he possesses "unique evidence, personal knowledge of the claims at issue, and other witnesses are incapable of providing testimony about the conduct alleged." *Shiber v. Centerview Partners LLC*, No. 21-CV-3649 (ER), 2023 WL 3071554, at *2–3 (S.D.N.Y. Apr. 25, 2023) (internal quotation and citations omitted). In these circumstances, the executive may be excused from giving testimony only in compelling circumstances not present here. *See Chevron Corp. v. Donziger*, No. 11-CV-0691 (LAK)(JCF), 2013 WL 1896932, at *1 (S.D.N.Y. May 7, 2013). *See also Consol. Rail Corp. v. Primary Indus. Corp.,* 92 Civ. 4927 (PNL), 1993 WL 364471, at *1 (S.D.N.Y. Sept. 10, 1993) ("highly-placed executives are not immune from discovery"); *Gen. Star Indem. Co. v. Platinum Indem. Ltd.,* 210 F.R.D. 80, 83 (S.D.N.Y. 2002) ("high ranking corporate executives are not automatically given special treatment which excuses them from being deposed.") (citation omitted).

103.    In determining whether to allow the deposition of a current or former corporate executive, courts consider the likelihood that the individual possesses relevant knowledge, whether another source could provide identical information, the possibility of harassment, and the potential disruption of business. *Scott v. Chipotle Mexican Grill, Inc*., 306 F.R.D. 120, 122–23 (S.D.N.Y. 2015) (citations omitted); *Harapeti v. CBS Television Stations Inc*., No. 21 MISC. 680 (PAE), 2021 WL 3932424, at *2 (S.D.N.Y. Sept. 2, 2021).

104.    Courts in this district frequently allow depositions of Apex witnesses where, as here, the witness is alleged to have been a participant in the conduct at issue or where their

experience has likely given them personal, relevant knowledge, even if that knowledge is not necessarily unique. *See Oakley v. MSG Networks, Inc.*, No. 17-CV-6903 (RJS), 2024 WL 4859024, at *3 (S.D.N.Y. Nov. 21, 2024); *Chevron*, 2013 WL 1896932, at *1; *Felder v. Warner Bros. Discovery, Inc.,* No. 23-CV-08487 (AT)(GS), 2025 WL 1718098, at *20 (S.D.N.Y. June 20, 2025); *Ayrton Cap. LLC v. Bitdeer Techs. Grp.*, No. 24-CV-5160 (LJL), 2025 WL 1745680, at *2 (S.D.N.Y. June 24, 2025); *Scott v. Chipotle Mexican Grill, Inc.,* 306 F.R.D. at 123.

105.    As described above, Respondent Lutnick was personally involved with Swan, Tether, and the Tether-appointed directors and was uniquely positioned to obtain – and did obtain – relevant information regarding Swan's mining business and the diversion of Swan's mining assets. Another Cantor employee is unlikely to have this information.

106.    Lutnick is also not shielded from discovery because he is currently serving as the Secretary of Commerce, since the discovery relates to his work as then-CEO of Cantor and not to his current role. Therefore, Applicant should be permitted to take discovery of Lutnick, to include his deposition.

36

**CONCLUSION**

For the foregoing reasons, Applicant respectfully requests that the Court (1) grant the Application; (2) enter the Proposed Order filed herewith; (3) authorize Applicant to serve document production subpoenas on Cantor Fitzgerald and Howard Lutnick, in a substantially similar form to the document requests at Middlemiss Decl. Ex. 2, as well as serve a deposition subpoena seeking testimony from Howard Lutnick; and (4) grant any and all other relief to Applicant deemed just and proper.

Dated: March 23, 2026

/s/    Arthur D. Middlemiss
Arthur D. Middlemiss (NY Bar No. 2683209)
arthur.middlemiss@lbkmlaw.com
Chiara Spector-Naranjo (NY Bar No. 4463790)
chiara.spector-naranjo@lbkmlaw.com
LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
10 Grand Central
155 East 44th Street, 25th Floor
New York, New York 10017
(212) 826-7001

LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
1050 K Street NW, Suite 400
Washington, DC 20001
(202) 833-8900

*Counsel for Applicant Electric Solidus, Inc. d/b/a Swan Bitcoin*

37