**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
  --------------------------------------------------------------x
                                                        :
                                                        :
                                                        :
                                                        :
                                                        :
IN RE EX PARTE APPLICATION OF ELECTRIC                  :
SOLIDUS INC. D/B/A/ SWAN BITCOIN FOR AN                 :   Case No. 1:26-mc-00124-LJL
ORDER TO TAKE DISCOVERY PURSUANT TO 28                  :
U.S.C. § 1782                                           :   Hon. Lewis J. Liman
                                                        :
                                                        :
                                                        :
                                                        :
                                                        :
  --------------------------------------------------------------x
```

<u>**RESPONDENT CANTOR FITZGERALD, L.P.'S**</u>
<u>**MEMORANDUM OF LAW IN OPPOSITION TO EX PARTE APPLICATION**</u>
<u>**FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782**</u>

David A. Paul, Assistant General Counsel
(DP7629)
CANTOR FITZGERALD SECURITIES
110 E. 59th Street, 7th Floor
New York, New York 10022
(212) 610-2298
dpaul@cantor.com
*Attorney for Respondent Cantor Fitzgerald,*
*L.P.*

April 2, 2026

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT & BACKGROUND ................................................... 1

    I.    Swan's Failed Litigation Claims Against Tether ..................................... 1

    II.    Swan's Current Petition ...................................................................... 4

ARGUMENT ........................................................................................................ 6

    I.    The Application Fails to Meet the Statutory Requirements of 28 U.S.C. § 1782 Because the Requested Material Is Not "For Use" in a Foreign Proceeding. .................. 6

    II.    The Court Should Exercise Its Wide Discretion to Deny Discovery Under the *Intel* Factors. ................................................................................... 10

        A.    The Discovery Sought Is Obtainable in the Foreign Proceedings. .......... 11

        B.    The Foreign Tribunals Are Likely to be Unreceptive to U.S. Federal Court Assistance Because Swan's Application to File Suit Has Not Been Granted. ..................................................................................... 12

        C.    Petitioner Seeks Discovery from Cantor through this Petition in Order to Circumvent the More Limited Discovery Rules of the UK and BVI ...... 13

        D.    The Petition Seeks Unduly Intrusive and Burdensome Discovery That Is Largely Irrelevant and Disproportionate to the Needs of the Foreign Proceedings. ................................................................................ 15

    III.    The Application Must Be Denied Because It Is Being Brought to Harass Cantor and Its Former CEO. ......................................................................... 17

CONCLUSION .................................................................................................... 20

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accent Delight Int'l Ltd.*,
  869 F.3d 121 (2d Cir. 2017)...................................................................................7

*In re Atvos Agroindustrial Investimentos S.A.*,
  481 F. Supp. 3d 166 (S.D.N.Y. 2020)...................................................................11

*In re BonSens.org*,
  95 F.4th 75 (2d Cir. 2024) ..........................................................................6, 8, 10

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
  673 F.3d 76 (2d Cir. 2012)...................................................................................17

*In re Diligence Glob. Bus. Intel. S.A.*,
  No. 21-MC-401 (JPO), 2021 WL 2156278 (S.D.N.Y. May 27, 2021) ..................17

*Electric Solidus, Inc. v. Proton Management Ltd et al.*,
  No. 2:24-cv-08280 (C.D. Cal.) .................................................................................1

*In re Escallón*,
  323 F. Supp. 3d 552 (S.D.N.Y. 2018)...................................................................13

*In re Harbour Victoria Inv. Holdings Ltd. Section 1782 Petitions*,
  No. 15-MC-127, 2015 WL 4040420 (S.D.N.Y. June 29, 2015)......................13, 15

*IJK Palm LLC v. Anholt Services USA, Inc.*,
  33 F.4th 669 (2d Cir. 2022) .......................................................................6, 7, 8, 9

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004).......................................................................... *passim*

*Inv. Vehicles v. KPMG, L.L.P.*,
  798 F.3d 113 (2d Cir. 2015)....................................................................................6

*In re IPC Do Nordeste, LTDA*,
  No. 12–50624, 2012 WL 4448886 (E.D. Mich. Sept. 25, 2012)............................11

*Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*,
  895 F.3d 238 (2d Cir. 2018)..................................................................................13

*Lederman v. New York City Dep't of Parks & Recreation*,
  731 F.3d 199 (2d Cir. 2013)..................................................................................19

*Mangouras v. Squire Patton Boggs*,
   980 F.3d 88 (2d Cir. 2020)................................................................................................10

*Mees v. Buiter*,
   793 F.3d 291 (2d Cir. 2015).................................................................................11, 12, 17

*Pereira v. Nucor Corp.*,
   No. CV 3:23-MC-00024-FDW-SCR, 2023 WL 4143229 (W.D.N.C. June 22,
   2023), *dismissed*, No. 23-1775, 2024 WL 3548462 (4th Cir. June 24, 2024).........................11

*In re Sargeant*,
   278 F. Supp. 3d 814 (S.D.N.Y. 2017)................................................................................12

**Statutes**

28 U.S.C. § 1782.............................................................................................................. *passim*

BVI Business Companies Act, 2004..........................................................................................8

**Other Authorities**

*British Virgin Islands*, CANDEY (July 2025),
   https://www.candey.com/derivativeclaimsinthebritishvirginislands .........................................9

U.K. Civil Rule 31.16 .........................................................................................................14

U.K. Civil Rule 31.17 .........................................................................................................14

Eastern Caribbean Supreme Court Procedural Rule Rule 28.4 ....................................................13

(Sept. 10, 2025), https://finance.yahoo.com/news/tether-eyes-victory-uk-high-
   192037772.html .............................................................................................................3

William Foxley, *Tether eyes victory in UK High Court over Swan mining dispute:
   Law360*.........................................................................................................................3

Respondent Cantor Fitzgerald, L.P. ("Cantor," or "Respondent") by and through its undersigned counsel[1], respectfully submits this Memorandum of Law in Opposition to the Application (the "Application" or "Petition") filed by Applicant Electric Solidus Inc. d/b/a Swan Bitcoin ("Swan", "Applicant," or "Petitioner") pursuant to 28 U.S.C. § 1782 ("Section 1782") for an Order authorizing it to obtain discovery from Respondent.

