**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE EX PARTE APPLICATION OF ELECTRIC SOLIDUS INC. D/B/A SWAN BITCOIN FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782

)
)
)
)
)
)
)
)
)

Case No. 1:26-mc-00124-LJL

**MEMORANDUM OF LAW IN OPPOSITION TO ELECTRIC SOLIDUS INC.**
**D/B/A SWAN BITCOIN'S *EX PARTE* APPLICATION FOR**
**AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS**
**PURSUANT TO 28 U.S.C. § 1782**

VINSON & ELKINS LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Phone: (212) 237-0000
Fax: (212) 237-0100

*Attorneys for Respondent Howard W. Lutnick*

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 4

    I.    Swan's Financial Distress Undermined the Joint Venture from the Start. ........................ 4

    II.   Swan's Application Stems from Litigation It Had No Right to Pursue. ........................... 5

    III.  Secretary Lutnick Has No Involvement in the Underlying Dispute. ............................... 7

    IV.  Swan Seeks Sweeping Discovery Far Beyond Any Legitimate Need. .............................. 9

LEGAL STANDARD ...................................................................................................... 11

ARGUMENT .................................................................................................................. 12

    I.    Swan Cannot Satisfy the Statutory "For Use" Requirement. .......................................... 12

    II.   The Court Should Exercise its Discretion to Deny Discovery Under
        the *Intel* Factors. ....................................................................................................... 14

        A.    Swan Can Obtain the Discovery It Seeks In the Foreign Proceedings. ........................ 14

        B.    Swan's Requests Are Overbroad and Unduly Intrusive and Burdensome. .................. 16

        C.    Swan's Application Reflects Bad Faith, Harassment, and an Improper Purpose. ........ 19

    III.  The Apex Doctrine Shields Secretary Lutnick from This Unwarranted Discovery. ........ 23

CONCLUSION ............................................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**

*Amaya v. Ballyshear LLC*,
    2021 WL 12101052 (E.D.N.Y. Sept. 30, 2021) ..................................................... 24

*Banoka S.a.r.l. v. Elliott Mgmt. Corp.*,
    148 F.4th 54 (2d Cir. 2025) ....................................................................................... 17

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
    673 F.3d 76 (2d Cir. 2012)......................................................................................... 23

*Certain Funds, Accts. &/or Inv. Vehicles v. KPMG, L.L.P.*,
    798 F.3d 113 (2d Cir. 2015)................................................................................. 12, 13

*Chin v. New York City Dep't of Correction*,
    741 F. Supp. 3d 18 (E.D.N.Y. 2024) ......................................................................... 23

*Dekel v. Clerkenwell Lifestyle Ltd.*, Claim No. BVIHC (COM) 2024/0466
    (E. Carib. Sup. Ct., High Ct. of Justice, Com. Div. Mar. 4, 2025) ........................... 21

*Euromepa S.A. v. R. Esmerian, Inc.*,
    51 F.3d 1095 (2d Cir. 1995)....................................................................................... 12

*Frasers Grp. PLC v. Gorman*,
    2023 WL 6938284 (S.D.N.Y. Oct. 19, 2023) ............................................................ 24

*Frasers Grp. PLC v. Stanley*,
    95 F.4th 54 (2d Cir. 2024) .................................................................................... 15, 18

*Hallmark Licensing LLC v. Dickens Inc.*,
    2018 WL 6573435 (E.D.N.Y. Dec. 13, 2018) ..................................................... 12, 23

*Harapeti v. CBS Television Stations Inc.*,
    2021 WL 3932424 (S.D.N.Y. Sept. 2, 2021)................................................... 23, 24, 25

*IJK Palm LLC v. Anholt Servs. USA, Inc.*,
    33 F.4th 669 (2d Cir. 2022) .................................................................................. 13, 14

*In re Aguila Energia e Participacoes Ltda.*,
    2023 WL 7001445 (S.D.N.Y. Aug. 22, 2023),
    *aff'd* 2025 WL 1661987 (2d Cir. June 12, 2025)...................................................... 19

*In re Apotex Inc.*,
    2009 WL 618243 (S.D.N.Y. Mar. 9, 2009) ............................................................... 11

*In re Application of Shervin Pishevar for an Ord. to take Discovery for use in Foreign Proc. Pursuant to 28 U.S.C. § 1782*, 439 F. Supp. 3d 290 (S.D.N.Y. 2020) ...................................... 17

*In re Application Pursuant to 28 U.S.C. Section 1782 of Okean B.V. & Logistic Sol. Int'l to Take Discovery of Chadbourne & Parke LLP*, 60 F. Supp. 3d 419 (S.D.N.Y. 2014).............. 18

*In re BonSens.org*,
95 F.4th 75 (2d Cir. 2024) ......................................................................................... 13

*In re Effecten-Spiegel AG*,
2018 WL 11732820 (S.D.N.Y. Aug. 10, 2018)......................................................... 23

*In re Ex Parte Application of Qualcomm Inc.*,
162 F. Supp. 3d 1029 (N.D. Cal. 2016) ..................................................................... 16

*In re Malev Hungarian Airlines*,
964 F.2d 97 (2d Cir. 1992)......................................................................................... 15

*In re New York City Policing During Summer 2020 Demonstrations*,
677 F. Supp. 3d 206 (S.D.N.Y. 2023)........................................................................ 24

*In re Ord. To Take Discovery for Use in a Foreign Proceeding Pursuant To 28 U.S.C. § 1782*,
2025 WL 1446876 (S.D.N.Y. May 20, 2025) ........................................................... 11

*In re Postalis*,
2018 WL 6725406 (S.D.N.Y. Dec. 20, 2018) ..................................................... 22, 23

*In re RSM Prod. Corp.*,
2018 WL 1229705 (S.D.N.Y. Mar. 9, 2018) ............................................................. 15

*In re Saul Klein*,
2023 WL 8827847 (S.D.N.Y. Dec. 21, 2023) ...................................................... 15, 18

*In re SBK Art LLC*,
2024 WL 4264893 (S.D.N.Y. July 30, 2024), *aff'd* 168 F.4th 68 (2d Cir. 2026) ................... 14

*In re Subpoena Issued to Dennis Friedman*,
350 F.3d 65 (2d Cir. 2003)......................................................................................... 16

*In re Zouzar Bouka; Vision Indian Ocean S.A.*,
637 F. Supp. 3d 74 (S.D.N.Y. 2022).......................................................................... 15

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004).................................................................................... 3, 11, 14, 19

*Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
2020 WL 6273396 (S.D.N.Y. Aug. 28, 2020)............................................................ 25

*Khan v. K1 Inv. Mgmt. LLC*,
  2025 WL 3525835 (E.D.N.Y. Dec. 9, 2025) ........................................................................... 25

*Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*,
  895 F.3d 238 (2d Cir. 2018) .................................................................................................. 11

*Lederman v. New York City Dep't of Parks & Recreation*,
  731 F.3d 199 (2d Cir. 2013) ................................................................................ 12, 23, 24, 26

*Mark Anthony Int'l SRL v. Prime Hydration, LLC*,
  2025 WL 2055998 (S.D.N.Y. July 23, 2025) ........................................................................ 24

*Mees v. Buiter*,
  793 F.3d 291 (2d Cir. 2015) ................................................................................ 11, 12, 19, 21

*Mussington v. Deborah Brosnan & Assocs., LLC*,
  708 F. Supp. 3d 1 (D.D.C. 2023) .................................................................................... 15, 16

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP*,
  376 F.3d 79 (2d Cir. 2004) .................................................................................................... 14

*United States v. Newman*,
  531 F. Supp. 3d 181 (D.D.C. 2021) ...................................................................................... 26

**Statutes**

28 U.S.C. § 1782 ................................................................................................................ *passim*

**Rules**

Fed. R. Civ. P. 26(b)(2)(C)(i) ................................................................................................. 18

Respondent Howard Lutnick ("Secretary Lutnick" or "Respondent"), the United States Secretary of Commerce and former Chairman and CEO of Cantor Fitzgerald, L.P. ("Cantor"), respectfully submits this Memorandum of Law in Opposition to the Application filed by Applicant Electric Solidus Inc. d/b/a Swan Bitcoin ("Swan" or "Petitioner") pursuant to 28 U.S.C. § 1782 ("Section 1782") (the "Application").