## PRELIMINARY STATEMENT & BACKGROUND

The Petition, and the pending request for leave to pursue potential "Foreign Proceedings" referenced in Swan's moving papers (*see* ECF No. 2 (hereinafter, "Petitioner's Br.") are apparently the latest chapters in a legal vendetta that Swan and its CEO, Cory Klippsten ("Klippsten") have pursued since 2024 against its former joint venturer, Tether Investments Ltd. ("Tether"), Tether's business partners, and former Swan personnel. The extensive record surrounding Swan's actions over the past two years makes clear that the Petition itself is little more than a fishing expedition designed to harass Cantor and its former CEO, due to their prior work with Tether. Furthermore, Swan's Application glosses over the fact that the "Foreign Proceeding" for which this Petition seeks discovery is a derivative claim that Swan has not – and, likely, will not – received permission from any tribunal to bring. This Court should deny the Petition.

## I.    Swan's Failed Litigation Claims Against Tether

Swan neglects to mention a key fact in its Application: That the two pending proceedings discussed in its papers (*see* Petitioner's Br., ¶¶ 75-76)—the first in the Central District of California,[2] and the second before the High Court of Justice of England and Wales[3]—concern an attempt by Swan to litigate the *very same* grievances detailed in the Petition, regarding the so-

---

[1] The undersigned does not represent Howard Lutnick, Cantor's former CEO and the current U.S. Secretary of Commerce.

[2] *See Electric Solidus, Inc. v. Proton Management Ltd et al.*, No. 2:24-cv-08280 (C.D. Cal.).

[3] *See Tether Investments Ltd. and 2040 Energy Ltd. v. Electric Solidus, Inc. t/a Swan Bitcoin* [filed January 14, 2025] EWHC (Comm), Claim No. CL-2025-000016.

called "Rain and Hell Fire Plan." Publicly available filing and reporting indicate that both proceedings have gone poorly for Swan due to the refutation of the central premise of Swan's case – that Swan had legal ownership of what it asserts to have been its own "mining operations" (*see, e.g.*, Petitioner's Br., ¶ 59) that were purportedly lost due to the actions of Tether and former Swan personnel. Swan now seeks to rehash these same claims in the form of a derivative suit – which Swan has not yet been granted permission to file – on behalf of 2040 Energy, the joint venture company in which Tether holds nearly 80% of the equity and Swan holds 20%. (*See* Paul Aff., Ex. 1 (hereinafter, "UK Particulars of Claim"), ¶¶ 3, 11.)

Swan initiated its first litigation regarding these events in September 2024, when it filed a complaint in the Central District of California (the "California Proceeding") against Proton Management Ltd. ("Proton") and several ex-Swan consultants who had left the company in August 2024 to form Proton. (*See* Paul Aff., Ex. 1, ¶¶ 1-2.) The crux of Swan's case against the defendants in the California Proceeding (hereinafter, the "Proton Defendants") is the exact same as in the potential derivative suit for which it purportedly now seeks discovery – that Swan's Bitcoin mining business was allegedly stolen by a group of individuals, acting in concert, through a so-called "rain and hell fire" plan. (*Compare id.* ("Over a period of several weeks in July and August, Defendants and other agents hatched and executed a "rain and hellfire" plan to steal Swan's billion-dollar Bitcoin mining business."), *with* Petitioner's Br., ¶¶ 14 ("As noted above, Zagury dubbed this a "rain and hellfire" scheme to steal Swan's personnel who were involved in Bitcoin mining for 2040 Energy, download thousands of confidential documents from Swan's servers, and cut Swan out of a lucrative partnership with Tether."), 59 ("On August 8, 2024, Swan mining's operations were ripped out from underneath Swan when Zagury—alongside nearly all of Swan's

2

mining team—resigned and launched a competing Bitcoin mining management company, Proton Management Ltd.").

On January 13, 2025, Tether and 2040 Energy (collectively, the "UK Claimants") brought suit against Swan in the High Court of Justice of England and Wales, in large part to enforce the shareholder agreement relating to the 2040 Energy joint venture (the "Shareholder Agreement") – to which both Tether's subsidiary, Zettahash, Inc. ("Zettahash") (which held Tether's 80% stake in 2040 Energy) and Swan were parties – which provided for English courts' exclusive jurisdiction of any disputes arising out of the Shareholder Agreement. (*See* UK Particulars of Claim, ¶¶ 14, 15.11.) The UK Claimants asserted that the California Proceeding was an attempt to circumvent the forum selection clause of the Shareholder Agreement, because "[a]t its core, Swan uses the California Proceedings to assert ownership over . . . [b]usiness [a]ssets which are owned by 2040 Energy" and whose ownership rights were required "to be determined before the English Courts," because the dispute arose from interpretation of the Shareholder Agreement. (*Id.*, ¶ 78.)