### INTRODUCTION[1]

In the Application, Swan seeks to depose and compel document production from Secretary Lutnick, a close advisor to President Donald Trump, a sitting member of the U.S. Cabinet, and the former Chairman and CEO of Cantor. The underlying dispute concerns the alleged "Rain and Hell Fire Plan" to divert Bitcoin mining assets from a joint venture, 2040 Energy Ltd. ("2040 Energy"). Swan and Tether (defined below) formed 2040 Energy in July 2023. (App., ¶ 2.) In August 2024, thirteen Swan employees resigned and allegedly misappropriated confidential information from 2040 Energy's systems. (App., ¶ 9.) Months later, 2040 Energy sold 26,048 ASIC Bitcoin mining machines to Tether for approximately $55.6 million ("Related Party Sale"). (App., ¶ 22.) Swan intends to use any evidence obtained through these proceedings in support of its application filed the same day in the British Virgin Islands seeking permission to file a derivative action in England on behalf of 2040 Energy against those it blames for the Rain and Hell Fire Plan and Related Party Sale.

Based on the allegations in the Application, it is apparent that Swan already has accessed and reviewed numerous internal documents concerning these issues. Nonetheless, neither

---

[1] The facts herein are drawn from the Application, public filings in related litigation, and other publicly available information. Secretary Lutnick does not admit any of the allegations in the Application. Citations to the Application (Dkt. 1) appear as "App., []," and to Swan's reply (Dkt. 16) appear as "Reply []." Citations to Respondent Cantor Fitzgerald, L.P.'s opposition to the Application (Dkt. 11) appear as "CF Opp. []." Unless otherwise noted, all exhibit references are those attached to the Declaration of Sara Brauerman and cited herein as "Ex. []."

Secretary Lutnick nor Cantor is alleged to have had any role in or knowledge of the creation, governance, management, or operation of 2040 Energy, or to have played any role in planning, coordinating, or executing the alleged Rain and Hell Fire Plan or Related Party Sale. Instead, Swan relies on a chain of speculative inferences to justify the extraordinarily burdensome discovery it seeks: because Cantor had a business relationship with Tether, and because then-CEO Lutnick purportedly received confidential information about Swan in connection with a potential Swan IPO, there is "reason to believe" that he "knew of and/or [was] somehow involved" in the scheme. (App., ¶ 15.) But Swan acknowledges it has no idea if Secretary Lutnick or Cantor have any relevant information, admitting that it requests this discovery "*to determine if Cantor and then-CEO Lutnick hold evidence*" relevant to the Rain and Hell Fire Plan. (App., ¶ 12.) Despite the lack of any direct connection between Secretary Lutnick and the underlying dispute, Swan seeks wide-ranging discovery into his personal business dealings and transactions—months before 2040 Energy was ever formed and through the present, years after the alleged Rain and Hell Fire Plan was purportedly executed.

This is not legitimate Section 1782 discovery—it is a speculative fishing expedition that if granted would impose significant discovery burdens on a sitting United States Cabinet Secretary and represents a backdoor attempt to obtain discovery for derivative claims that may never be filed and that Swan lacks authority to bring. Swan also seeks duplicative discovery readily obtainable from the actual parties to the underlying proceedings. The Court should exercise its wide latitude to deny the Application for at least three reasons.

*First*, the Application fails to satisfy Section 1782's statutory requirements. In particular, Section 1782 requires the discovery sought to be "for use" in a foreign proceeding. Here, it is undisputed that the foreign proceedings are not within reasonable contemplation—Swan cannot

2

file derivative claims unless and until the BVI Court grants it permission to do so, a procedural hurdle that the Second Circuit has held defeats the "for use" requirement.

*Second,* the discretionary factors articulated in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), as well as the Court's own discretionary authority, weigh decisively against granting the Application because: (i) if any exists, the discovery sought is duplicative of information obtainable from the parties to the foreign proceedings; (ii) the overbroad requests are unduly burdensome and intrusive for any third party, but particularly the Secretary of Commerce and former CEO of Cantor; (iii) Swan's own Application admits it is fishing for information—seeking discovery "to determine if" Secretary Lutnick "hold[s] evidence" relevant to its claims; (iv) the discovery unreasonably seeks irrelevant and cumulative information; and (v) the Application is designed to harass Secretary Lutnick—evidenced by Swan CEO's derogatory public attacks on the Secretary. Section 1782 does not allow an applicant to serve harassing subpoenas seeking information already available in the foreign jurisdiction for improper purposes.

*Third*, Secretary Lutnick is a sitting Cabinet-level official and the former CEO of Cantor, and is therefore shielded from unnecessary, burdensome, and harassing discovery under the well-settled apex doctrine that applies in this Circuit. Swan has not demonstrated the exceptional circumstances required to compel discovery from a current high-ranking government official, nor has it demonstrated that Secretary Lutnick possesses unique, first-hand knowledge regarding the Rain and Hell Fire Plan or Related Party Sale or that less burdensome means cannot produce the same information. Finally, because the Application appears designed to harass the Secretary, and compelling him to sit for a deposition would significantly disrupt his official duties, the Application should be denied.

## BACKGROUND

**I.    Swan's Financial Distress Undermined the Joint Venture from the Start.**

Petitioner is a financial services company that advises on and facilitates investments in Bitcoin.[2] Tether Investments Ltd. (with its affiliates, "Tether") is a financial technology company that issues stablecoin.[3] In July 2023, Swan and Tether entered into a Shareholder Agreement to create a bitcoin mining joint venture called 2040 Energy. (App., ¶ 2.) Tether funded 100% of the joint venture and holds approximately 80% of its equity; Swan ran day-to-day operations and holds 20% equity. (Ex. A, at 4.) Under the Shareholder Agreement, Swan is not entitled to any shareholder distributions until Tether's investment is repaid in full. (*Id.* at 15.) Swan's founder and CEO, Cory Klippsten, served as 2040 Energy's CEO until August 2024. (Ex. A, at 5.)

In early 2024, Swan faced financial difficulties and sought to raise capital through a Series C fundraising and an IPO. (Ex. B, at 2; Ex. C, at 6-7.) Those efforts failed. (*Id.*) In July 2024, Swan announced it was closing its managed mining services and laid off a portion of its workforce. (*See also* Ex. A, at 5; Ex. C, at 7.) Petitioner alleges that during this period, certain Swan personnel developed the so-called "Rain and Hell Fire Plan" to divert Bitcoin mining assets ("Mining Assets"), including computer and proprietary business information, from 2040 Energy to Tether. (App., ¶¶ 5-6.) The purported scheme was executed on August 8 and 9, 2024, when 13 Swan employees resigned, allegedly after downloading confidential business information from 2040 Energy's internal systems, and started their own business, Proton Management Ltd. ("Proton"). (App., ¶ 60.)