Public reporting of this litigation from September 2025 reveal that eventually, Swan "conceded that it did not own the intellectual assets of the joint venture vehicle."[4] Consequently, Tether accused Swan of "mislead[ing] the California court by pretending that it has a business that it doesn't have."[5] Swan's counsel disclosed that "[a]s part of the concessions, Swan . . . drop[ped] its California-based lawsuit."[6] At the time, the California Proceeding had been stayed pending the resolution of certain Proton Defendants' appeal to the Ninth Circuit of the district court's denial of their motion to compel arbitration, but a November 12, 2025 filing indicates that the parties stipulated to dismiss this appeal. (*See* Paul Aff., Ex. 1.)

---

[4] William Foxley, *Tether eyes victory in UK High Court over Swan mining dispute: Law360*, YAHOO!FINANCE (Sept. 10, 2025), https://finance.yahoo.com/news/tether-eyes-victory-uk-high-192037772.html. Ex. 9.
[5] *Id.*
[6] *Id.*

## II.     Swan's Current Petition

As Swan concedes in passing, it has not obtained permission to bring the derivative case on behalf of 2040 Energy, Inc. for which it seeks the discovery sought in this Petition; Swan requires the High Court of Justice in the BVI to grant its application before it can initiate a derivative action before the UK court. (*See* Petitioner's Br., ¶¶ 69-71.) This issue is critical: Swan has no legal right to bring the claims that purportedly form the basis of the Petition.

In the Petition, Swan rehashes as the basis for a potential derivative suit the same allegations asserted in the failed California Proceeding that in mid-2024, it was "the subject of an elaborate fraud" involving Tether and its own employees, which resulted in the poaching of "valuable Bitcoin mining operations." (*See* Petitioner's Br. at 2.) Swan claims that Tether-Appointed Directors Giancarlo Devasini and Jean-Louis Van der Velde, together with Swan's former Chief Investment Officer Raphael Zagury, conspired to divert mining assets from 2040 Energy, a BVI-incorporated joint venture, to Tether and its affiliates through the so-called "Rain and Hell Fire Plan." (*Id.* ¶ 6.) Swan (again) alleges that on August 8, 2024, thirteen of Swan's employees "resigned within hours," allegedly followed by "the unauthorized download of thousands of Confidential and Proprietary Mining Assets" from Swan's systems. (*Id.* ¶ 9.) Swan further alleges (again) that on December 7, 2024, the Tether-Appointed Directors approved a "Related Party Sale" of approximately 26,048 ASIC Bitcoin mining machines from 2040 Energy to Tether for approximately $55.6 million, which Swan contends was roughly 4.5 times below their actual value. (*Id.* ¶ 61.)

The allegations about Cantor that relate to the factual basis of the potential derivative claim are noticeably thin: Swan alleges that Cantor had a business relationship with Tether and that Cantor received "highly confidential and proprietary information about Swan's mining business" in connection with a discussion between Cantor and Swan about a potential Swan IPO. (*Id.* ¶ 73.)

4

That's it. On these tenuous grounds, Swan seeks sweeping discovery from Cantor, including document requests encompassing "all communications," "all documents," and "all records" between Cantor and numerous entities spanning more than three years. (*See* ECF No. 5-2 at 7 ("Document Requests").)

Critically, however, Swan has no legal right to file a derivative action. Rather, Swan has merely "recently filed an application seeking the BVI Court's permission to bring derivative proceedings" in England. (Petitioner's Br., ¶ 70.)  That permission has not been granted, and it is unlikely to be granted due to the stringent requirements governing derivative lawsuits under BVI law that Swan is unlikely to meet (as explained more fully below).  Thus, Swan seeks to use this Court as a vehicle to prematurely obtain broad discovery for a foreign proceeding that is unlikely to ever transpire, which would paradoxically result in Cantor – a non-party – being the *only* entity to produce discovery in connection with a case that never sees the light of day.

The Court should exercise its broad discretion to deny the Application for three reasons.

*First*, Swan has failed to meet the statutory requirements of Section 1782 because the Foreign Proceedings for which discovery is sought are not within reasonable contemplation. Swan's ability to file the derivative action depends on an intervening favorable decision from the BVI Court, and Swan has failed to show that such permission is likely to be granted.  Furthermore, Swan's recent litigation history, in which it sought to assert claims related to the same underlying dispute on its own behalf (rather than on behalf of 2040 Energy) indicates that Swan's application is likely to be denied due to the improper purpose for which it seeks to bring the derivative action.

*Second*, even if Section 1782's statutory requirements were satisfied, all four discretionary factors articulated by the Supreme Court in *Intel* weigh in favor of denying the Application.  *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).  The discovery sought is

5

obtainable from parties to the foreign proceedings; the foreign tribunals are unlikely to be receptive to the overbroad discovery sought; the Application is a transparent attempt to circumvent the restrictive disclosure regimes of the BVI and England; and the document requests are unduly intrusive and burdensome.