---

[2] SWAN BITCOIN, *What Is Swan Bitcoin?*, https://help.swanbitcoin.com/hc/en-us/articles/360046659494-What-is-Swan-Bitcoin (last visited May 11, 2026). Ex. E.
[3] TETHER OPERATIONS, S.A. DE C.V., *What are Tether tokens and how do they work?*, https://tether.to/en/how-it-works (last visited May 11, 2026). Ex. F.

Proton and former 2040 Energy employees ("Proton Defendants") deny any such scheme. (*See generally* Exs. B; C.) They contend they resigned because Swan was "running out of money and on the verge of bankruptcy" which "threatened 2040 Energy's mining operations." (Ex. A, at 7; Ex. C, at 5.) After the resignations, Swan could not assure Tether that it would be able to continue operating 2040 Energy, as required by the Shareholder Agreement. (Ex. C, at 4-5.) After Tether notified Swan of this default under the Shareholder Agreement, Mr. Klippsten resigned as CEO of 2040 Energy. (*Id.*) On August 13, 2024, Tether informed Swan that Proton would assume operational and administrative functions at 2040 Energy. (Ex. B, at 2.) On December 7, 2024, 2040 Energy completed the Related Party Sale, selling 26,048 ASIC Bitcoin mining machines to Tether for approximately $55.6 million. (App., ¶ 22.)

## II.    Swan's Application Stems from Litigation It Had No Right to Pursue.

Swan responded to these events with an aggressive litigation campaign. In September 2024, Swan sued Proton and certain individuals in California federal court asserting various state and common law violations ("California Litigation").[4] Swan also sought a temporary restraining order, a preliminary injunction, and expedited discovery. (Ex. A, at 6-7; Ex. B, at 4.) Swan knew or should have known that the claims against Proton were subject to a binding arbitration agreement under the Shareholder Agreement, yet, according to the Proton Defendants, deliberately chose to file in a public federal forum. (*See generally* Ex. B.) Swan also knew or should have known it maintained no ownership rights over the assets at issue—the same trade secrets and confidential information it accused the Proton Defendants of stealing belonged to 2040 Energy, not Swan, under the Shareholder Agreement. (Ex. B, at 2; Ex. C, at 19-20.) Swan pursued these

---

[4] *See Electric Solidus, Inc. v. Proton Management Ltd.*, No. 2:24-cv-08280 (C.D. Cal.).

claims anyway. The Court denied Swan's requests for a TRO and expedited discovery, and Swan withdrew its motion for a preliminary injunction. (Ex. A, at 7-8.)

In response to the California Litigation, 2040 Energy and Tether initiated litigation in the United Kingdom ("UK Litigation") (per the Shareholder Agreement choice of law provision) to confirm, among other things, that 2040 Energy owned the Mining Assets. (Ex. A, at 11-12.) On the eve of trial, Swan submitted a sworn undertaking conceding that 2040 Energy, not Swan, owned the Mining Assets, and agreed not to "obtain control of any of the Business Assets, including through the California Proceedings," "pursue or prosecute or progress any of its existing claims in respect of the Business Assets currently being pursued in" the UK litigation, and "'deal with ... any of the Business Assets' other than at the direction of 2040 Energy." (Ex. A, at 2, 13-14.) The Court ordered Swan to pay Tether's and 2040 Energy's legal fees and costs. (*Id.*, at 2.)

Meanwhile, the court in the California Litigation eventually granted Proton's motion to compel arbitration, confirming that the claims against it never belonged in federal court in the first place;[5] as for the individual defendants, Swan has acknowledged that all proceedings are "in the process of being withdrawn" based on the UK Litigation.[6] (App., ¶ 76.) However, Swan has not yet dismissed the proceedings, which is the subject of a recently filed motion for sanctions. (Exs. A; D.) The sanctions motion argues that Swan pursued the California Litigation "to gain leverage in discussions" with Tether and to "publicly tarnish Defendants' and Tether's reputation in public filings," and that "Swan's CEO then compounded these falsities by repeating them in public media, amplifying a fabricated narrative to bolster Swan's business interests and harm Defendants" and details the subsequent damage to the Proton Defendants. (Ex. A, at 2.) This is important because

---

[5] *See* Order Granting Defendant Proton's Motion to Compel Arbitration, *Electric Solidus, Inc. v. Proton Management Ltd.*, No. 2:24-cv-08280 (C.D. Cal. July 21, 2025), Dkt. 250.
[6] As of April 22, 2026, no arbitration has been filed. (Ex. A, at 21.)

Swan attempts to downplay the other proceedings as non-merits-based. (Reply, at 2.) But the significance of these other proceedings lies in Swan's propensity for weaponizing the litigation process, a relevant factor for these proceedings, by knowingly prosecuting claims based on rights it does not have, in public venues in which it agreed not to litigate, exacerbated by inflammatory public statements in the media.

On March 23, 2026, the same day that the Application was filed, Swan filed an application in the Commercial Division of the High Court of Justice of the Eastern Caribbean Supreme Court ("BVI Court"), seeking permission to file a derivative action on behalf of 2040 Energy against Giancarlo Devasini and Jean-Louis Van der Velde ("Tether-Appointed Directors") and others for breaches of their fiduciary duties owed to 2040 Energy, among other claims (the "BVI Proceedings"). If Swan is successful, then it "intends" to file a derivative lawsuit in England ("Proposed English Proceedings" and with the BVI Proceedings, "Foreign Proceedings").

### III.   Secretary Lutnick Has No Involvement in the Underlying Dispute.

From 1991 to 2025, Secretary Lutnick served as Chairman and Chief Executive Officer of Cantor, a global financial services firm with over 12,000 employees across more than thirty offices worldwide.[7] Under Secretary Lutnick's leadership, Cantor emerged as an early proponent of cryptocurrency, strategically investing in crypto-focused companies. In November 2024, Secretary Lutnick was nominated by President Trump to serve as the 41st United States Secretary of Commerce and confirmed by the United States Senate on February 18, 2025.

Swan admits it does not know if Secretary Lutnick has any relevant information to the dispute. (*See* App., ¶¶ 12, 72.) This admission alone should foreclose the discovery Swan seeks here. As discussed *supra*, neither Secretary Lutnick nor Cantor is alleged to have had any role in

---

[7] CANTOR FITZGERALD, *Who We Are*, https://www.cantor.com/our-company/who-we-are/ (last visited May 11, 2026). Ex. G.

or knowledge of the creation, governance, management, or operation of 2040 Energy, or to have played any role in planning, coordinating, or executing the alleged scheme. (App., ¶¶ 2-9.) The Application expressly identifies the participants who conceived of and carried out the Rain and Hell Fire Plan, none of which include Secretary Lutnick or anyone else from Cantor.[8]

Swan speculates that Secretary Lutnick, as CEO of Cantor, "likely" knew about the Rain and Hell Fire Plan or Related Party Sale for two reasons:

*First*, Swan shared information with Cantor and Secretary Lutnick in connection with a potential Series C capital raise and IPO in June 2024. But Swan's own allegations establish that these interactions were minimal and confined to ordinary-course dialogue between a company and its potential investment banker. For example, Swan refers to a text message exchange between Klippsten and Raphael Zagury, Swan's former Chief Investment Officer, in June 2024, in which Zagury told Klippsten that he revealed the business's value to Cantor and Secretary Lutnick in connection with the potential Series C capital raise, which Cantor was planning to market to investors.[9] (App., ¶ 15.) Swan similarly refers to a WhatsApp group chat created by Devasini, a 2040 Energy director, introducing Klippsten and Secretary Lutnick for a "possible initial public offering of Swan led by Cantor," and a slide deck and related materials shared with Cantor. (App., ¶ 8.) These interactions, if true, are typical of a prospective investment banking relationship. There is no evidence in the Application revealing any direct communications from Secretary Lutnick or Cantor regarding 2040 Energy, the Related Party Sale, or Rain and Hell Fire Plan.