*Third*, this Court's discretionary denial of the Application is further warranted because Klippsten's near-daily derogatory public statements regarding Cantor and Mr. Lutnick confirm that the Petition has been filed to harass Cantor and Mr. Lutnick, rather than to obtain information genuinely needed for the Foreign Proceedings.  This Court should not validate the improper purpose for which Swan brings this Petition.

For these reasons, Cantor respectfully requests that the Court deny Swan's Petition.

**ARGUMENT**

### I.    The Application Fails to Meet the Statutory Requirements of 28 U.S.C. § 1782 Because the Requested Material Is Not "For Use" in a Foreign Proceeding.

A Section 1782 petition must meet three statutory requirements: "(1) the person or entity resides or is found in the district where the application is made; (2) the requested material is for use in a foreign proceeding; and (3) the application is made by a foreign or international tribunal or any interested person." *IJK Palm LLC v. Anholt Services USA, Inc.*, 33 F.4th 669 (2d Cir. 2022) (internal quotations omitted). Under the second requirement, the proceeding in which the discovery would be used "need not be 'pending,' or 'imminent,' but must still be 'within reasonable contemplation.'" *In re BonSens.org*, 95 F.4th 75, 80 (2d Cir. 2024) (quoting *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 100 (2d Cir. 2020)); *see also Intel*, 542 U.S. at 259. This requires a petitioner to show "reliable indications of the likelihood that proceedings will be instituted within a reasonable time." *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 123 (2d Cir. 2015) (citation omitted). "At minimum, a § 1782 applicant must present

6

to the district court some concrete basis from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye." *Id.*

Although Petitioner cites *In re Accent Delight Int'l Ltd.*, 869 F.3d 121 (2d Cir. 2017) to support its claim the Application "meets the 'for use' requirement of Section 1782" (*see* Petitioner's Br., ¶ 88), and cites a number of other cases in arguing that "BVI and English courts . . . have granted Section 1782 applications" (*see id.*, ¶ 95), Swan conspicuously declines to identify for this Court the binding precedent most applicable to the present procedural posture – in which the BVI Court must grant Swan's pending application before Swan even has legal authorization to initiate the derivative claims in the UK for which it purportedly needs discovery from Cantor. The Second Circuit has held that when "a movant's ability to initiate a proceeding depends on some intervening event or decision," the court can only conclude that the proceeding is reasonably contemplated if the applicant "provide[s] an objective basis on which to conclude that the event will occur or the requisite decision will be favorable." *IJK Palm LLC*, 33 F.4th at 680. A failure to do so will result in denial of the petition. *Id.* at 680–81.

The Second Circuit's decision in *IJK Palm* is directly on point. There, the petitioner sought to bring a "double-derivative suit" in the Cayman Islands related to its "indirect investment" in an oil company. *Id.* at 676, 679. The Second Circuit noted, however, that the petitioner "would need to seek leave of the Cayman court to proceed," and that its "chances of success in that endeavor [were] uncertain at best." *Id.* at 680. Since there were "significant procedural hurdles" that petitioner would have to clear before bringing its suit, the Court concluded petitioner did "not provide[] an objective basis on which to conclude that it [could] bring its double-derivative suit," and thus had "not carried its burden to show that the proposed suit [was] 'within reasonable contemplation.'" *Id.*

Similarly, in *In re BonSens.org*, the Second Circuit upheld the denial of a Section 1782 application where the petitioner filed an expert declaration opining that the requested discovery was "directly relevant" to a pending appeal in France. 95 F.4th at 81. The French case had been dismissed by the Administrative Court of Paris for "lack of jurisdiction" and its appeal to the highest Administrative Court in France was currently pending. *Id.* at 78-79. The court reasoned that a "battle-by-affidavit of international legal experts" was "beyond the scope of our review in the § 1782 context," and found that the petitioner "provide[d] no more than speculation" and "no objective basis" to conclude that the appellate court's decision would be favorable. *Id.* at 81. The Second Circuit concluded that the petitioner had "not carried its burden to show that a merits proceeding is within reasonable contemplation." *Id*. (internal quotation marks omitted).

By contrast, none of the cases Swan cites in its brief involve an application to seek discovery in aid of a foreign proceeding that cannot be commenced until the petitioner receives a favorable ruling from a foreign tribunal. Consequently, these cases are inapposite.