*Second*, Swan cites Cantor's business relationship with Tether as evidence that either Cantor or Secretary Lutnick could have known about the Related Party Sale or Rain and Hell Fire

---

[8] Petitioner has represented that it does not expect Secretary Lutnick or Cantor to be a named party to the Foreign Proceedings. (App., ¶ 93.)

[9] Unlike other evidence referenced in the Application, this text message was not submitted with the Application.

Plan. But the Application fails to supply the missing link—none of the alleged Cantor-Tether activities[10] has any nexus to this dispute. Instead, Swan strings together publicly reported events about Cantor's dealings with Tether and Secretary Lutnick's divestiture from Cantor to create the impression of a connection, while identifying no actual evidence of one. The only alleged connection between Secretary Lutnick and the underlying dispute is the aforementioned conversations with Swan about a potential IPO and Series C capital raise. The Application contains no allegations reasonably suggesting Secretary Lutnick possessed specific knowledge of an alleged scheme by Swan's own personnel to resign and form a competing company.

The Application is also replete with allegations about Secretary Lutnick's broader involvement in the cryptocurrency industry—his public advocacy for Bitcoin, industry conference statements, and recent appointment as Secretary of Commerce—none of which bears on the Rain and Hell Fire Plan or Related Party Sale. (*See, e.g.*, App., ¶¶ 16-21, 32-33.) These allegations do not justify the burdensome discovery sought of a high-ranking executive and government official.

## IV.    Swan Seeks Sweeping Discovery Far Beyond Any Legitimate Need.

On the same day it filed the BVI Proceedings, Swan initiated the present action seeking expansive productions and deposition testimony from Secretary Lutnick and Cantor. (App., ¶ 1.) Specifically, the document requests seek six overbroad categories of documents over a more than three year period, from January 1, 2023 to the present: (i-ii) "all" communications and records of meetings between Secretary Lutnick and Swan, 2040 Energy, Tether, Proton, Elektron,[11] Marlin

---

[10] The activities referenced include the creation of the Dynasty Trust A, Cantor's role in the GENIUS Act, and the Tether UCC financing statement (App., ¶¶ 22-30); Secretary Lutnick's trips to the Bahamas in 2021-2022 (App., ¶ 41); Cantor's management of Tether's treasury holdings (App., ¶ 42); Brandon Lutnick's cryptocurrency education in Lugano (App., ¶¶ 43-45); Cantor's involvement in the Twenty One Capital SPAC (App., ¶ 46); and Secretary Lutnick's dinner with President Bukele (App., ¶ 48).

[11] Elektron refers to Elektron Management LLC, Elektron Energy LP, Elektron Operations Management Ltd, and any other entity using the "Elektron" name, and their employees, directors, officers, and agents. The Application alleges that Elektron was the new entity formed to replace 2040 Energy as part of the "scheme." (App., ¶ 63.)

Capital,[12] or "any related person" regarding "the valuation, sale, transfer, or disposition of the Machine Assets and the Related Party Sale"; (iii) "all" documents relating to "actual or anticipated business dealings with 2040 Energy, Tether, Proton, Elektron, or any related person"; (iv) "all" documents received from Swan "in connection with the contemplated IPO or fundraising round" and "any communications regarding these documents with non-[Swan] related parties"; (v) "all" documents "reflecting any payments, deposits, or financial transactions" between Secretary Lutnick and "2040 Energy, Tether, Proton, Elektron, Twenty One Capital[13] or any related person"; and (vi) "all" documents "relating to or referencing the Related Party Sale or *En Masse* Resignations or the circumstances surrounding these events." (Dkt. 5, Ex. 2.) Swan seeks the same categories of documents and deposition testimony from both Secretary Lutnick and Cantor. (App., ¶ 72.)

In connection with the foregoing, Mr. Klippsten has engaged in a sustained public campaign of derogatory statements targeting Secretary Lutnick, including in the week leading up to the filing of this Application, confirming that Swan's purpose in this Application is not to obtain information genuinely needed for the Foreign Proceedings, but to harass and embarrass the Secretary. (*See, e.g.,* Ex. I (Klippsten tweeting several times over eight days about Secretary Lutnick, including after the Application was filed, stating "Lutnick on the Hot Seat, Yet Again… This week Swan Bitcoin filed an ex parte application… seeking court authorization to subpoena Cantor Fitzgerald and its former CEO, US Commerce Secretary Howard Lutnick"). Section 1782 was not designed to serve as a weapon for such improper purposes.

---

[12] The Application alleges that Marlin Capital introduced Tether and Cantor in 2020 or 2021. (App., ¶ 37.)

[13] According to the Application, Twenty One Capital is "a public company with significant Bitcoin treasury controlled by Tether. The 'independent' board members installed at the new company included Zagury and [Zachary] Lyons" and "Cantor provided a SPAC for the purpose of acquiring the company." (App., ¶ 46.)

10

## LEGAL STANDARD

A Section 1782 application must satisfy three statutory prerequisites: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015) (citation omitted). Failure to satisfy even one of the three elements requires denial of the application. *See In re Ord. To Take Discovery for Use in a Foreign Proceeding Pursuant To 28 U.S.C. § 1782*, 2025 WL 1446876, at *4 (S.D.N.Y. May 20, 2025) (denying application because second requirement not met).

Even if these statutory grounds are satisfied, a court need not order the requested discovery. The Court maintains broad discretion to grant or deny discovery based on four factors articulated in *Intel*: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which case "the need for § 1782(a) aid generally is not as apparent"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) "whether the subpoena contains unduly intrusive or burdensome requests."[14] 542 U.S. at 264-65.

The *Intel* factors are "nonexhaustive," and courts in the Second Circuit have exercised their discretion to deny or limit Section 1782 applications on grounds that extend beyond the four enumerated factors. *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 245

---

[14] While courts consider the *Intel* factors cumulatively, courts have denied discovery based on just one factor. *See, e.g., In re Apotex Inc.*, 2009 WL 618243, at *3 (S.D.N.Y. Mar. 9, 2009) (vacating Section 1782 order and subpoena based solely upon the fourth *Intel* factor).

11

(2d Cir. 2018) ("The *Intel* factors are not to be applied mechanically. A district court should also take into account any other pertinent issues arising from the facts of the particular dispute.") (citation omitted); *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1101 n.6 (2d Cir. 1995) ("if the district court determines that a party's discovery application under § 1782 is made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials, the court is free to deny the application in toto").