Swan's Application suffers from the same fatal deficiency as the petitions in *IJK Palm* and *In Re BonSens.org*. As Swan acknowledges, it has not filed a derivative action; it has merely applied to the BVI Court for *permission* to bring one. (*See* ECF No. 3, ¶ 8.) Swan itself acknowledges that the BVI Court "considers various factors, including whether the proceedings are likely to succeed" in determining "whether to grant permission." (Petitioner's Br., ¶ 71.) Furthermore, secondary sources published by BVI practitioners indicate that under s.184C of the BVI Business Companies Act, 2004 – the law that establishes the conditions under which a shareholder may bring a derivative action – an applicant can only receive leave to bring a derivative suit if it proves to the BVI High Court that "[t]he applicant is acting in good faith and it appears to

be in the interests of the company that the claim be brought."[7]   Under the BVI High Court's "cautious and pragmatic approach," "[a] derivative claim will generally not be permitted if it is being brought for an ulterior motive or if the applicant is seeking to advance a personal grievance under the guise of acting on the company's behalf."[8]

Here, the record strongly suggests that Swan is unlikely to convince the BVI High Court that it is doing anything other than seeking to litigate "a personal grievance under the guise of acting on [2040 Energy's] behalf," which will result in the denial of its application for leave to pursue the derivative claim.  That is because, as explained previously, the purported "derivative" claims that Swan hopes to assert again before the UK court relate to the same alleged theft of its business through the "rain and hellfire plan" previously asserted in the California Proceedings on behalf of Swan *itself* rather than 2040 Energy.  This resulted in 2040 Energy and Tether being forced to initiate the English High Court proceeding to establish that 2040 Energy, and not Swan, owns the Bitcoin mining assets at issue.  Swan previously (and unsuccessfully) attempted to establish through the California and English litigation that 2040 Energy *did not* own the assets that were purportedly transferred to Tether, Proton, and their affiliates in the "rain and hellfire plan." But now, Swan seeks to bring a derivative suit *on behalf* of 2040 Energy in which it argues that the Tether-affiliated directors unjustly deprived 2040 Energy of the full value of these assets. Consequently, the BVI court is likely to deduce the obvious: Swan is attempting to pursue its *own* interests under the guise of a derivative suit on behalf of 2040 Energy.

Swan's conclusory assertion that the BVI Court is "likely to grant leave" (*see* ECF No. 3, ¶ 17) is precisely the kind of speculation the Second Circuit rejected in both *IJK Palm* and

---

[7] David Harby, *Derivative Claims in the British Virgin Islands*, CANDEY (July 2025), https://www.candey.com/derivativeclaimsinthebritishvirginislands. Ex. 10.
[8] *Id.*

*BonSens.org*. Swan has failed to provide an objective basis for concluding that it will be permitted to file the derivative proceeding in England. And given the complications posed by its past litigation history, it appears Swan is highly unlikely to be able to do so. Indeed, despite admitting that it filed its application for leave to bring a derivative action before the BVI Court on March 23, 2026 (*see id.*, ¶ 8), Swan has failed to attach this application as an exhibit to any of its declarations in support of the Petition. As a result, it has deprived the Court (and Cantor) of the ability to fully assess the factors that are relevant to determining whether this Petition should be granted. By failing to provide this information, Swan has failed to meet its burden of establishing for this Court a reasonable basis for concluding that the BVI court is likely to grant Swan leave to file the Foreign Proceedings, and the clear implication from Swan's failure to attach that information is that it is unlikely to support the Petition.[9] *See Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 102 (2d Cir. 2020) ("On remand, the district court must deny the § 1782 application as moot in light of the fact that the ECtHR and Querella Criminal proceedings have either terminated or will not occur.").[10]

## II.    The Court Should Exercise Its Wide Discretion to Deny Discovery Under the *Intel* Factors.

Even where the statutory prerequisites of Section 1782 are satisfied, "a district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so." *Intel Corp.*, 542 U.S. at 264. The Court has wide discretion to grant or deny discovery, guided by four nonexclusive factors: (1) whether "the person from whom discovery is sought is a participant in a foreign proceeding, . . . (2) the nature of the foreign tribunal, the character of the proceedings

---

[9] Among the information Swan failed to share is a copy of the Shareholder Agreement, which likely speaks to the parties' rights with respect to the potential derivative claims. Here again, Swan's failure to provide a copy of the Shareholder Agreement suggests it does not support the Petition.

[10] That the Delaware District Court granted a separate 1782 petition is of no moment. That application went unopposed and from review of the docket it lacked the bad faith animus apparent in this Petition.

underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the § 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the request is unduly intrusive or burdensome." *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015) (internal citations omitted). All four factors weigh decisively against granting the Application.

### A. The Discovery Sought Is Obtainable in the Foreign Proceedings.

Under the first *Intel* factor, even if the person from whom discovery is sought is not a party to the foreign proceeding, courts have nonetheless favored denial of Section 1782 applications where the same material is obtainable from the parties to the foreign proceeding.[11] Here, Swan is largely seeking discovery that is easily obtainable from other parties (including itself) to the potential Foreign Proceedings.

Request 1 seeks communications between Cantor and Tether, as well as communications between Cantor and Swan. Both Tether and Swan would be parties to the potential Foreign Proceedings. If the BVI court grants Swan leave to file the derivative case, and if that case proceeds to the disclosure phase, and if these documents are deemed relevant to the dispute, then Tether and Swan can produce any relevant communications with Cantor during the litigation. It is unnecessary and burdensome for Cantor, a third-party, to undertake the expense of reviewing and producing these communications, especially at this premature stage.

---

[11] *See, e.g., In re Atvos Agroindustrial Investimentos S.A.,* 481 F. Supp. 3d 166, 176 (S.D.N.Y. 2020) (where discovery sought was in possession of Brazilian litigant, first *Intel* factor favored denial even though that respondent was not a litigant); *In re IPC Do Nordeste, LTDA*, No. 12–50624, 2012 WL 4448886, at *5-6 (E.D. Mich. Sept. 25, 2012) (finding the first *Intel* factor supported quashing a Section 1782 subpoena, even though respondent was not a party to the foreign proceeding, because the foreign court "ha[d] the power to order the production of the evidence sought"); *Pereira v. Nucor Corp.*, No. CV 3:23-MC-00024-FDW-SCR, 2023 WL 4143229, at *3 (W.D.N.C. June 22, 2023), *dismissed,* No. 23-1775, 2024 WL 3548462 (4th Cir. June 24, 2024) (weighing in favor of denial that company from whom evidence was sought established that it did not possess any discovery that the petitioner could not obtain from the Brazilian entities who would be litigants in the event a proceeding was filed before Brazilian courts).