Additionally, the "apex doctrine" independently shields Secretary Lutnick from the discovery requested. Under this doctrine, a party seeking discovery from a high-ranking government official must demonstrate "exceptional circumstances"—that the official possesses "unique first-hand knowledge related to the litigated claims" and that "the necessary information cannot be obtained through other, less burdensome or intrusive means." *Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013). For former high-ranking corporate officers, courts apply a similar framework, considering "the likelihood that the individual possesses relevant knowledge, whether another source could provide identical information, the possibility of harassment, and the potential disruption of business." *See Hallmark Licensing LLC v. Dickens Inc.,* 2018 WL 6573435, at *5 (E.D.N.Y. Dec. 13, 2018). As both a current Cabinet-level official and former CEO of Cantor, Secretary Lutnick is entitled to protection under both standards. *See also*, *infra*, Argument, Section III.

## ARGUMENT

### I.   Swan Cannot Satisfy the Statutory "For Use" Requirement.

The Application fails the second statutory requirement that the discovery it seeks be "for use in a proceeding before a foreign or international tribunal." *Mees*, 793 F.3d at 297. To satisfy this requirement, a petitioner must show "reliable indications of the likelihood that proceedings will be instituted within a reasonable time." *Certain Funds, Accts. &/or Inv. Vehicles v. KPMG,*

12

*L.L.P.*, 798 F.3d 113, 123 (2d Cir. 2015) (citation omitted). Where "a movant's ability to initiate a proceeding depends on some intervening event or decision," the court can only conclude that the proceeding is reasonably contemplated if the applicant "provide[s] an objective basis on which to conclude that the event will occur or the requisite decision will be favorable." *IJK Palm LLC v. Anholt Servs. USA, Inc.*, 33 F.4th 669, 680 (2d Cir. 2022); *see also In re BonSens.org*, 95 F.4th 75, 81 (2d Cir. 2024) (upholding denial of a Section 1782 application where petitioner "provide[d] no more than speculation" and "no objective basis" to conclude a favorable appellate ruling and therefore, the ability to "use" the discovery material was too attenuated).

Swan cannot meet this standard. It has not filed the Proposed English Proceedings and currently lacks authority to do so. The Second Circuit has found these circumstances fatal to the "for use" requirement. In *IJK Palm*, the petitioner sought Section 1782 discovery for use in a proposed derivative suit in the Cayman Islands but could not file that suit without first clearing a procedural prerequisite—obtaining permission from the Company's "liquidators" or leave of the Cayman court. 33 F.4th at 672-73. The Second Circuit held the petitioner failed the "for use" requirement because it had not "provided a sufficient basis to conclude" it could actually bring the suit. *Id.* at 680. Swan is in the same position. Like the *IJK Palm* petitioner, Swan cannot proceed without first clearing a procedural hurdle, and although it speculates that it is "likely" to succeed in the BVI Court, it offers no "objective basis" to conclude that the Proposed English Proceedings will ever occur, let alone "within a reasonable time" as Section 1782 requires.

Swan argues it need not establish the "for use" requirement for the Proposed English Proceedings because the requirement is satisfied by the BVI Proceedings. (Reply, at 2.) But the Second Circuit's decision in *IJK Palm* forecloses this argument. The court there did not treat the petitioner's efforts to obtain permission to assert derivative claims itself as a separate, freestanding

13

"foreign proceeding" that could independently support Section 1782 discovery; rather, it analyzed the "procedural hurdles" as part of the contemplated derivative action. 33 F.4th at 680. The Court should do the same here.[15] *See*, *infra*, Section II.B (describing BVI Proceedings). Swan cannot point to an "objective basis" to conclude the BVI Court will grant leave. And just as the *IJK Palm* court declined to treat the Cayman leave requirement as creating an independent qualifying proceeding, this Court should not treat Swan's BVI application as a standalone "foreign proceeding" for Section 1782 purposes.

## II.    The Court Should Exercise its Discretion to Deny Discovery Under the *Intel* Factors.

Even where Section 1782's statutory prerequisites are satisfied, the Court has wide discretion to deny the Application, guided by four nonexclusive factors. *Intel,* 542 U.S. at 247 (Section 1782 "*authorizes, but does not require*, a federal district court to provide judicial assistance" to interested persons in foreign proceedings) (emphasis added). These factors weigh decisively against granting the Application.

### A.  Swan Can Obtain the Discovery It Seeks In the Foreign Proceedings.

The first *Intel* factor weighs heavily in favor of denying discovery under Section 1782 where the same information can be obtained within the jurisdiction of the foreign court. *See Intel*, 542 U.S. at 264. The vast majority of discovery Swan seeks from Secretary Lutnick duplicates materials obtainable from (a) Swan itself, which possesses its own communications with Secretary Lutnick and Cantor;[16] and (b) Tether and its principals, which would be parties to or involved in

---

[15] Swan relies on *In re SBK Art LLC*, 2024 WL 4264893 (S.D.N.Y. July 30, 2024), *aff'd* 168 F.4th 68 (2d Cir. 2026), but there, the "Anticipated Litigation" was not dependent on the two pending proceedings, which were themselves independent, merits-based actions that existed irrespective of whether the anticipated litigation would ever be filed. *See id.*, at *7. Here, by contrast, the pending BVI action is not an independent merits-based proceeding—it is the "procedural hurdle" that Swan must clear before it has any right to file the derivative claims at all.

[16] For example, Request 1 seeks communications between Swan, Tether, 2040 Energy, and Secretary Lutnick; Request 4 seeks documents received from Swan in connection with the contemplated IPO—Swan itself possesses these documents. Request 5 seeks documents concerning financial transactions between Secretary Lutnick, Swan, 2040 Energy, and Tether. (Dkt. 5, Ex. 2.)

14

the Foreign Proceedings. The Application should be denied on this basis. *See Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 85 (2d Cir. 2004) (affirming denial of Section 1782 application when discovery could be obtained through party to foreign proceeding).[17]

Swan relies on *In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992) to argue that foreign litigants need not exhaust discovery options abroad before seeking Section 1782 discovery. But in *Malev*, the Second Circuit merely held that there is no *requirement* that the applicant first seek the requested discovery from the foreign tribunal. *Id.* at 101. While there may be no exhaustion requirement, the Court should still consider the "possibility that the applicant could obtain the discovery in the foreign proceedings along with other factors, including that pursuing discovery in the foreign court would have been more convenient—an approach consistent with 'the familiar standards of Rule 26 of the Federal Rules of Civil Procedure.'" *See Frasers Grp. PLC v. Stanley*, 95 F.4th 54, 60 (2d Cir. 2024) (citation omitted); *see id.* at 58-59 (affirming denial of documentary and testimonial discovery from CEO under the first *Intel* factor because the documents were "obtainable through discovery from [corporate entity] in the English Proceedings" and there was no indication that "the documents sought are 'unobtainable absent § 1782(a) aid'") (citation omitted); *In re Zouzar Bouka; Vision Indian Ocean S.A.*, 637 F. Supp. 3d 74, 93 (S.D.N.Y. 2022) (denying Section 1782 discovery from CEO because the CEO's documents were duplicative of documents in the company's possession, which received identical discovery requests); *Mussington v. Deborah Brosnan & Assocs., LLC*, 708 F. Supp. 3d 1, 17 (D.D.C. 2023) ("Ordering the production of documents that could easily have been ordered produced by the foreign tribunal

---

[17] *See also In re Saul Klein*, 2023 WL 8827847, at *11 (S.D.N.Y. Dec. 21, 2023) (denying Section 1782 application, finding first *Intel* factor weighed against applicant who "in substance, []seeks records of the parties … in the Brazilian probate proceedings"); *In re RSM Prod. Corp.*, 2018 WL 1229705, at *4 (S.D.N.Y. Mar. 9, 2018) (denying Section 1782 application against a non-party in the foreign proceeding and finding it "would be an independent and strong basis on which to deny the application" in order "to assist an Israeli court by providing discovery from an Israeli resident whose documents are within the Israeli court's jurisdiction").

does little to encourage foreign countries to provide similar assistance to U.S. courts because the 'assistance' it provides is not *helpful* to the foreign country's tribunal and may indeed interfere with foreign tribunal's authority and ability to control its own proceedings.").[18] There is simply no basis to burden third parties with discovery obligations before the parties themselves have engaged in any discovery, and before Swan is even authorized to initiate the Proposed English Proceedings.