Similarly, Request 4 seeks "[a]ll documents received from Swan Bitcoin in connection with the contemplated IPO or fundraising round." Swan itself brings this litigation and therefore possesses the very documents it seeks from Cantor.

Request 5 seeks documents "reflecting any payments" between Cantor and Tether. In the event the derivative litigation is authorized and proceeds, Tether will be a party and it can produce relevant records sufficient to identify this information; anything Cantor produces would be duplicative of discovery that could be easily obtained from a party to the case.

Thus, this factor weighs heavily in favor of denying the Application.

**B. The Foreign Tribunals Are Likely to be Unreceptive to U.S. Federal Court Assistance Because Swan's Application to File Suit Has Not Been Granted.**

The second *Intel* factor examines the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or court to U.S. federal-court judicial assistance. *Mees,* 793 F.3d at 298.

Swan's foreign proceedings are merely theoretical. Swan has simply *applied for permission* from the BVI Court to bring a derivative action in England. That permission has not been granted and therefore Swan has no legal right to bring the Foreign Proceedings. The discovery sought from Cantor is premature and immaterial because Swan's ability to bring the Foreign Proceedings hinges entirely on whether the BVI and UK courts will permit a derivative shareholder suit to proceed. Swan's overbroad demands to Cantor have no bearing on Swan's application to the BVI High Court, which, as explained previously, is unlikely to be granted. (*See* Section I, *supra.*) Having already litigated these precise factual issues, and obtained discovery regarding the same, in *two* forums, there is no reason to believe that Swan requires discovery from Cantor in order to show the BVI High Court that it has a colorable derivative claim. *See In re*

12

*Sargeant*, 278 F. Supp. 3d 814, 823 (S.D.N.Y. 2017) ("Courts must guard against the specter that parties may use § 1782 to investigate whether litigation is possible before launching it.").

Further, if this Court were to grant the Petition, and the BVI court were to deny Swan's application, then Cantor—a non-party to Foreign Proceedings—would ironically be the only entity to produce discovery in connection with cases that do not transpire. Such a result would be nonsensical and highly unfair. The Court should seek to avoid this outcome.

Thus, this factor also weighs heavily in favor of denying the Application.

## C. Petitioner Seeks Discovery from Cantor through this Petition in Order to Circumvent the More Limited Discovery Rules of the UK and BVI

In applying the third *Intel* factor, courts within the Second Circuit have denied Section 1782 petitions when the application appears to be an attempt "to circumvent the . . . more restrictive discovery practices" of the foreign forum. *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 245 (2d Cir. 2018); *see also In re Escallón*, 323 F. Supp. 3d 552, 560 (S.D.N.Y. 2018) (denying application that was an "apparent attempt" to depose a witness who had already testified, in circumvention of foreign law preventing second examinations). Denial is further warranted when it appears that the petitioner "is engaging in a fishing expedition to identify other foreign venues in which to bring suit." *In re Harbour Victoria Inv. Holdings Ltd. Section 1782 Petitions*, No. 15-MC-127, 2015 WL 4040420, at *7, 9 (S.D.N.Y. June 29, 2015).

First, both the UK and BVI are jurisdictions that do not entertain the same breadth of discovery as U.S. courts, suggesting that Swan's Application is an attempt to get broad, burdensome, and commercially sensitive discovery from Cantor that it could not obtain in the jurisdictions where the Foreign Proceedings would occur.

Under BVI disclosure rules, specific disclosures must be "directly relevant to one or more matters in issue in the proceedings." Eastern Caribbean Supreme Court Procedural Rule 28.4,

13

*Standard disclosure*. (*See* Paul Decl., Ex. 11.) A catch-all request (like Swan's document requests to Cantor) for anything that "relates to," "references," or concerns the "circumstances surrounding" events—without specifying what aspects of those events are in issue—would likely be regarded as impermissibly wide.

Moreover, UK Civil Rule 31.16, governing disclosure before proceedings start, states that the court may make an order for such disclosure "only where . . . the respondent is likely to be a party to subsequent proceedings." (*See id.*, Ex. 12.)   As Swan admits (*see* Petitioner's Br., ¶ 93), Cantor is not likely to be a party to the Foreign Proceedings.  Swan would have no basis to obtain pre-litigation discovery from Cantor in the UK.

Further, UK Civil Rule 31.17, which governs orders for disclosure against a non-party, provides that the court may make an order "only where—(a) the documents of which disclosure is sought are likely to support the case of the applicant or adversely affect the case of one of the other parties to the proceedings; and (b) disclosure is necessary in order to dispose fairly of the claim or to save costs." (*Id.*)  Additionally, "[a]n order under this rule must . . . specify the documents or the classes of documents which the respondent must disclose." (*Id.*)  Swan's document requests do not come close to meeting this bar, as Swan has not specified with any particularity "the documents or the classes of documents" it seeks, nor has Swan made any showing that Cantor's production would be "necessary in order to dispose fairly of the claim."  Nor could it, as many of Swan's document requests seek information that would already be in the possession of parties to the potential Foreign Proceedings, such as "All documents received from Swan Bitcoin in connection with the contemplated IPO" (*see* Request No. 4) or "All communications between [Cantor] and Swan Bitcoin [or] 2040 Energy" (*see* Request No. 1).