### B.  Swan's Requests Are Overbroad and Unduly Intrusive and Burdensome.

The fourth *Intel* factor favors denial due to the overbreadth of Swan's Discovery Requests. "Requests are unduly intrusive and burdensome where they are not narrowly tailored, request confidential information and appear to be a broad 'fishing expedition' for irrelevant information." *In re Ex Parte Application of Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016) (citation omitted) (recognizing the Federal Rules of Civil Procedure require requests to be "'proportional' 'considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit'").

*First*, all requests seek information over a more than three-year period, even though the alleged events giving rise to the Foreign Proceedings occurred in August and December 2024. Nonetheless, Swan seeks discovery beginning on January 1, 2023, seven months before 2040 Energy was formed, more than a year before Cantor was introduced to Swan, and nearly two years before the Related Party Sale. It also seeks documents "to the present," again, notwithstanding that the events at issue occurred nearly two years ago. (Dkt. 5, Ex. 2.) There is no good faith basis to

---

[18] Even under Rule 26, courts in the Second Circuit limit duplicative third-party discovery. *See In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 69 (2d Cir. 2003) (holding that Rule 26 grants district courts "broad discretion" to limit discovery that is "duplicative, cumulative, or more readily obtainable from another source").

seek documents for the time period requested, let alone from a former CEO to a third party who is also a current high-ranking government official.

*Second*, Swan seeks "all" documents, communications, and records. Courts routinely find such requests unduly intrusive and burdensome. *Banoka S.a.r.l. v. Elliott Mgmt. Corp.*, 148 F.4th 54, 69 (2d Cir. 2025) (finding requests for broad categories of "all documents and communications" unduly intrusive and burdensome, particularly where they sweep in materials beyond respondents' direct involvement).

*Third*, Requests 3 and 5 are especially burdensome and intrusive—they are not narrowly tailored and seek expansive, highly confidential information irrelevant to the Foreign Proceedings. Request 3 seeks documents concerning Secretary Lutnick's "actual or anticipated business dealings" with 2040 Energy, Tether, Proton, or Elektron "*or any related person*." (Dkt. 5, Ex. 2.) Request 5 seeks "any payments, deposits, or financial transactions" between Secretary Lutnick and 2040 Energy, Tether, Proton, Elektron, Twenty One Capital, or "*any related person*." (*Id.*)

These requests suffer from many problems, including that they are not in any way tied to the Mining Assets, Related Party Sale, or Rain and Hell Fire Plan. Also, "any related person" is not defined and therefore purports to expand the inquiry to innumerable individuals or companies that "relate" in any way to 2040 Energy, Tether, Proton, Elektron, or Twenty One Capital. For example, if unbeknownst to him, Secretary Lutnick and 2040 Energy share the same accountant or law firm, these requests could capture payments to his advisors—even though such professionals have nothing to do with the Related Party Sale or Mining Assets. The breadth of these requests also raises significant confidentiality, competitive, privilege, and national security issues. *See In re Application of Shervin Pishevar for an Ord. to take Discovery for use in Foreign Proc. Pursuant to 28 U.S.C. § 1782*, 439 F. Supp. 3d 290, 306–07 (S.D.N.Y. 2020) (recognizing

17

that Section 1782 application may be denied if information sought is privileged). These concerns are particularly acute for a third-party individual, who bears no obligation to submit to the breadth of discovery typically reserved for parties to litigation—let alone one who is a high-ranking government official and former CEO. Courts have rejected such overreach. *See Saul Klein*, 2023 WL 8827847, at *14 (finding that "grapeshot" subpoenas with no non-speculative basis constitute "a fishing expedition" and "a vehicle for harassment") (internal citation omitted).

Swan argues that scope objections should be addressed after the Section 1782 application is granted. But *Intel* requires that the Court consider the gating issue of whether the requests are unduly burdensome and intrusive such that the Application should be denied. *Frasers*, 95 F.4th at 59-60 (concluding the fourth *Intel* factor weighed against relief because the discovery request was "unduly intrusive or burdensome"; "court *must* limit the frequency or extent of discovery otherwise allowed if it determines that the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive") (quoting Fed. R. Civ. P. 26(b)(2)(C)(i)); *In re Application Pursuant to 28 U.S.C. Section 1782 of Okean B.V. & Logistic Sol. Int'l to Take Discovery of Chadbourne & Parke LLP*, 60 F. Supp. 3d 419, 427, 432-33 (S.D.N.Y. 2014) (denying a Section 1782 application as unduly intrusive and burdensome even though the first three *Intel* factors favored granting it; "the burden that production of such documents would impose on non-party Chadbourne and its non-waiving clients is so great that it easily outweighs the other *Intel* factors, and compels denial of Okean's § 1782 application."). For the reasons set forth herein, the Court should deny the Application on this basis.[19]

---

[19] To the extent the Court is inclined to permit some discovery, it should order Swan to first obtain this information from Cantor before seeking discovery from Secretary Lutnick. *See Frasers*, 95 F.4th at 59-60.

*Finally*, Swan's deposition request is unduly intrusive and burdensome given Secretary Lutnick's current position as Secretary of Commerce, and for the same reasons discussed herein regarding the breadth of the information sought concerning Secretary Lutnick's business relationships and transactions. *See also*, *infra*, Argument, Section III.

### C. Swan's Application Reflects Bad Faith, Harassment, and an Improper Purpose.

The third *Intel* factor considers whether the Application "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States[.]" *Intel*, 542 U.S. at 264-65. Courts deny Section 1782 applications under this factor when the application is made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials. *See Mees*, 793 F.3d at 299 n.10 ("A request that appears only marginally relevant to the foreign proceeding may in certain cases suggest that the application 'is made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials,' which would be grounds for a discretionary denial of discovery.") (simplified). These concerns apply here. Swan is not entitled to the discovery it seeks from Secretary Lutnick for at least three reasons under this factor.

        1. <u>Swan Admits It Is Fishing for Information Secretary Lutnick May Not Even Possess.</u>

*First*, Secretary Lutnick is not alleged to have knowledge about the events relevant to the BVI Proceedings. *See In re Aguila Energia e Participacoes Ltda.*, 2023 WL 7001445, at *5 (S.D.N.Y. Aug. 22, 2023), *aff'd* 2025 WL 1661987 (2d Cir. June 12, 2025) (explaining fishing expeditions may indicate a misuse of Section 1782). The potential derivative claims concern alleged breaches of fiduciary duty by the Tether-Appointed Directors of 2040 Energy—Devasini and Van der Velde—in connection with the Related Party Sale. Secretary Lutnick was not a director of 2040 Energy and had no fiduciary duty to 2040 Energy, nor is he alleged to have been

19

a participant in the events giving rise to the derivative claims Swan seeks to bring.