Lastly, Petitioner's own brief confirms that Swan intends to use this Petition to obtain discovery of irrelevant, or barely relevant, topics in the hope of finding information that incriminates Cantor or Tether.  For example, Swan admits it seeks information regarding the sale of "Tether-controlled Northern Data AG['s] . . . bitcoin mining subsidiary Peak Mining" (Petitioner's Br. ¶ 67)—a transaction not even at issue in the potential Foreign Proceedings. Without any concrete evidence—or any explanation of how such evidence would even be material to the Foreign Proceedings—Swan speculates that it is possible that "the Northern Data transactions involved . . . assets diverted from Swan or 2040 Energy," and that the purportedly "undervalued related party sale . . . establishes a pattern of activity also seen in the alleged Related Party Sale(s) of the Foreign Proceedings." *(Id.)*  This is precisely the sort of "fishing expedition to identify other . . . venues" for potential litigation that the courts have warned against.  *In re Harbour Victoria Inv. Holdings Ltd.*, 2015 WL 4040420, at *9.

This factor weighs heavily in favor of denying the Application.

### D.  The Petition Seeks Unduly Intrusive and Burdensome Discovery That Is Largely Irrelevant and Disproportionate to the Needs of the Foreign Proceedings.

The fourth *Intel* factor also favors denial of the Petition due to the overbreadth of Swan's Document Requests, which are not narrowly tailored temporally, geographically, or in their subject matter.

For instance, each of the requests seek documents from January 1, 2023 to the present—a period of over three years (*see* Document Requests) – despite the fact that the purported breaches of fiduciary duty occurred during a two-month window in mid-2024.  Swan has provided no reason to seek documents from Cantor that stretch so far beyond the events at issue.   Similarly, Request 1 encompasses seeks "[a]ll communications" with six different entities and "any related person" (without further definition) "regarding the valuation, sale, transfer, or disposition of the Machine

Assets and the Related Party Sale." (*Id.*)  There is no attempt to cabin this request to communications that directly concern the allegedly nefarious actions detailed in the Petition, or more importantly to the discrete allegations concerning Cantor.

Request 3 seeks "[a]ll documents relating to actual or anticipated business dealings with 2040 Energy, Tether, Proton, Elektron, or any related person, including but not limited to contracts, agreements, memoranda of understanding, and correspondence." (*Id.*)  In other words, this Request seeks the entirety of the commercial relationship between Cantor and multiple entities, regardless of whether those dealings relate to the matters at issue in the BVI/UK proceedings, and including dealings that are merely "anticipated."  As such, this Request seeks information that is not only confidential and commercially sensitive, but irrelevant.

Request 5, similarly, seeks "[a]ll documents reflecting any payments, deposits, or financial transactions between [Cantor] and 2040 Energy, Tether, Proton, Elektron, Twenty One Capital or any related person." *Id*.  This Request would require the disclosure of a vast number of sensitive financial transactions between Cantor and a slew of counterparties, regardless of whether such transactions are related to the alleged "Rain and Hell Fire Plan." For Cantor to provide every financial transaction between five different entities, any related person, affiliated persons, and any of its predecessors or successors is an unjustifiable burden.

Request 6 asks for "[a]ll documents relating to or referencing the Related Party Sale or the En Masse Resignations or the circumstances surrounding these events." *Id*. This blanket request for all documents related to a general issue fails to set forth with reasonable particularity the documents sought. Cantor cannot respond to this request without wasting countless hours speculating what constitutes "circumstances surrounding" these events.

16

In conclusion, the breadth of Swan's requests largely seek information that is immaterial to the potential Foreign Proceedings, and would be duplicative of communications that could be obtained from the actual parties in the event the Foreign Proceedings are authorized, rendering the burden on non-party Cantor all the more unjustified.

The fourth *Intel* factor therefore overwhelmingly favors denial.

### III.    The Application Must Be Denied Because It Is Being Brought to Harass Cantor and Its Former CEO.

"A request that appears only marginally relevant to the foreign proceeding may in certain cases suggest that the application is made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials, which would be grounds for a discretionary denial of discovery." *Mees*, 793 F.3d at 299, n.10. (internal quotation marks and citation omitted); *see also Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 81 (2d Cir. 2012) ("[A] district court may deny the section 1782 application where it suspects that the discovery is being sought for the purposes of harassment."); *In re Diligence Glob. Bus. Intel. S.A.*, No. 21-MC-401 (JPO), 2021 WL 2156278, at *2 (S.D.N.Y. May 27, 2021) (denying a Section 1782 application that appeared to be "brought in bad faith" and "unreasonably s[ought] irrelevant materials" because the subpoena sought "a broad range of information relating to Qatar's World Cup bid" and "[n]ot all of this information clearly bears on [respondent's] relationship with" the petitioner's adversary in the foreign proceeding).