The only "relevant information" Secretary Lutnick allegedly received was certain information in connection with Cantor's advisory role for Swan's anticipated IPO and Series C fundraise. (*See, e.g.*, App., ¶¶ 8; 15.) But, as discussed *supra*, Background, Section III, these interactions are typical of a prospective investment banking relationship. There is no evidence or allegation that Secretary Lutnick received, accessed, or used that information in connection with the Mining Assets, Related Party Sale, or Rain and Hell Fire Plan.

The Application is also replete with speculation about what Secretary Lutnick "may" have known based on Cantor's crypto business dealings, systematically conflating his current government position with his prior private sector conduct to generate a nonexistent connection. (*See, e.g.*, App., ¶¶ 16, 47, 74; *see also*, *supra*, Background, Section III.) Swan draws no connection between any of these activities and the Rain and Hell Fire Plan or Related Party Sale and admits it is fishing—seeking to "determin[e]" whether the defendants in the BVI Proceedings spoke with Secretary Lutnick about these events. (App., ¶ 72.) To the extent Swan implies any such connection, it is purely speculative—the evidence Swan has already gathered reveals no communication between any relevant party and Secretary Lutnick about the issues in the Foreign Proceedings, confirming the absence of any meaningful nexus.

2. Swan's Requests Seek Irrelevant and Cumulative Materials Beyond the Scope of Any Legitimate Inquiry.

*Second*, the discovery unreasonably seeks materials irrelevant to the Foreign Proceedings and cumulative of materials in Swan's or other parties' possession. As a threshold issue, the breadth of irrelevant material sought is unreasonable when viewed in context—the Proposed English Proceedings are neither authorized nor filed, and the BVI Proceedings are a procedural mechanism to determine whether Swan should be permitted to assert derivative claims on behalf

of 2040 Energy—not a complete merits-based assessment of those claims. The inquiry in the BVI Proceedings focuses on Swan's motivations for asserting the derivative claims and any residual cost and impacts on 2040 Energy. *See* Section 184C of the BVI Business Companies Act, 2004. While the Court will assess whether Swan "is likely to succeed," that inquiry is necessarily based on a limited record submitted by the parties, rather than a full trial on the merits.[20] *Dekel v. Clerkenwell Lifestyle Ltd.*, Claim No. BVIHC (COM) 2024/0466, at 13 (E. Carib. Sup. Ct., High Ct. of Justice, Com. Div. Mar. 4, 2025) (explaining 184C proceedings should be "simple and inexpensive" and "should not be allowed to escalate into a minor trial").

As discussed, *supra*, Argument, Section II.B, the requests are irrelevant to the Foreign Proceedings due to their overbreadth[21]—sweeping in documents over a more than three-year period, when the relevant events spanned a few months; seeking Secretary Lutnick's "actual or anticipated business dealings" and "payments, deposits, or financial transactions" untethered to the Mining Assets or Related Party Sale; and raising significant confidentiality, competitive, privilege, and national security concerns.

In addition, the discovery Swan seeks from Secretary Lutnick is unreasonably cumulative of materials obtainable from the parties to, or others involved in, the Foreign Proceedings. *See, supra,* Argument, Section II.A (discussing first *Intel* factor); *see also* App., Ex. 2 (requesting communications and transactions between Secretary Lutnick and Swan and 2040 Energy); *Mees*, 793 F.3d at 302 n.18 ("To the extent that the district court finds that Mees already possesses the

---

[20] As discussed in the Cantor opposition, it is also relevant that Swan could not obtain this discovery from Secretary Lutnick in the Foreign Proceedings. (CF Opp., at 13-15.) While Section 1782 does not require evidence to be discoverable in a foreign jurisdiction, *Intel* affords courts discretion to consider whether a party is using Section 1782 to circumvent foreign proof-gathering restrictions, particularly where, as here, doing so would be extraordinary given the burdensome nature of the discovery and Secretary Lutnick's current and former positions.

[21] As to the discovery requests that pertain to the events at issue in the Foreign Proceedings (*i.e.*, the Related Party Sale), as discussed, there is no evidence in the Application suggesting Secretary Lutnick has such relevant information. (*See*, *supra*, Argument, Section II.C.1.)

materials sought in her application, that might support a determination that the application has 'the purpose of harassment' or 'seeks cumulative materials.'") (citation omitted).

> 3.  Swan's CEO Has Publicly Targeted Secretary Lutnick to Harass and Embarrass Him.

Finally, Mr. Klippsten's derogatory public statements about Secretary Lutnick further suggest the Application is not a legitimate discovery device. *See In re Postalis*, 2018 WL 6725406, at *4 (S.D.N.Y. Dec. 20, 2018) (finding applicant's own public statements undermined the credibility of its asserted purpose for seeking Section 1782 discovery).

As discussed, Mr. Klippsten, Swan's CEO, is a frequent and public critic of Secretary Lutnick. In the week leading up to the filing of this Application, Mr. Klippsten frequently tweeted about the Secretary:

- **2026-03-18** — "Giancarlo Devasini, controlling shareholder of @tether, told me that Lutnick got his stake in Tether 'bloody cheap'[.]"
- **2026-03-20** — "As Lutnick Sold Cantor to His Children, Tether Gave Them a Loan. … An ethics expert said the loan may be 'another favor his family owes Tether.'"
- **2026-03-22** — "'if Tether's loan helped @howardlutnick complete a transaction that 'will ultimately benefit both him and his children, it's yet another favor his family owes @Tether."
- **2026-03-25** — "Lutnick on the Hot Seat, Yet Again… This week Swan Bitcoin filed an ex parte application… seeking court authorization to subpoena Cantor Fitzgerald and its former CEO, US Commerce Secretary Howard Lutnick[.]"

Ex. I. Mr. Klippsten made further public statements about these proceedings weeks later.[22]

Similar to the conduct at issue in the sanctions motion in the California Litigation, Mr. Klippsten's public statements—viewed alongside the Application's allegations about Secretary Lutnick untethered to the underlying dispute—suggest the true purpose of the Application is to harass Secretary Lutnick rather than obtain information genuinely needed for the Foreign

---

[22] Aiden Reiter, *Splitting the Monetary Regulatory Baby*, POLITICO (Apr. 23, 2026), https://www.politico.com/newsletters/morning-money/2026/04/23/splitting-the-monetary-regulatory-baby-00888087. Ex. H.

Proceedings. Courts deny Section 1782 applications where the court "suspects that the discovery is being sought for the purposes of harassment." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 81 (2d Cir. 2012) (citation omitted); *see also Postalis*, 2018 WL 6725406, at *5 ("Seeking discovery under § 1782 for an improper purpose ... is bad faith just as a harassing application is in bad faith."). For all of the foregoing reasons, the third *Intel* factor weighs heavily in favor of denying the Application.