This Court has a separate independent basis for denying the Application: Swan evidently filed the Petition in a bad faith effort to harass Cantor and its former CEO.[12]

---

[12] Filings from the California Proceeding confirm that this Petition is not the first time that Swan has attempted to abuse the legal process to exact revenge against third parties simply due to their association with Tether. Specifically, Swan sued Gibson Dunn, its original counsel in the California Proceeding, for malpractice simply because the firm moved to withdraw as counsel early in the litigation due to a conflict of interest that arose when it hired a lateral partner who was representing Tether in other matters. (*See* Paul Aff., Exs. 5-6.) A filed declaration from a Gibson

A cursory review of the public-facing X account of Swan's CEO, Klippsten (@CorySwan), makes plain that the purpose of the Petition is to harass Cantor and Mr. Lutnick by subjecting them to burdensome and intrusive discovery while simultaneously badmouthing them in public. Klippsten's recent posts on X largely consist of personal, provocative, salacious, and vituperative attacks on Cantor and Mr. Lutnick, who he repeatedly refers to as "Gross Howard." (*See* Paul Aff., Ex. 8.)  As confirmed by a more than seven-paragraph tweet from its principal, Klippsten, on March 25, 2026 publicly announcing the filing of this Petition, Swan's purpose in bringing this Application is apparently to put Mr. "Lutnick on the hot seat" (*see id.*) – a plainly improper purpose.

Furthermore, the content of the Application itself confirms Swan's harassing motive. Out of the more than fifty paragraphs in Swan's memorandum of law in which Cantor or Mr. Lutnick are mentioned, only a handful are even tenuously related to Cantor's involvement in or knowledge of the alleged breaches of fiduciary duty by the Tether-Appointed Directors of 2040 Energy.  And even many of those allegations are based entirely on speculation and conjecture.  (*See generally* Petitioner's Br.)  The sparse allegations that tangentially reference Cantor in the context of the relevant fact pattern show that there is no need for discovery from non-party Cantor. For example:

- "A top Tether banker who works closely with Cantor was a central figure in the complex transactions around the Machine Asset Diversion. Cantor and then-CEO Lutnick acted as Tether's investment banker and advisor in Tether's aggressive drive to take over the Bitcoin mining industry—which would be further advanced by the Mining Assets Diversion from 2040 Energy to Tether." (*Id.* ¶ 13.);

- "Shortly after the December 2024 Machine Asset Diversion, Cantor acted as the investment banker in a series of related-party transactions by Tether involving the same former Swan employees involved in the diversion of the Bitcoin mining business. . . . Such an undervalued related party sale likely harmed Northern Data minority

Dunn partner further asserts that Swan demanded an eye-popping sum of *$18 million* from Gibson Dunn in exchange for dropping Swan's opposition to the motion to withdraw.  (*See id.*, Ex. 7.)

18

> shareholders and establishes a pattern of activity also seen in the alleged Related Party Sale(s) of the Foreign Proceedings." (*Id.* ¶ 66.)

- "Cantor subsequently served as investment banker in a series of post-diversion transactions involving the same former Swan employees involved in the Tether-backed diversion of 2040 Energy's mining business, including acting as placement agent for Tether's investment in Rumble and providing a SPAC for Tether's Twenty One Capital—which installed the principal architects of the asset diversion scheme as directors." (*Id.* ¶ 73.)

As is apparent, none of these allegations connect Cantor or Mr. Lutnick to the specific breaches of fiduciary duty at issue in the potential Foreign Proceedings. They are, at best, largely accusations of guilt by association.

Furthermore, with respect to the majority of references to Cantor or Mr. Lutnick in the Application, Petitioner does not even pretend to tie them to the conduct at issue in the Foreign Proceedings. The vast majority of the allegations about Cantor and Mr. Lutnick involve public disclosure of Cantor's business dealings with Tether, details of Mr. Lutnick's divestiture from Cantor, and rank speculation about a whole host of things that have nothing to do with the pending litigations between Swan and Tether. Instead, Petitioner appears to include this content simply to smear Respondents' reputations. And the Discovery Requests seek wide intrusive information that goes far beyond the boundaries of the potential litigation.

The harassing nature of the Application is further exemplified by Swan's request not only for document discovery, but for a subpoena ad testificandum that would force Mr. Lutnick—the current United States Secretary of Commerce—to testify in Foreign Proceedings with which he and Cantor had no involvement. Swan has not attempted to demonstrate any "exceptional circumstances" that would justify compelling the testimony of a high-ranking government official such as Mr. Lutnick, such as proving that he has unique, first-hand knowledge that is material to Swan's claims in the Foreign Proceeding, other than by stating so in unsubstantiated conclusory fashion. *Cf. Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir.

2013) (reasoning that "to depose a high-ranking government official, a party must demonstrate exceptional circumstances justifying the deposition—for example, that the official has unique first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained through other, less burdensome or intrusive means").

In short, the facial overbreadth of Swan's requests, combined with the numerous derogatory and immaterial public statements that Klippsten has made about Cantor and Mr. Lutnick—both on social media and in the Application itself—confirm that the true purpose of this Application is to harass Cantor and its former CEO, now a Cabinet-level secretary. The Application can, and should, be denied on these grounds alone.

**CONCLUSION**

For the foregoing reasons, Cantor respectfully requests that the Court deny the Application in its entirety.

Dated: April 2, 2026
　　　New York, New York

Respectfully submitted

By: ___ */s/David A. Paul* ___
David A. Paul, Assistant General Counsel
(DP7629) 110 East 59th Street, 7th Floor
New York, NY 10022
(212) 610-2298
DPaul@cantor.com

*Attorney for Respondent Cantor Fitzgerald & Co.*

20