### III.    The Apex Doctrine Shields Secretary Lutnick from This Unwarranted Discovery.

As a sitting Cabinet-level official and the former CEO of Cantor, Secretary Lutnick is entitled to apex doctrine protections, which provide "an additional layer of protection for" senior government officials and corporate executives subject to discovery. *Harapeti v. CBS Television Stations Inc.*, 2021 WL 3932424, at *2 (S.D.N.Y. Sept. 2, 2021). Courts applying the apex doctrine to high-ranking government officials require a showing of "exceptional circumstances," including that the official has "unique first-hand knowledge related to the litigated claims" *and* that "the necessary information cannot be obtained through other, less burdensome or intrusive means." *Lederman*, 731 F.3d at 203; *Chin v. New York City Dep't of Correction*, 741 F. Supp. 3d 18, 25 (E.D.N.Y. 2024) ("exceptional circumstances" require "*both* that the discovery sought from the high-level government official is relevant *and* necessary and that it cannot otherwise be obtained") (citation omitted). For former high-ranking corporate officers, courts apply a similar framework, considering "the likelihood that the individual possesses relevant knowledge, whether another source could provide identical information, the possibility of harassment, and the potential disruption of business." *See Hallmark Licensing,* 2018 WL 6573435, at *5.[23] Though framed

---

[23] The apex doctrine applies with equal force to former senior corporate officers. *In re Effecten-Spiegel AG*, 2018 WL 11732820, at *1 (S.D.N.Y. Aug. 10, 2018) ("Courts must be vigilant so that CEOs (and former CEOs) and those in control of large institutions are not subjected to the burdens of discovery without a showing that they are likely to

differently, the two tests share the same animating concern: "that depositions of high-profile or high-ranking busy individuals with exceptional demands on their schedules present a heightened risk of abuse or harassment, of the sort that Rule 26 expressly guards against."[24] *Mark Anthony Int'l SRL v. Prime Hydration, LLC*, 2025 WL 2055998, at *2 (S.D.N.Y. July 23, 2025). Under either formulation of the apex doctrine—the "exceptional circumstances" standard or the corporate officer factors—the result is the same: Swan cannot overcome the heightened protections afforded to Secretary Lutnick as both a former high-ranking corporate officer and a current high-ranking government official.

*First*, Secretary Lutnick lacks unique knowledge of Swan's claims. As discussed *supra*, there is no evidence that Secretary Lutnick has the requisite direct or "unique" knowledge concerning the Related Party Sale or Rain and Hell Fire Plan. *See Amaya v. Ballyshear LLC*, 2021 WL 12101052, at *2 (E.D.N.Y. Sept. 30, 2021) (granting protective order because "the record [was] otherwise devoid of information to demonstrate that Bloomberg possesses any unique knowledge to overcome the apex doctrine"); *Frasers Grp. PLC v. Gorman*, 2023 WL 6938284, at *4 (S.D.N.Y. Oct. 19, 2023), *aff'd sub nom. Frasers Grp. PLC v. Stanley*, 95 F.4th 54 (2d Cir. 2024) (finding evidence "too tenuous" to establish CEO's "personal role in connection with the margin call at issue"); *In re New York City Policing During Summer 2020 Demonstrations*, 677 F. Supp. 3d 206, 208-09 (S.D.N.Y. 2023) (mere involvement in discussing or approving policies does not establish relevance of testimony). Swan does not, and cannot, make such a showing. Swan argues that Secretary Lutnick "was personally involved with Swan, Tether, and the Tether-

---

have information useful to the litigation that cannot fairly and with less burden be found elsewhere."); *see also Harapeti*, 2021 WL 3932424, at *2.

[24] Swan argues that Secretary Lutnick's current position does not shield him from discovery since the discovery "relates to his work as then-CEO of Cantor." (App., ¶ 106.) This argument fails because Secretary Lutnick is entitled to apex protections in *both* capacities—as former CEO of Cantor and as current Secretary of Commerce. The policies undergirding the doctrine therefore apply with particular force here.

appointed directors" and "was uniquely positioned to obtain" Swan information. (App., ¶ 105.) But Swan misapplies the standard—Secretary Lutnick's knowledge must be related to Swan's *claims*, not to the parties involved. *Lederman*, 731 F.3d at 203. Swan concedes that it does not actually know whether Secretary Lutnick has any knowledge about the Related Party Sale or Rain and Hell Fire Plan and there is no cited evidence to believe he did.[25] Moreover, Swan makes no showing (nor can it) that the requested information is *necessary* to Swan's claims, especially given that the BVI Proceedings are a procedural hurdle that will not yield a merits-based finding, and Swan presently has no right to initiate the Proposed English Proceedings.

*Second*, the Application does not explain why the requested discovery cannot be obtained through less burdensome means. There is no indication that the parties have engaged in any discovery in the BVI Proceedings, which would supply much of the requested information. *See supra*, Argument, Section II.A. And all alleged activities occurred while Secretary Lutnick was employed by Cantor. *See, e.g.,* App., ¶¶ 10, 16. Accordingly, Swan should be required to first seek any such information from Cantor, the parties to the Foreign Proceedings, or other third parties before burdening Secretary Lutnick. *See Khan v. K1 Inv. Mgmt. LLC*, 2025 WL 3525835, at *5 (E.D.N.Y. Dec. 9, 2025) ("[P]arty depositions should be completed before proceeding to depositions of non-parties."); *Harapeti*, 2021 WL 3932424, at *2 ("[U]nless the executive 'has unique evidence, personal knowledge of the claims at issue,' and 'other witnesses are incapable of providing testimony about the conduct alleged,' executives are safeguarded from depositions.") (citation omitted); *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2020 WL 6273396, at *1 (S.D.N.Y. Aug. 28, 2020) ("because Plaintiffs have not sought any

---

[25] Swan cites cases permitting apex discovery where the parties already engaged in extensive discovery, and the witness participated in the conduct at issue or had personal, relevant knowledge. (*See* App., ¶ 104.) Secretary Lutnick is not alleged to have personal knowledge about the events relevant to the Foreign Proceedings. *See*, *supra*, Argument, Section II.C.1.

25

testimony from other employees about this putative conspiracy, they cannot establish that Mr. Gorman's knowledge is unique").

*Third*, the remaining apex factors—harassment and disruption—independently compel denial. As discussed, the discovery requests are harassing, a conclusion reinforced by Mr. Klippsten's public remarks about Secretary Lutnick. *See supra*, Argument, Section II.C.3. And compelling a sitting Secretary of Commerce to submit to deposition in a private commercial dispute would significantly disrupt his official duties—exactly the kind of burden the apex doctrine is designed to prevent. *See Lederman*, 731 F.3d at 203 ("High-ranking government officials are generally shielded from depositions because they have 'greater duties and time constraints than other witnesses.'"); *United States v. Newman*, 531 F. Supp. 3d 181, 188 (D.D.C. 2021) (noting apex doctrine serves multiple purposes, including "permit[ting] high-ranking government officials 'to perform their official tasks without disruption or diversion'" and "limit[ing] 'indiscriminate depositions'") (citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should deny Swan's Application in its entirety.

Dated: May 11, 2026                                 Respectfully Submitted,

                                                    **VINSON & ELKINS LLP**

                                                    */s/ Sara E. Brauerman*
                                                    Sara E. Brauerman
                                                    Vinson & Elkins LLP
                                                    The Grace Building
                                                    1114 Avenue of the Americas
                                                    32nd Floor
                                                    New York, NY 10036
                                                    212-237-0288
                                                    Email: sbrauerman@velaw.com

                                                    *Counsel for Respondent Howard W. Lutnick*

26

## CERTIFICATE OF COMPLIANCE

I, Sara E. Brauerman, an attorney duly admitted to practice before this Court, hereby certify that the foregoing Memorandum of Law was prepared using Microsoft Word and complies with Local Civil Rule 7.1(c). The total word count of the Memorandum of Law is 8,596 words, as calculated by Microsoft Word.

*/s/ Sara E. Brauerman*
Sara E. Brauerman