# Exhibit A

**THE EASTERN CARIBBEAN SUPREME COURT**

**VIRGIN ISLANDS**

**IN THE HIGH COURT OF JUSTICE**

**COMMERCIAL DIVISION**

**CLAIM NO. BVIHC (COM) 0121 OF 2026**

**IN THE MATTER OF THE BUSINESS COMPANIES ACT 2004 (AS AMENDED)**

**AND**

**IN THE MATTER OF 2040 ENERGY LTD**

**BETWEEN:**

**ELECTRIC SOLIDUS, INC. (d/b/a Swan Bitcoin)**

**Applicant**

**-and-**

**2040 ENERGY LIMITED**

**Respondent**

Mr Stephen Midwinter KC, instructed by Conyers, Dill and Pearman (BVI), Mr Jerry Samuel and Mr Aaron Mayers, of that firm, for the Applicant

Mr Richard Hill KC, instructed by Forbes Hare, and Mr Christopher Bromilow, of that firm, for the Respondent

---

**2026: 8 July**

**20 July**

---

**JUDGMENT**

## A INTRODUCTION

[1] **MITHANI J KC (Ag.)**: This is an application ("the Application" or "this Application") by Electric Solidus, Inc., trading as Swan Bitcoin ("the Applicant" or "Swan"), pursuant to section **184C of the BVI Business Companies Act 2004** ("the Act"), for leave to bring a derivative claim in the name and on behalf of the Respondent, 2040 Energy Limited ("the Respondent" or "the Company"), against ten proposed defendants, with the Company itself joined as a nominal defendant because the proceedings, if permitted, would be brought on its behalf. Unless the context otherwise requires, references in this judgment to section numbers alone are references to sections of the Act.

[2] Swan holds 20% of the Company's issued shares. It alleges that, between mid-2024 and 2025, the Company's Bitcoin mining business — together with the assets, personnel, and confidential information necessary to conduct it — was unlawfully diverted for the benefit of the Company's majority shareholder, Tether Investments, S.A. de C.V. ("TINV"), and entities associated with it, in breach of directors' duties, contractual obligations, and equitable duties owed to the Company. The Respondent resists the Application in its entirety. Its position is that no wrong of the kind alleged was done to the Company, and that Swan's true purpose in bringing this Application is collateral to, rather than aligned with, the interests of the Company.

This Application raises questions of considerable importance concerning the scope and operation of the statutory derivative jurisdiction under section **184C** of the Act. . More particularly, this Application requires the Court to consider: (i) the circumstances in which a minority shareholder may be permitted to litigate in the name of the company where those controlling it decline to do so; (ii) the interaction between contractual governance arrangements contained in a shareholders' agreement and directors' fiduciary duties; (iii) the proper construction and operation of contractual exculpatory provisions such as article 71 of the Company's Articles of Association; and (iv) the extent to which the existence of alternative remedies bears upon the exercise of the Court's discretion under **section 184C**. Although the factual matrix is unusual, the legal questions raised are of wider importance to the development of the derivative jurisdiction in this Territory.

[3] The task before me is not to decide, once and for all, whether the causes of action which Swan wishes to advance will succeed. Nor is it the function of the Court at this stage to resolve disputed questions of primary fact where those disputes are properly capable of resolution only after disclosure, expert evidence and cross-examination. It is to apply the evaluative exercise prescribed by **section 184C**, weighing the considerations identified by the legislature, while resisting any temptation to convert what is, in form, an application for leave into a trial of the underlying dispute. That said, because the parties have placed a substantial body of documentary and witness evidence before the Court, it is necessary to engage with that material in some detail in order to answer the statutory questions.

[4] Although many of the allegations advanced by Swan are serious and, in some instances, involve allegations of breach of fiduciary duty, conspiracy and dishonest assistance, it is important to emphasise at the outset that this is not the occasion upon which those allegations are finally determined. The Court is not deciding whether the proposed defendants have committed the wrongs alleged against them. Rather, it is deciding whether Swan has satisfied the statutory conditions upon which Parliament has permitted a shareholder exceptionally to litigate in the name of a company whose own decision-making organs have declined to do so.

[5] I address the parties and principal witnesses in Section B. Section C explains the nature of the derivative jurisdiction and the framework within which this Application falls to be decided. I then take each of the matters identified in **section 184C(3)** and section **184C(2)** in turn (Sections D to I), before addressing the question of a costs indemnity under **section 184D** (Section J) and setting out my conclusions and the disposal of the Application (Section K). Under each issue, I

set out a summary of the relevant facts, the applicable law, and the parties' rival submissions, together with my assessment of their respective strengths. The structure adopted follows the statutory sequence prescribed by **section 184C**. That approach has the additional advantage of enabling each statutory consideration to be analysed separately whilst recognising, as later discussed, that the statutory factors frequently overlap in practice and ultimately require an evaluative judgment in the round. In particular, I have sought, so far as practicable, to distinguish between findings of primary fact, the applicable legal principles, the parties' rival submissions and my conclusions on each statutory factor. That approach assists both in identifying the basis upon which this Application falls to be decided and in ensuring that no provisional observation made at the leave stage is inadvertently treated as a final determination of the substantive dispute.

[6] Save where I make findings expressly for the purpose of determining whether the statutory requirements for leave are satisfied, nothing in this judgment should be treated as a final determination of any disputed question of fact. Any observations on the underlying merits are provisional, are based solely on the present evidential record, and are made without the benefit of disclosure, expert evidence, or cross-examination.

[7] Although I have referred expressly only to those authorities and submissions necessary to determine this Application, I have considered all of the principal submissions advanced by leading counsel, together with the authorities to which they referred, whether or not they are expressly discussed in this judgment. Where particular submissions are not mentioned individually, that is because I have not found it necessary to address them separately in order to determine the issues arising under **section 184C**.

[8] Although the merits issue at times bordered on a rehearsal of the underlying factual case of the kind more commonly associated with an application for summary judgment, where an applicant contends that the written evidence relied upon by the defendant requires close scrutiny, I have not approached it on that basis. I have instead considered the Application on a broad-brush footing, leaving the essential factual disputes to be determined on another occasion.

[9] Although the judgment may appear lengthy, it is in fact relatively concise when measured against the considerable volume of documentary material in the bundles, the length of the skeleton arguments and the time devoted to oral submissions. That should not be taken to suggest that the issues were treated cursorily. On the contrary, they were considered with care and in detail.

But in a case of this kind, it is seldom necessary for the court to address every issue, much less every submission, and certainly not every document placed before it.

[10] The guiding approach is well established in the authorities. The Court is not required to conduct a detailed examination of the merits; it need only be satisfied that, on the face of the material before it, the claim appears to be meritorious.

[11] The authorities on what is necessary for the Court to come to that view are not entirely consistent: see **Minority Shareholders, Law Practice and Procedure**, Seventh Edition, Victor Joffe KC, SC, *et al*, at para. 2.90 *et seq*. The position is put in the following terms in **Hollington on Shareholders' Rights,** 10th Edition, Robin Hollington KC, 2023, Sweet and Maxwell, at para. 6-08, disregarding the footnotes in that paragraph):

> " … the claimant needs to satisfy the court that there is a *prima facie* case that the company is entitled to the relief claimed, which is a higher test than a seriously arguable case: **McGaughey v Universities Superannuation Scheme Ltd** [2022] EWHC 1233 (Ch) (Leech J), appeal dismissed [2023] EWCA Civ 873**,** at [133]–[146] … [and **Abouraya v Sigmund** [2015] BCC 503]. See also **Boston Trust Company Ltd v Szerelmey Ltd & Ors** [2020] EWHC 1136 (Ch), at [61]-[64], where it was common ground that a *prima facie* case in a common law derivative claim was 'roughly equivalent to showing a good or strong arguable case required in the context of jurisdictional gateways or freezing injunctions': In **Korchevtsev v Severa** [2022] EWHC 2324 (Ch), at [18]–[19], the Court proceeded on the basis that the test for permission in a common law derivative claim where there were heavily contested issues of fact in that case could be considered as the same as for a freezing injunction, while also accepting that the threshold might in some cases be lower than a "good arguable case". In **Dumont Enterprises Ltd v Fazita Investment Ltd** [2023] EWHC 1294 (Ch), the Court was satisfied that the claims were sufficiently meritorious to satisfy the *prima facie* merits threshold to permit a derivative claim to continue and went on to adopt that reasoning in considering whether to grant permission to serve out. [See also] **Re Nexbell Ltd** [2021] EWHC 1258 (Ch); [2021] B.C.C. 904 at [16]–[25]."

[12] In this context, it has been established by a preponderance of authority that the Court must not conduct a mini-trial in order to satisfy itself whether an applicant has established a meritorious case. As Lord Glennie in **Wishart, Petitioner** [2009] CSOH 20, at [39], observed:

> "… It is not however appropriate that the merits should be investigated in detail. It is clear from the Law Commission report that one of the objectives underlying their recommendations was to avoid a detailed investigation into the merits of the case taking place at the leave stage, since such a 'mini-trial' would be time-consuming and expensive. As the Lord Ordinary observes, the very nature of the control mechanism which the leave requirement has introduced … must mean that the process at that stage is not intended to be lengthy and drawn out: otherwise, the unprincipled shareholder would be able to use the leave application to drag the company through all the anguish and expense of the litigation which it is the object of the legislation to avoid; and, on the other side of the coin, those in control of the

company would be able to use their superior resources to stifle or delay meritorious claims. The dangers are illustrated by experience in England and Wales, where leave applications have been in use for much longer. As the Court of Appeal observed in **Prudential Assurance Co Ltd v Newman Industries Ltd** [1982] Ch 204 it cannot be right to subject the company to lengthy proceedings in order to decide whether the plaintiff is entitled to subject it to lengthy proceedings … In our opinion, the approach which should be aimed at is that described by Lord Denning M.R., anticipating the leave procedure which was subsequently introduced, in **Wallersteiner v Moir (No.2)** [1975] QB 373 at 392, 'this preliminary application should be simple and inexpensive. It should not be allowed to escalate into a minor trial'."

[13] The parties will often consider that more needs to be said on the merits because that is one of the statutory factors to which the Court must have regard when deciding whether leave should be granted. In my judgment, however, that is seldom necessary. In most cases, the Court should be able to give judgment *ex tempore*, particularly where the submissions are properly confined and the Court has had the benefit of reading the papers in advance. I referred to this in **ZVI Dekel v Clerkenwell Lifestyle Ltd** BVIHCM2024/0466 , but, as noted above, the principle is — in England, Wales and Scotland, at any rate — of much longer standing. I should emphasise that this is not intended as criticism of the parties: in many cases, it will not be immediately apparent what material ought properly to be included to assist the Court in assessing where the merits lie. Nothing I say should be understood as criticism of counsel. Each was faced with a substantial factual record and serious allegations requiring careful presentation. My observation is simply that, consistently with the authorities, derivative applications should ordinarily remain focused upon the statutory questions rather than developing into an extensive rehearsal of the underlying merits. As Mr Stephen Houseman QC, sitting as a deputy High Court Judge, observed in **Boston Trust Company Ltd v Szerelmey Ltd** [2020] EWHC 1136 (Ch), at [73], "the court should look under the bonnet of each claim, but need not strip down the engine, so to speak."

[14] Before leaving this introductory section, I should add one further observation. Applications for leave to bring derivative proceedings inevitably require the Court to perform a careful balancing exercise. If the threshold is set too low, the statutory safeguard enacted by Parliament will become ineffective, exposing companies to expensive and disruptive litigation at the instance of dissatisfied shareholders. If it is set too high, genuine corporate wrongs committed by those controlling a company may escape judicial scrutiny altogether. The statutory discretion conferred by **section 184C** seeks to strike an appropriate balance between those competing considerations.

## B DRAMATIS PERSONAE

[15] Given the number of individuals and corporate entities involved, and the fact that several witnesses hold overlapping roles across related proceedings in three jurisdictions, it is convenient to identify the principal participants before turning to the issues. The descriptions which follow are included solely as an aid to reading this judgment; they are not findings as to the role played by any individual in the matters alleged.

[16] The *dramatis personae* is drawn from a most helpful and more detailed document provided on behalf of the Respondent. I should make clear, however, that the descriptions of the entities and individuals concerned, and of the roles alleged to have been played by them, may not be agreed between the parties and may not be accurate in every respect. It is nevertheless a useful *aide-mémoire*, and I adopt it for the limited purpose of identifying the relevant parties and the part each is said to have played for the purposes of this Application. However, doing so should not be taken as an endorsement of the factual accuracy of any particular description contained within it.

[17] It should also be borne in mind that these descriptions are intended only to assist the reader. They should not be taken as findings that the individuals concerned occupied the roles attributed to them at every material time, nor that they participated in the conduct alleged by Swan. Those matters remain disputed.

### *(i) The parties*

| Name / Entity | Role |
|---|---|
| **Electric Solidus, Inc. ("Swan")** | Applicant. A US (Delaware) corporation trading as Swan Bitcoin. Holds 20% of the shares in the Company. Responsible under the SHA for the Company's day-to-day management, including the Bitcoin mining operations. |
| **2040 Energy Limited ("the Company")** | Respondent (nominal defendant to the proposed derivative claim). A BVI company incorporated in June 2023 as the joint venture vehicle for the Bitcoin mining business. |
| **Tether Investments, S.A. de C.V. ("TINV")** | Holds 79% of the Company's shares; sole external funder (approx. US$408m advanced in interest-free loans). Formerly incorporated in |

| | |
|---|---|
| | the BVI, redomiciled to El Salvador. Forms part of the wider Tether corporate group. Proposed first defendant to the derivative claim; also claimant in the related English proceedings. |
| **Max Keiser** | Holds the remaining 1% of the Company's shares; introduced Swan and Tether. |

***(ii) Individuals said to be involved in the alleged scheme***

| **Name** | **Role** |
|---|---|
| **Giancarlo Devasini** | TINV-appointed director of the Company; controlling shareholder and Chairman of TINV's ultimate parent. Deponent of Devasini 1. Proposed defendant. |
| **Ludovicus van der Velde** | TINV-appointed director of the Company; senior Tether executive. Proposed defendant. |
| **Cory Klippsten** | Swan-appointed director of the Company; CEO of Swan. Deponent of Klippsten 1 and Klippsten 2 (Applicant's evidence). |
| **Raphael Sequerra Zagury** | Formerly Swan's Head of Mining: said to be the author of the "Zagury Memo", the "NxT Plan", the "Elektron Plan" and the "rain and hellfire" notes; now CEO of Proton and Elektron. Deponent of Zagury 1 and Zagury 2 (Respondent's evidence). Proposed defendant; also respondent to a related Florida arbitration brought by Swan. |
| **Alexander Holmes** | Former Swan/Company employee; author of the message said to reveal that assets were moved out of the Company "so they are not encumbered by the frivolous Swan lawsuit" (the "Holmes Message"). Proposed defendant. |
| **Zachary Lyons** | Tether's key representative in financing the mining operation; now Tether's Chief Investment Officer. Deponent of Lyons 1 (Respondent's evidence). Proposed defendant. |
| **Paolo Ardoino** | Senior Tether executive said to have participated in or approved the scheme. Proposed defendant. |

| Name | Role |
|---|---|
| **Khaled Khatoun** | Deponent of Khatoun 1 and Khatoun 2 on Swan's behalf, addressing the procedural history and allegations of bad faith. |
| **Yan Pritzker** | Deponent for and director of Swan (Pritzker 1), providing valuation, deployment and quantum analysis in reply evidence. |
| **Kate Jackson-McGill KC** | Deponent of Jackson-McGill 1 on the Company's behalf, addressing the merits defences and the **section 184C(2)** factors. |

***(iii) Corporate vehicles said to have received the diverted business***

| Entity | Role |
|---|---|
| **Proton Management Ltd ("Proton")** | Incorporated 2 August 2024; assumed operational control of the Company's mining business following the Mass Resignation; employed the former Mining Team. Proposed defendant. |
| **Elektron** | New, wholly Tether-owned mining entity to which the Company's mining business, personnel and (on Swan's case) confidential information are said to have been diverted; said to have grown from the NxT Plan/Elektron Plan projections to approximately 50 EH/s by November 2025. Proposed defendant. |
| **Strange-Quark Systems LLC** | Entity understood to be related to Elektron; involvement not yet established pending disclosure. Proposed defendant. |

***(iv) Related proceedings and decision-makers referred to in the evidence***

| Proceedings | Relevance |
|---|---|
| **California Proceedings (US District Court, Central District of California)** | Commenced by Swan in its own name, 25 September 2024, alleging misappropriation of trade secrets; voluntarily withdrawn following Swan's concession that the relevant assets belonged to the Company, not to Swan. No finding of bad faith against Swan. |
| **English Proceedings (Commercial Court)** | Commenced by TINV and the Company in January 2025 alleging breach of the SHA's English jurisdiction clause. Includes the judgment |

| Proceedings | Relevance |
|---|---|
| | and order of Henshaw J (9 September 2025) on the "Ownership Issue" declaring the "Business Assets" (including BNOC and related tools) the property of the Company, and the anti-suit Application and Judgment described separately below. |
| **The Anti-Suit Application and Judgment** | TINV's application to restrain Swan from pursuing this Application, dismissed by the Deputy Judge (Mr. Sean O'Sullivan KC) on 26 June 2026: Tether Investments, S.A. de C.V. & Anor v Electric Solidus, Inc. [2026] EWHC 1652 (Comm) ("the Anti-Suit judgment"). |
| **Florida Arbitration** | Personal claim by Swan against Mr Zagury alone, proceeding on the basis that the relevant Business/Mining Assets belong to the Company. |

***(v) Overview of the joint venture (largely common ground)***

[18] The Company was incorporated in June 2023 as the vehicle for a Bitcoin mining joint venture between Swan and TINV, pursuant to a shareholders' agreement dated 28 July 2023 ("the Shareholders' Agreement" or "the SHA"). In substance, TINV provided funding and held majority control (79% of the shares and two of the Company's three board seats), while Swan was responsible for the Company's day-to-day management and mining operations, holding 20% of the shares and one board seat. Funding was advanced under a Senior Tranche Instrument dated 28 July 2023, in interest-free tranches repayable within 60 months. By May 2024, TINV had advanced approximately US$408 million ("the Debt"), a figure later reduced to approximately US$354 million following the Related Party Sale addressed in Issue 4 below.

[19] Both parties accepted during oral submissions that the Shareholders' Agreement occupies a central position in the commercial relationship between Swan and the remaining shareholders, although they differ fundamentally as to its proper construction and legal consequences.

[20] The SHA makes provision for two distinct periods: the period before full repayment of the Debt ("the Repayment Date"), and the period thereafter. Before the Repayment Date, TINV is entitled to appoint a majority of the board, and the Company may not conduct business or deploy cash except in accordance with TINV-approved Investment Memos. In addition, a broad range of Reserved Matters require TINV's written consent pursuant to Schedule 2A to the SHA. After the

Repayment Date, TINV must relinquish one board seat in favour of an independent director, the Investment Memo mechanism falls away, TINV is required to transfer shares so as to increase Swan's holding to 48.5%, and Swan becomes entitled to 50% of profit distributions. As considered below, the question when, and by what means, the Company's progress towards the Repayment Date was halted is itself a live issue in this Application.

[21] Swan commenced proceedings in California on 25 September 2024 ("the California Proceedings"), later voluntarily withdrawn following its concession that the relevant assets belonged to the Company rather than to Swan itself. TINV commenced proceedings in the Commercial Court in England in January 2025 ("the English Proceedings"); in the course of those proceedings Henshaw J gave judgment on the "Ownership Issue" (9 September 2025) and declared the "Business Assets" to be the Company's property.

[22] Following the filing of this Application, TINV applied for an anti-suit injunction to restrain Swan from pursuing it; that application was dismissed in the Anti-Suit Judgment on 26 June 2026. Swan has, in addition, indicated an intention to counterclaim in the English Proceedings for harm said to have been suffered by it personally, has brought a separate arbitration against Mr Zagury alone in Florida ("the Florida Arbitration"), and has obtained discovery under 28 U.S.C. section 1782 in proceedings in Delaware and New York.

[23] The foregoing summary is intended only to provide sufficient background to place the issues in context. The factual disputes material to the determination of this Application are addressed under the individual statutory factors to which they relate.

[24] The remaining, and sharply contested, factual and legal issues are best addressed individually, issue by issue, following the structure of the Act. Before doing so, however, it is convenient to say something about the nature of the jurisdiction conferred by **section 184C**, since several of the parties' submissions on the individual statutory factors can only properly be understood against that background.

## C THE STATUTORY SCHEME AND THE NATURE OF DERIVATIVE PROCEEDINGS

[25] At common law, the starting point is the rule in **Foss v Harbottle** (1843) 2 Hare 461. That rule reflects two fundamental principles of company law. The first is the "proper plaintiff" principle, namely that where a wrong has been done to a company it is ordinarily for the company, and not an individual shareholder, to seek redress. The second is the principle of majority rule, namely

that the internal affairs of a company should ordinarily be regulated by the will of the majority acting through the company's constitutional machinery, and not through litigation initiated by dissenting shareholders.

[26] These principles serve important commercial purposes. They preserve the separate legal personality of the company, avoid a multiplicity of proceedings, prevent inconsistent judgments, and ensure that decisions concerning the conduct of litigation remain vested in the organs entrusted by law and by the company's constitution with responsibility for managing its affairs.

[27] Difficulties arise, however, where those controlling the company are themselves alleged to have committed the wrong complained of, or are so closely aligned with those alleged wrongdoers that the company cannot realistically be expected to vindicate its own rights. In those circumstances a rigid application of *Foss v Harbottle* would risk leaving serious corporate wrongs without an effective remedy. It is that difficulty which gave rise first to the equitable derivative action and subsequently to the statutory jurisdiction now contained in **section 184C**. As the Privy Council recently explained in **Tianrui (International) Holding Company Ltd v China Shanshui Cement Group Ltd** [2024] UKPC 36, at [34]-[36], the modern statutory jurisdiction continues to perform that fundamental function.

[28] **Section 184C** gives statutory expression to the long-established equitable exception **to Foss v Harbottle**. Parliament has recognised that where those controlling the company are themselves alleged to have committed the relevant wrongdoing, strict adherence to the proper plaintiff principle may leave the company without any effective remedy. The statutory jurisdiction, therefore, confers upon the Court a carefully controlled discretion to authorise derivative proceedings where the statutory conditions are satisfied. Those principles promote certainty, preserve the separate legal personality of the company, prevent a multiplicity of proceedings and avoid undue judicial interference in corporate decision-making. Parliament nevertheless recognised that those principles may operate unjustly where those controlling the company are themselves alleged to have committed the wrongdoing complained of. **Section 184C**, therefore, provides a carefully regulated statutory exception, enabling the Court, in appropriate circumstances, to authorise a shareholder to litigate on behalf of the company where the company's own decision-making organs cannot realistically be expected to do so.

[29] It follows that the derivative jurisdiction is exceptional. Parliament has not conferred upon minority shareholders a general right to substitute their own commercial judgment for that of the board or the majority. Rather, **section 184C** provides a carefully controlled mechanism whereby, in limited

circumstances, a shareholder may be permitted to litigate on behalf of the company where the company's own decision-making machinery cannot properly be expected to do so.

[30] The discretion conferred by **section 184C** is not exercised by mechanically counting the number of factors pointing in favour of, or against, granting leave. Nor does the statute assign predetermined weight to any particular consideration. The Court's task is evaluative. The statutory exercise is, therefore, qualitative rather than arithmetical. It must consider each of the mandatory statutory factors, together with any other relevant circumstances, and then stand back to determine whether, viewed as a whole, this is one of the exceptional cases in which derivative proceedings should be authorised.

[31] In the British Virgin Islands, that exception is now given statutory form by **section 184C**. The relevant provisions of that section, for the purposes of this Application, are in the following terms:

> "(1) Subject to subsection (3), the Court may, on the application of a member of a company, grant leave to that member to:
>
> (a) bring proceedings in the name and on behalf of that company; or
>
> (b) intervene in proceedings to which the company is a party for the purpose of continuing, defending or discontinuing the proceedings on behalf of the company.
>
> (2) Without limiting subsection (1), in determining whether to grant leave under that subsection, the Court must take the following matters into account:
>
> (a) whether the member is acting in good faith;
>
> (b) whether the derivative action is in the interests of the company taking account of the views of the company's directors on commercial matters;
>
> (c) whether the proceedings are likely to succeed;
>
> (d) the costs of the proceedings in relation to the relief likely to be obtained; and
>
> (e) whether an alternative remedy to the derivative claim is available.
>
> (3) Leave to bring or intervene in proceedings may be granted under subsection (1) only if the Court is satisfied that:
>
> (a) the company does not intend to bring, diligently continue or defend, or discontinue the proceedings, as the case may be; or

(b) it is in the interests of the company that the conduct of the proceedings should not be left to the directors or to the determination of the shareholders or members as a whole.

(4) …

(5) The Court may grant such interim relief as it considers appropriate pending the determination of an application under subsection (1).

(6) Except as provided in this section, a member is not entitled to bring or intervene in any proceedings in the name of or on behalf of a company."

[32] The structure of the section is deliberate. It first imposes threshold conditions that must exist before leave can be granted, and then requires the Court to undertake an evaluative exercise by reference to a number of mandatory, though non-exhaustive, considerations. The distinction between those two stages is of considerable importance and should not be blurred.

[33] **Section 184C(6)** provides that, except as provided in that section, a member is not entitled to bring or intervene in any proceedings in the name of or on behalf of a company. The effect of **section 184C(6)** is that the obtaining of leave under **section 184C** is a condition precedent to a member's right to bring derivative proceedings on a company's behalf, whether those proceedings are to be pursued in the BVI or elsewhere, and that the provision excludes any parallel derivative claim at common law. A shareholder wishing to pursue proceedings in the name of a BVI company must therefore first obtain the leave of this Court. The leave requirement is not a procedural formality. It is an essential statutory safeguard designed to protect companies from inappropriate litigation whilst ensuring that genuine corporate wrongs are capable of being remedied where those controlling the company are unwilling or unable to act.

[34] The statutory exercise proceeds in two stages. First, the Court must be satisfied that one of the alternative preconditions in **section 184C(3)** is met: that the company does not intend to bring, prosecute, compromise or abandon the relevant proceedings, or that it is in the company's interests that their conduct should not be left to its directors or to the shareholders as a whole: **Glory Advance International Ltd v Merit Fortune Holdings Ltd** BVIHC(COM) 2015/0090, at [16].

[35] Second, once that threshold is crossed, the Court must have regard to the five matters identified in section **184C(2)**:

(a) whether the member is acting in good faith;

(b) the interests of the company;

(c) the likelihood that the proceedings will succeed;

(d) the costs of the proceedings in relation to the relief likely to be obtained; and

(e) whether an alternative remedy to the derivative claim is available.

[36] Those matters are not exhaustive, and the statute does not prescribe the weight to be given to any of them. Nor does the statute establish any hierarchy between them. No single factor is inevitably decisive, and the Court exercises an overall discretion, weighing all the matters relevant to the particular case: see, by way of examples, **Franbar Holdings Ltd v Patel** [2008] EWHC 1534 (Ch); **Dekel** (permission to appeal granted, on a discrete point unrelated to the passages cited in this judgment), at [22], [24]–[26]; **Glory Advance**, at [23], [32]; and **Xeno Origin Ltd v Ma Kwok Leung** BVIHCMAP2025/0024, BVIHCMAP2025/0026, 3 July 2026. Put another way, there may be cases where considerations of fairness to the company, quite apart from the statutory merits factors themselves, justify refusing permission notwithstanding that the statutory factors might otherwise favour leave. That illustrates why **section 184C** cannot sensibly be approached as an exhaustive code.

[37] The exercise required by **section 184C** is, therefore, neither mechanical nor formulaic. It is not a checklist upon which success or failure depends simply upon the number of factors pointing one way or the other. Nor is it an exercise in assigning predetermined numerical weight to particular considerations. Rather, it requires the Court to evaluate all relevant circumstances in the round before deciding whether the exceptional jurisdiction to authorise derivative proceedings ought to be exercised.

[38] The judgment in **Xeno Origin** was not brought to my attention at the hearing on 8 July 2026, as the parties only became aware of it on 9 July 2026. Had it then been available, I have no doubt that it would have featured prominently in the parties' submissions. Several of the observations of Farara JA are plainly of significance. Although *obiter* and, therefore, not binding on this Court, they are nonetheless compelling and may properly be regarded as instructive on certain of the issues arising for determination. That said, I should make clear that my decision on the Application would in any event have been the same. In my judgment, **Xeno Origin** does not establish any new principle of law which was not already reflected in the authorities cited by the parties. Rather, it provides valuable appellate guidance upon the application of those established principles. Accordingly, whilst I have taken **Xeno Origin** fully into account before finalising this

judgment, I have not considered it necessary to invite further submissions because, in my judgment, it does not alter the applicable legal principles or the outcome of this Application.

[39] Finally, I emphasise that the statutory factors should not be treated as hermetically sealed compartments. They overlap in important respects. A conclusion reached under one factor may legitimately inform the evaluation of another, provided that each statutory requirement is addressed independently. The ultimate exercise remains a single evaluative judgment directed to whether leave should be granted.

[40] In **Xeno Origin**, Farara JA (with whom Price-Findlay, CJ and Esco. L. Henry JA agreed), referring to my observations in **Dekel**, stated:

> "[115] It is also submitted by Mr. Ma that the language of **sections 184C(2) & (3)** is amply supported by the authorities. Reference is made to **Glory Advance** where (at para. 23) Leon J opined: '… there is no reason why any particular consideration should "trump" another …. The appropriate discretionary weighing will depend on all the circumstances of each matter." And, in … **Dekel**, Mithani J at paras. [23] and [27]: —
>
> > '**s. 184C** gives a wide and unfettered power to grant leave to bring a derivative claim, subject, of course, to the limitation that it must be exercised judicially and, therefore, on a case-by-case basis.'
> >
> > The factors specified in **s. 184C**, which the Court must take into account, are not exhaustive", and "do not carry more weight than those that are not so set out.' (Emphasis supplied [by Farara JA])."
>
> [116] The opinion of Mithani J in **ZVI Dekel** adopts the approach that the court's discretion under **section 184C(2)** is "wide and unfettered" and is not limited by the five factors or considerations specified therein, which are to be treated as "non-exhaustive". Second, Mithani J in that extract, also underscores that a judge, in exercising the discretion under section **184C** whether to grant leave, may take into account other relevant considerations or factors, on a case-by-case basis. Third, Mithani J is of the further opinion that none of the five specified factors under subsection (2) necessarily carry more weight than other relevant factors to be taken into account which are not specified at subsection (2)."

[41] At [120]-[121], Farara JA went on to say:

> "Can the judge when dealing with an application for leave under **section 184C** attach more weight to an 'additional' factor than the weight which he attaches to any of the five mandatory factors specified in **subsection (2)**, as suggested by Mithani J in the passage above from **ZVI Dekel**? In my considered opinion, strictly speaking the answer may be "yes", as a matter of principle, judicial discretion and logic. However, it is difficult, but not impossible, to conceive of circumstances where an additional consideration attracts more weight or significance to the determination of an application for leave under **section 184C**, than the five mandatory considerations under **subsection (2)**. As a

matter of legislative purpose and context, the five mandatory factors specified in **subsection (2)**, by their very nature and significance to the determination of an application by a member for leave to bring derivative proceedings, must be accorded prominence and great importance, in my view. In most if not all cases, the court's assessment of each of these factors is very likely to point, prima facie, to granting or refusing leave, as the case may be, if not decisive."

This is to be compared and contrasted with **subsection (3)** which uses the word "only" in limiting or curtailing court's ability to grant an application for leave. Satisfying the two requirements of **subsection (3)** is absolutely critical to the court's determination of an application for leave under **subsection (1)**, even if an applicant has satisfied the judge on each of the five mandatory considerations under **subsection (2)** and any additional relevant factors founded on the evidence adduced and circumstances of each case. This is clear from the use of the wording of the subsection …",

[42] In **Xeno Origin**, Farara JA stated, approving my observations in **Dekel**, that an additional factor may, in an appropriate case, be weightier in the exercise of the discretion under **section 184C** than a statutory factor which the Court must take into account under that provision. The substance of this point has been acknowledged in many English cases on the broadly similar provision specified in section 263 of the UK Companies Act 2006.

[43] I respectfully agree with Farara JA that a court may, in an appropriate case, attach greater weight to an additional factor than to one of the statutory factors, although the position is not entirely free from doubt on the authorities. The English authorities have been reviewed in some detail in **Mithani: Directors' Disqualification** (Tiran Nersessian KC, Gen. Ed.), LexisNexis (loose-leaf and online), at para III[352A] *et seq*. Although that discussion arises in the context of Schedule 1 to the Company Directors Disqualification Act 1986, it considers analogous statutory provisions employing materially similar language and the competing strands of authority. The preponderance of English authority supports the proposition that, in an appropriate case, an additional factor may properly carry greater weight than one of the statutory factors. Nothing in that analysis, however, detracts from the fundamental proposition that the Court remains entitled, and indeed obliged, to have regard to all relevant matters in reaching its decision.

[44] In **Xeno Origin**, at [123], Farara JA cited extensively from a passage of Wallbank J's judgment at first instance in that case, in which Wallbank J stated that he disagreed with my observations in **Dekel**, where I had said that the discretion of the Court under **section 184C** was "wide and unfettered", observing:

"I **disagree with Justice Mithani that the Court's jurisdiction is unfettered**. I agree with him that it is wide, but I do not agree that it is unfettered. Precisely the conditions in **184C**, they are the **fetters**. And **I agree with him that other factors can be taken into account and could prevail** but these ones that are listed out in the Act, they must be

> taken into account… Now, I also agree that this is **not a box-ticking exercise** and I agree also with Justice Mithani that there is **a considerable amount of leeway** in the Court's assessment of whether or not the various factors should result in leave being granted or the like. **I do not say that those factors set out in the statute are a cumulative list of hurdles to be overcome**, such as Mr. Lord has suggested, that you have to satisfy the Court on all of them in order to get leave. I don't see it as hard and fast as that. It is the **overall picture** which should inform the Court's discretion." (emphasis added by Wallbank J)

[45] Wallbank J appears to have taken an unduly restrictive view of the point made in **Dekel**. The discretion there described as wide and unfettered was expressly qualified by the requirement that it be exercised judicially, on a case-by-case basis, and in accordance with the purpose for which it is conferred. A discretion of that kind is not rendered arbitrary merely because the statute does not prescribe rigid criteria.

[46] Properly understood, there is no inconsistency between describing the discretion as "wide" and recognising that it must be exercised consistently with the statutory purpose. A discretion may be broad in the range of considerations capable of being taken into account whilst remaining constrained by the object of the legislation and the principles governing its exercise.

[47] That was the point made in **Dekel**, and it reflects a principle of general application wherever a court is entrusted with a discretion. As Parker LJ observed in **Ottway v Jones** [1955] 1 WLR 706 at 714, even a discretion that is "completely unfettered" on its face "cannot be exercised arbitrarily; it must be exercised judicially and on fixed principles dictated by reason and justice." The same principle underlies numerous statutory discretions. The breadth of a discretion concerns the range of matters capable of being taken into account, not the absence of legal principle governing its exercise. That point is illustrated by, for example, section 33 of the Limitation Act 1980 of England and Wales. There, too, the court is required to have regard to specified matters, yet Lord Hoffmann in **A v Hoare** [2008] UKHL 6 had no difficulty in describing the discretion as "unfettered", notwithstanding that "the court was enjoined by **sub-s (3)(a)** to have regard to [inter alia] the reasons for delay …".[1]

[48] In my respectful judgment, the real difficulty with the analysis is conceptual. A discretion is not rendered "fettered" merely because Parliament has identified matters to which the Court must have regard. Statutory discretions routinely require mandatory considerations to be taken into account whilst nevertheless remaining broad in the range of other considerations capable of influencing the ultimate decision. To describe such a discretion as "wide and unfettered", in the

---

[1] [2008] UKHL 6, at [49].

sense explained in Dekel, is simply to recognise that Parliament has not attempted exhaustively to prescribe every circumstance relevant to the exercise of the discretion.

[49] In **Xeno Origin**, Farara JA found it difficult, though not impossible, to conceive of circumstances where such an additional factor would attract more weight to the determination of an application for leave under **section 184C**, than the five mandatory factors under **subsection (2)**. The present case itself illustrates why such circumstances may arise. The statutory factors do not operate in isolation. Their relative importance necessarily depends upon the factual matrix before the Court. The discretion conferred by **section 184C** is sufficiently broad to permit that conclusion where justice requires it.

[50] In my judgment, **Dekel** is a clear example of a case in which an additional factor may be decisive. Where the case against the proposed defendants is weak, a court's refusal to afford the costs protection contemplated by **section 184D** may not be enough, particularly if the company is insolvent, on the brink of insolvency, or likely to be rendered insolvent by having to pursue the claim. In such circumstances, the applicant would be entitled to contend that the court should grant leave and, as Mr Midwinter KC appeared to suggest, leave the question of security to be raised by the defendants. That course, however, has two obvious disadvantages: first, the defendants remain wholly unprotected until a security for costs order is made; and second, there is at least a real possibility that no such order will be granted if countervailing considerations point the other way. In my judgment, therefore, that additional factor may assume substantial importance in a case of this kind. That example also illustrates why **section 184C** cannot sensibly be treated as a closed statutory code. Parliament identified five mandatory considerations but did not attempt exhaustively to prescribe every circumstance capable of bearing upon the exercise of the discretion.

[51] Wrongdoer control — whether formal, in the sense of a shareholding or board majority, or practical, in the sense of an alignment of interest between the board and the proposed defendants — bears on both stages of the exercise. It is often the very reason why a precondition under **section 184C(3)** is met, and it is also relevant to the Court's assessment of the company's interests under **section 184C(2)(b)**, since a board that is dominated by the proposed defendants cannot be expected to give a disinterested account of whether proceedings against themselves are commercially appropriate: **Dekel**, at [84]–[97].

[52] As to likelihood of success under **section 184C(2)(c)**, the applicable standard is whether the proposed proceedings are more probable than not to succeed: **Basab Inc v Accufit**

**Investments Inc** BVIHCMAP 2014/0020, at [39]; and **Dekel**, at [30]–[40]. That assessment is necessarily provisional and is made on the material available at the leave stage. The application is not to be treated as, and should not become, a mini-trial of the merits, and it will often be unreasonable to expect an applicant to have adduced expert evidence by this stage, particularly where he may not ultimately be granted leave to rely on it: **Dekel**, at [28]–[29], [38] and fn.2, applying **Basab** and **Glory Advance** to the same effect. The proposed causes of action in this case engage a director's duty to act in good faith in what he considers to be the company's best interests, for a proper purpose, and to avoid conflicts of interest — duties reinforced by the strict no-conflict and no-profit rules established in cases such as **Regal (Hastings) Ltd v Gulliver** [1967] 2 AC 134 and **Cook v Deeks** [1916] AC 554. The duty to account for profits made in consequence of a breach of fiduciary duty is, moreover, strict: it does not depend on any "but for" counterfactual analysis of what the fiduciary might have earned had no breach occurred, and it affords no defence for a fiduciary to show that he could have made the same profit without disloyalty: **Rukhadze v Recovery Partners GP Ltd** [2025] UKSC 10, applying **Regal (Hastings)** and **Boardman v Phipps** [1967] 2 AC 46. The same principle underlay the recent decision of the Court of Appeal in **Song & Zhao v Smith** [2026] EWCA Civ 719, concerning a shareholder who continued to pursue business opportunities after a joint venture partner had withdrawn, where the Court considered both a fiduciary's duty to account for profits to the company and whether the same conduct amounted to unfair prejudice to the other shareholder — a juxtaposition of remedies of some relevance to Issue 6 below. Whether Swan ultimately establishes any such breach will depend upon findings of fact which cannot properly be made at this stage. The present question is simply whether the proposed causes of action possess sufficient apparent merit to satisfy **section 184C(2)(c)**.

[53] It follows that the Court's task is not to decide whether the applicant will ultimately succeed at trial. Rather, it is to determine whether, on the present evidential record, the statutory threshold has been crossed.

[54] Finally, because a derivative claim exposes the company itself — rather than the shareholder personally — to the costs, delays, and management burden of litigation, often against its own controlling shareholder or persons associated with it, the jurisdiction has consistently been treated as a remedy of last resort. That consideration finds statutory expression in **section 184C(2)(e)**, which requires the Court to consider whether an adequate alternative remedy is available to the shareholder in its own right; it is addressed fully under Issue 6 below.

[55] I should emphasise, however, that satisfying **section 184C(3)** merely opens the gateway to the exercise of the Court's discretion. It creates no presumption that leave should thereafter be granted, nor does it diminish the importance of the mandatory considerations contained in **section 184C(2)**.

## D ISSUE 1 — THE STATUTORY PRECONDITIONS: SECTION 184C(3)

### The Facts

[56] The following summary is intended to provide the factual context necessary to determine the present application. It should not be understood as containing findings of fact except where expressly indicated.

[57] The material facts relevant to **section 184C(3)** are straightforward and largely undisputed. TINV holds approximately 79% of the Company's issued share capital and is entitled to appoint two of the Company's three directors. Those directors, Mr Devasini and Mr van der Velde, are themselves among the proposed defendants to the derivative claim. Mr Devasini states expressly in his evidence (Devasini 1) that the Company does not intend to commence the proceedings which Swan seeks permission to bring on its behalf. The purpose of **subsection (3)** is readily apparent. Parliament has recognised that there is little utility in permitting a shareholder to invoke the discretionary factors in **subsection (2)** unless the shareholder first demonstrates that the company's own decision-making machinery cannot reasonably be expected to determine for itself whether proceedings should be brought. **Section 184C(3)**, therefore, performs an important gatekeeping function before the Court proceeds to consider the discretionary factors in **section 184C(2)**. It recognises that no rational observer could realistically expect directors who are themselves alleged to have participated in the wrongdoing complained of to authorise proceedings against themselves or against those with whom they are said to have acted in concert.

### The Law

[58] **Section 184C(3)** permits the grant of leave only if the Court is satisfied of one of two alternative preconditions: (i) that the company does not intend to bring, prosecute, compromise or abandon the relevant proceedings; or (ii) that it is in the company's interests that their conduct should not be left to its directors or to the shareholders as a whole: **Glory Advance**, at [16]. As already noted, wrongdoer control — whether formal or, as a matter of practical alignment, between the

board and the proposed defendants — is directly relevant to whether either precondition is met: **Dekel**, at [88]–[97].

## The Rival Arguments

### *Applicant's case*

[59] Swan submits that both limbs of **section 184C(3)** are, in any event, independently satisfied. First, Mr Devasini's own evidence establishes that the Company does not intend to sue. Second, and separately, wrongdoer control is complete: TINV controls 79% of the shares and two of the three board seats, and its two appointees are themselves among the proposed defendants, such that it is plainly in the Company's interests that conduct of the proceedings should not be left to its own directors or majority shareholder. Swan further submits that this is the paradigm case for the operation of **section 184C(3)**: no rational observer, it argues, could realistically expect directors who are themselves alleged to have participated in the wrongdoing complained of to authorise proceedings against themselves or against those with whom they are said to have acted in concert.

### *Respondent's case*

[60] The Respondent's evidence and skeleton argument do not, on the material before me, mount any serious challenge to either precondition being met. Its resistance to the Application is concentrated on the discretionary factors in **section 184C(2)**, addressed under Issues 2 to 6 below.

## Conclusion on Issue 1

[61] Both limbs of **section 184C(3)** are satisfied.

[62] The Respondent did not seriously dispute that the statutory threshold contained in **section 184C(3)** was satisfied. Rather, its case was that, even if the jurisdictional gateway was crossed, the Court should nevertheless refuse leave after considering the discretionary factors contained in **section 184C(2)**. Accordingly, its submissions were directed principally to Issues 2 to 6 rather than to the threshold requirements imposed by **subsection (3)**.

[63] Mr Devasini's evidence places beyond genuine dispute that the Company does not intend to bring the proposed proceedings. That finding alone is sufficient to satisfy **section 184C(3)(a)**.

[64] Independently of that conclusion, I am satisfied that **section 184C(3)(b)** is likewise engaged. TINV exercises effective control of the Company through both its shareholding and its entitlement

to appoint a majority of the board. The directors through whom that control is exercised are themselves among the proposed defendants. Whether or not Swan ultimately establishes the wrongdoing alleged against them, the statutory purpose underlying section **184C(3)(b)** is plainly engaged where those responsible for determining whether proceedings should be brought are themselves alleged to be participants in the conduct complained of.

[65] I, therefore, conclude that each limb of **section 184C(3)** is independently satisfied. This conclusion is not controversial. Nor does it materially affect the ultimate outcome of the Application, which turns instead upon the discretionary considerations addressed in **section 184C(2)**.

[66] I should add that the satisfaction of **section 184C(3)** does not create any presumption that leave should thereafter be granted. It merely permits the Court to proceed to the second stage of the statutory analysis. Whether leave should ultimately be granted remains entirely dependent upon the Court's assessment of the discretionary considerations contained in **section 184C(2)**.

[67] I begin with the statutory factors identified by **section 184C**. Although I address them separately for analytical convenience, I do not lose sight of the fact that they are not hermetically sealed compartments. The evidence and considerations relevant to one factor frequently bear upon another, and the Court's ultimate task is to stand back and evaluate the application in the round.

## E <u>ISSUE 2 — GOOD FAITH: SECTION 184C(2)(A)</u>

### <u>The Facts</u>

[68] Good faith is concerned with the applicant's dominant purpose in seeking leave. It is not displaced merely because the applicant also stands to derive an incidental commercial benefit if the proceedings succeed.

[69] Swan's equity interest in the Company was, on its own evidence (Khatoun 2), structurally subordinated to TINV's debt and had no immediately realisable financial value at the time of the breakdown in the parties' relationship. Swan has brought or threatened proceedings in four fora arising out of overlapping events: the California Proceedings (in its own name, later withdrawn); the English Proceedings (as defendant, with a threatened personal counterclaim); the Florida Arbitration (against Mr Zagury personally); and this Application. The California court made no finding of bad faith against Swan in connection with the withdrawn proceedings, and Henshaw J did not find bad faith or hopelessness in Swan's concession on the Ownership Issue.

**The Law**

[70] The enquiry required by **section 184C(2)(a)** is directed to Swan's predominant purpose in seeking leave to pursue derivative proceedings. It is neither sufficient nor necessary that Swan should have acted from a single motive. Commercial parties commonly pursue litigation for a variety of overlapping reasons. The existence of a commercial interest, or even a substantial personal interest, does not of itself demonstrate bad faith. Equally, a genuine belief that wrongdoing has occurred does not necessarily establish good faith. The Court must evaluate all the evidence objectively in order to determine whether, viewed as a whole, the predominant purpose of the Application is the vindication of rights belonging to the Company or the pursuit of Swan's own commercial objectives. Nor do I regard the existence of multiple proceedings, viewed in isolation, as indicative of bad faith. Modern international commercial disputes frequently generate litigation in several jurisdictions. Nor is there anything inherently improper in advancing different legal causes of action where different legal systems provide different remedies. The significance of the present case lies elsewhere. It lies in the cumulative impression created when substantially the same underlying commercial events are characterised in materially different ways according to the forensic requirements of the particular proceedings. It is that cumulative pattern, rather than the existence of multiple proceedings itself, which I regard as relevant.

[71] I also bear firmly in mind that good faith is not to be assessed by reference to hindsight or by isolating individual events from their broader commercial context. The question is whether, objectively assessed at the time this application was brought, Swan was predominantly seeking to advance the interests of the Company through derivative proceedings or whether those proceedings formed part of a wider litigation strategy directed principally towards Swan's own commercial interests. The Court must be careful not to equate the existence of a commercial motive with bad faith, and I therefore approach the question of motive with some caution. Commercial self-interest and good faith are not mutually exclusive concepts. Shareholders commonly pursue litigation in circumstances where they hope ultimately to improve the value of their investment or strengthen their commercial position, and such motives are entirely consistent with good faith provided that the predominant purpose remains the vindication of rights belonging to the company rather than the pursuit of an improper collateral objective. The real question is whether Swan is genuinely seeking to vindicate rights belonging to the Company or whether the proposed proceedings are, in substance, being pursued for an ulterior purpose inconsistent with the statutory jurisdiction.

[72] For completeness, I add that no single matter discussed above would, taken in isolation, have led me to conclude that Swan had failed to satisfy **section 184C(2)(a)**. My conclusion is based upon the cumulative effect of all the evidence. It is the combination of the matters identified above, viewed against the background of the wider litigation history and the commercial context in which this application has been brought, that ultimately persuades me that Swan has failed to discharge the burden resting upon it.

## The Rival Arguments

### *Applicant's case*

[73] On behalf of Swan, Mr Midwinter submits that allegations of bad faith should not readily be inferred merely because Swan had commercial interests of its own in pursuing the litigation.

[74] Swan submits that the volume and character of the contemporaneous documentary evidence of the alleged scheme is itself sufficient to support a genuine belief that the Company has been wronged, and that the true object of the Application is to obtain redress for the Company. It relies on the absence of any adverse finding of bad faith by the California court or by Henshaw J. As to the suggestion that its shares have no value, Swan accepts that its equity had no immediately realisable value given its structural subordination to the Debt, but contends that its shares would have become highly valuable but for the alleged scheme, and that it would make no commercial sense for TINV to have continued funding the Company on an interest-free basis, and for Swan to have contributed its own effort, if Swan could never realistically benefit. As to the suggestion of an abusive multi-jurisdictional campaign, Swan submits that each strand — California, the Florida Arbitration, and the section 1782 applications — has an independent and legitimate explanation, and that the Florida Arbitration in particular proceeds consistently with, rather than inconsistently with, its concession that the relevant assets belong to the Company.

[75] Swan further submits that the very existence of the contemporaneous documents upon which it relies—the NxT Plan, the Elektron Plan, the "rain and hellfire" notes and the Holmes Message — is fundamentally inconsistent with the suggestion that this Application is merely a tactical device. It argues that few minority shareholders would undertake litigation of this magnitude unless they genuinely believed that a substantial corporate wrong had occurred.

### *Respondent's case*

[76] The Respondent disputes each of those allegations and contends that they are based upon an incomplete and legally flawed interpretation of the contemporaneous documents. The

Respondent contends that this Application is not brought in good faith, relying on five matters: first, that Swan's shares are admittedly of no realisable value, such that the real purpose of the Application is to generate settlement leverage rather than to benefit the Company; second, a want of candour as to the SHA's actual terms; third, materially inconsistent positions taken across the California, Florida, English, and BVI proceedings — in particular, pleading harm to Swan personally in Florida while pleading harm to the Company here — said to engage the line of authority on abusive inconsistent claims and to raise a risk of double recovery; fourth, an allegation that Swan's account is contradicted by its own contemporaneous notes of a call on 16 July 2024; and fifth, an allegation, addressed further under Issue 3, that a proposed alternative vehicle referred to in the evidence as "2140" shows that the Company itself suffered no loss, since any relevant assets and opportunities would, on the Applicant's own case, never have accrued to the Company in any event.

[77] The Respondent further submits that the manner in which Swan had advanced the litigation formed part of the overall good-faith assessment required by **section 184C**.

**Conclusion on Issue 2**

[78] Having considered all of the evidence bearing upon this issue, both individually and cumulatively, I have reached the conclusion, not without hesitation, that Swan has failed to establish that this Application is being pursued predominantly for the purpose of vindicating rights belonging to the Company. I emphasise the word "predominantly". I fully accept that Swan may genuinely believe that serious wrongs have been committed. Equally, I accept that Swan may sincerely wish the Company to recover losses which it alleges have been suffered. Those matters, however, are not themselves determinative. The question posed by **section 184C(2)(a)** is whether the statutory derivative procedure is predominantly being employed for the benefit of the Company, or whether it is principally being deployed in furtherance of Swan's own commercial position.

[79] I have also taken into account the manner in which Swan has conducted these proceedings. Whilst litigation conduct may in an appropriate case bear upon the question of good faith, it is only one factor within the broader evaluative exercise required by **section 184C**.

[80] Standing back and considering the evidence as a whole, I am not persuaded that Swan has discharged the burden of satisfying me that the application has been brought in good faith within the meaning of **section 184C**. I emphasise, however, that this conclusion is directed solely to the statutory question before the Court. It should not be understood as constituting any wider finding concerning Swan's general commercial conduct or credibility.

[81] I readily accept that a shareholder whose shares are presently "under water" is not thereby precluded from acting in good faith. Many derivative claims arise precisely because the value of the shareholder's investment has been seriously impaired by the wrongdoing alleged. I place little weight upon the present economic value of Swan's shareholding viewed in isolation. A shareholder whose investment has become economically impaired is not thereby incapable of acting in good faith. Indeed, many derivative claims arise precisely because alleged misconduct has diminished the value of the company's business. The significance of Swan's economic position lies not in the fact that its shares presently have limited or no economic value, but in the way that circumstance interacts with the wider course of conduct upon which the Respondent relies.

[82] I emphasise that this conclusion involves no finding that Swan has fabricated its allegations, or that its witnesses have been dishonest; nor does it involve any final determination of the underlying merits. It reflects my assessment, viewed objectively on the material before me, of the purpose for which the derivative procedure is presently being used. My reasons follow.

[83] First, Swan's own evidence concedes that its equity interest had no immediately realisable value at the material time, given its structural subordination to the Debt. I accept, as a matter of principle, that a shareholder whose present economic interest is limited may nonetheless genuinely believe that the company has been wronged, and that fact alone would not defeat good faith. But Swan's further answer — that its shares would have become valuable but for the alleged scheme — presupposes the very success of the claim for which leave is sought, and does not meet the more immediate difficulty that, on the material before me, the practical effect of this Application is to generate leverage against TINV in circumstances where no value is presently, or in the short to medium term, capable of accruing to Swan directly. A derivative claim brought predominantly to improve a shareholder's negotiating position, rather than because the shareholder has a genuine, presently-held belief that pursuing the claim will benefit the company as such, does not satisfy section **184C(2)(a)**, even where the underlying grievance may have some foundation.

[84] Second, I do not accept that Swan's shifting characterisation of who has suffered the relevant harm, across the California Proceedings, the Florida Arbitration, the English Proceedings, and this Application, is satisfactorily explained simply by treating each as a discrete and independently justified step. Taken cumulatively, the pattern is one of a party selecting, at each stage, whichever characterisation of ownership and loss best serves its immediate tactical

position — harm to Swan where that serves its purpose, harm to the Company where that serves its purpose — rather than the consistent position one would expect of an applicant proceeding from a settled view that the Company, and the Company alone, has been wronged in the manner now alleged.

[85] It is not the existence of different proceedings that concerns me. Modern international commercial disputes frequently generate parallel litigation in different jurisdictions. Nor do I suggest that parties are forever confined to precisely the same legal analysis in every forum. Rather, the difficulty lies in the cumulative impression created when substantially the same factual events are repeatedly characterised in materially different ways depending upon the forensic advantages available in each jurisdiction.

[86] Third, I have taken into account the Respondent's evidence that Swan's own contemporaneous notes of the 16 July 2024 call are difficult to reconcile with its present case that it opposed the transition to Elektron from the outset as an unlawful scheme against the Company.

[87] Swan's explanation — that it was, at the time, contemplating winding down its own non-mining business under commercial pressure — does not answer the point convincingly; if anything, it confirms that Swan was, at the material time, prepared to countenance a negotiated exit from the mining business, which sits uneasily with its current characterisation of the same events as a covert and unlawful expropriation orchestrated without its knowledge or acquiescence.

[88] I have not overlooked that Swan's case does not depend solely on inference from subsequent events. It relies heavily on contemporaneous documents said to have been generated by persons alleged to have participated in the scheme itself — the NxT Plan, the Elektron Plan, and the "rain and hellfire" notes — which, if ultimately accepted at trial as authentic and interpreted as Swan contends, are capable of providing substantial support for the allegation that a coordinated plan existed before the Mining Team's departure. The Respondent disputes both the authenticity of the interpretation placed on those documents and their significance, contending that they record discussions of a consensual restructuring rather than an unlawful diversion of corporate opportunity. That dispute cannot be resolved on the present material, and I have given Swan's reliance on those documents full weight in reaching my conclusion; it does not, however, displace the three difficulties identified above, which go to Swan's own conduct and evidence rather than to the conduct of the proposed defendants.

[89] Those documents, therefore, constitute an important countervailing consideration. They demonstrate that Swan's allegations cannot properly be dismissed as speculative or fanciful. They do not, however, answer the different question posed by **section 184C(2)(a)**, namely whether the derivative jurisdiction is predominantly being invoked for the benefit of the Company. I have therefore treated them as a significant factor in Swan's favour, but not as determinative of the statutory issue. I likewise attach limited significance to the fact that no findings adverse to Swan were made in the California proceedings or by Henshaw J in the English proceedings. Those courts were determining different questions, applying different legal principles, and doing so upon different evidential records. Whether Swan is acting in good faith for the purposes of **section 184C** is a distinct statutory question falling to be determined independently on the evidence before this Court. I, therefore, regard those decisions as part of the factual background, but not as materially advancing the statutory enquiry.

[90] For these reasons, I find that Swan has not discharged the burden of showing that it is acting in good faith within the meaning of **section 184C(2)(a)**. This finding does not depend on, and should not be read as, a finding that Swan's underlying complaints are dishonest or invented; it reflects my assessment that the derivative procedure is not, on the evidence before me, being used predominantly for the benefit of the Company. This factor weighs against the grant of leave.

[91] My conclusion on this issue should not be misunderstood. I do not find that Swan has acted dishonestly, improperly or in bad faith in the ordinary sense of those expressions. Nor do I conclude that its allegations are fabricated or incapable of succeeding. My conclusion is confined to the statutory concept of good faith contained in **section 184C(2)(a)**. Having considered the evidence in the round, I am not persuaded that Swan has established that the present application is being pursued predominantly for the purpose of vindicating rights belonging to the Company. That conclusion forms one important factor, though not the only factor, leading me to refuse leave.

[92] I should emphasise once again that this conclusion is confined to the statutory concept of good faith contained in **section 184C(2)(a)**. It should not be understood as amounting to any finding that Swan has fabricated evidence, advanced knowingly false allegations or otherwise acted dishonestly. Nor should it be taken as expressing any concluded view on the ultimate merits of the underlying allegations, all of which remain to be determined, if at all, in appropriate proceedings. My conclusion is a narrower one: namely that Swan has failed to satisfy me that the exceptional statutory procedure of derivative litigation is, on the present evidence, being

invoked predominantly in the interests of the Company rather than principally in furtherance of Swan's own commercial objectives.

[93] I emphasise that this conclusion should not be understood as establishing any general principle that derivative proceedings are contrary to a company's interests whenever they involve substantial cost or complexity. Many derivative claims necessarily involve significant expenditure. The conclusion reached here is fact-specific and depends upon the combination of circumstances identified above, including my conclusions on the remaining statutory factors.

## F ISSUE 3 — INTERESTS OF THE COMPANY: SECTION 184C(2)(B)

### The Facts

[94] The next question is whether it appears to be in the interests of the Company that the proposed proceedings should be brought. That enquiry is necessarily prospective. It requires the Court to assess, on the material presently available, whether authorising litigation is likely to advance the Company's interests when viewed objectively and commercially.

[95] The facts relevant to **section 184C(2)(b)** are largely uncontroversial. Any damages or equitable recovery obtained in the proposed proceedings would belong to the Company rather than to Swan personally. To the extent that such recovery was realised, it would be available, at least initially, to reduce the substantial indebtedness owed by the Company to TINV, presently said to stand at approximately US$354 million. Separately, Swan advances a substantial claim for an account of profits against Elektron, alleging that Elektron has generated significant profits through the exploitation of business opportunities, confidential information and personnel said properly to have belonged to the Company. According to Mr Zagury's own evidence, Elektron has developed into a highly profitable mining operation operating at approximately 50 EH/s. The Respondent further contends that any decision by the Company itself to fund litigation of this nature would require compliance with the Investment Memo provisions contained in the SHA.

[96] Swan further submits that the Respondent's analysis places undue emphasis upon the Company's present indebtedness whilst overlooking the nature of the assets which it alleges have been diverted. If Swan's allegations are ultimately established, the Company has allegedly been deprived not merely of individual assets but of business opportunities, mining infrastructure, confidential information and future revenue streams which formed an integral part of the

commercial venture contemplated by the SHA. Swan therefore submits that restoring those assets to the Company would necessarily advance its interests.

**<u>The Law</u>**

[97] **Section 184C(2)(b)** requires the Court to have regard to the interests of the company, taking into account any views expressed by its directors as to those interests, but the Court will scrutinise rather than uncritically accept a company's assertion that proceedings against those who control it, or are closely associated with those who do, are commercially inappropriate: **Dekel**, at [84]–[85].

[98] The Court's task is not to decide whether the directors' commercial decisions were correct. It is to decide whether there is a sufficient basis for concluding that litigation challenging those decisions is presently in the Company's interests.

[99] The enquiry requires an objective commercial evaluation. The Court is not required simply to accept the views of those presently controlling the company, particularly where, as here, two of the three directors expressing those views are themselves proposed defendants; were the position otherwise, derivative proceedings could rarely, if ever, be brought against incumbent directors. Equally, the Court must avoid substituting its own commercial judgment for that of directors acting honestly within the scope of their managerial discretion. No single factor under **section 184C(2)** is determinative in the exercise by the Court of its overall discretion: **Dekel**, at [22], [24]–[26]; and **Glory Advance**, at [23], [32].

[100] Although each of the statutory factors must be addressed separately, it would be artificial to ignore the extent to which they inform one another. The weaker the apparent merits of the proposed proceedings, the less likely it is that exposing the Company to their attendant burdens will objectively promote its interests. Equally, the existence of a realistic alternative remedy bears directly upon the practical utility of authorising derivative litigation

[101] The enquiry required by **section 184C(2)(b)** is an objective one. The question is not whether Swan honestly believes that the proposed proceedings are in the Company's interests, nor whether TINV or the existing directors take a different view. The Court must determine for itself whether, viewed objectively and having regard to all the relevant circumstances, authorising the proposed proceedings would be likely to promote the interests of the Company as a separate legal person. In undertaking that exercise, it is important not to equate the interests of the Company with the interests of any particular shareholder. Nor should the Company's interests

automatically be assimilated to those of its present controllers. The statutory jurisdiction exists precisely because there will be cases in which those interests diverge. The Court must, therefore, stand back from the positions adopted by the competing shareholders and identify what course best serves the interests of the Company itself, considered as a separate legal person, rather than the interests of any individual shareholder, creditor or director. Although the views of the directors are a relevant consideration, they cannot be determinative where those expressing those views are themselves alleged to have participated in the wrongdoing complained of or are otherwise closely aligned with those against whom relief is sought.

## The Rival Arguments

### *Applicant's case*

[102] Swan submits that the claim is manifestly in the Company's interests. Reduction of the Company's own debt is itself a benefit to the Company, not merely to TINV; and, on Mr Pritzker's analysis, a successful claim would, on a conservative model, generate a surplus for the Company after full repayment of the Debt by around March 2027. Independently of the debt-reduction analysis, the account of profits claim against Elektron is not limited by the size of the Debt and offers a further, independently sufficient, route to a substantial recovery for the Company. As to the funding objection, Swan submits that it is circular: if no claim is brought, the Company has no realistic prospect of recovering the value said to have been diverted, and its treasury will in any event be progressively applied against the Debt.

[103] Swan further submits that it is wrong to analyse the Company's interests exclusively through the prism of its present indebtedness. It argues that, if its allegations are ultimately established, the Company has been deprived of the very business by which that indebtedness was intended to be repaid. It therefore says that refusing leave would itself permanently deprive the Company of the opportunity to recover assets and profits which properly belong to it.

### *Respondent's case*

[104] The Respondent, by contrast, submits that **section 184C(2)(b)** requires the Court to undertake a practical commercial assessment. It argues that the proposed proceedings would involve extensive disclosure exercises across multiple jurisdictions, substantial management time, significant legal expenditure and prolonged commercial uncertainty. Those burdens, it submits, substantially outweigh any realistic prospect of benefit to the Company.

[105] The Respondent submits that any recovery would do no more than reduce the Company's debt to its own controlling shareholder — in substance, money moving in a circle — with no value realistically capable of reaching Swan given the extent to which its equity is said to be underwater, and that funding the litigation from the Company's own treasury without an Investment Memo would itself constitute a further breach of the SHA, exposing the Company to acceleration of the Debt as an Event of Default.

[106] The Respondent further submits that the Court should not lose sight of the practical consequences of authorising derivative proceedings on this scale. The proposed litigation would involve ten defendants, substantial disclosure exercises across several jurisdictions, expert evidence, and very significant management time. It submits that exposing the Company to those burdens cannot realistically be regarded as promoting its commercial interests.

**<u>Conclusion on Issue 3</u>**

[107] The existence of serious allegations does not of itself demonstrate that litigation is in the Company's interests. The statutory jurisdiction requires something more than the existence of arguable claims.

[108] I accept, as a matter of legal principle, that reducing a company's indebtedness ordinarily advances that company's interests. A solvent company with fewer liabilities is, all other things being equal, better placed commercially than one burdened by greater indebtedness. Nor do I accept the Respondent's submission that the identity of the creditor necessarily deprives such a recovery of value to the Company. The Company and TINV remain separate legal persons. The extinguishment of a genuine debt owed by the former to the latter is capable, in principle, of conferring a real commercial benefit upon the Company.

[109] The question posed by **section 184C(2)(b)**, however, is not whether some theoretical benefit can be identified; it is whether, viewed realistically and commercially, the proposed proceedings ought to be pursued in the Company's interests. Given my finding under Issue 2, this factor is closely bound up with the conclusion already reached: a claim not being pursued predominantly for the Company's benefit is unlikely to be one whose pursuit, at the Company's expense, is in the Company's interests. Independently of that, I accept the Respondent's submission that it is not in the Company's interests to bear the costs and management burden of derivative proceedings of this scale and complexity where, as I find under Issue 6, an adequate alternative remedy is available to Swan in its own right. The prospect that a successful claim might, in due

course, reduce the Company's debt to TINV or result in an account of profits against Elektron does not outweigh these concerns.

[110] That, however, is not the end of the enquiry. **Section 184C(2)(b)** requires the Court to evaluate the Company's interests in the round. It is therefore necessary to balance the potential benefit of any recovery against the very substantial burdens which derivative proceedings of this nature would inevitably impose upon the Company. Those burdens include not merely the financial costs of the litigation, but also the diversion of management resources, the uncertainty associated with long-running international proceedings, and the practical consequences of requiring the Company itself to litigate against those who presently exercise control over it.

[111] I also attach significance to the conclusion already reached under Issue 2. Although each statutory factor must be considered separately, they do not exist in isolation. Where the Court has concluded that the derivative procedure is not being invoked predominantly for the benefit of the Company, that conclusion inevitably informs the objective assessment of whether exposing the Company to the burdens of litigation can properly be said to promote its interests. The statutory factors are distinct, but they are not hermetically sealed compartments.

[112] Taking all of these matters together, I am not satisfied that Swan has demonstrated that authorising the proposed proceedings presently appears to be in the Company's interests. That conclusion is reached having regard to the totality of the evidence presently before the Court and without prejudging the ultimate merits of the underlying disputes.

[113] I, therefore, conclude that, although the proposed proceedings might potentially confer some benefit upon the Company if successful, the overall balance comes down against granting leave. The combination of my findings on good faith, the practical burdens of the proposed litigation, and the availability of an adequate alternative remedy leads me to conclude that authorising derivative proceedings would not, viewed objectively, promote the interests of the Company within the meaning of **section 184C(2)(b).**

## G <u>ISSUE 4 — LIKELIHOOD OF SUCCESS: SECTION 184C(2)(C)</u>

### <u>The Law</u>

[114] My conclusions on good faith and the Company's interests are each sufficient to weigh materially against the grant of leave. I turn next to what, in the circumstances of this case, is the most

substantial statutory issue, namely whether Swan has demonstrated that the proposed proceedings are more likely than not to succeed.

[115] The exercise required by **section 184C(2)(c)** is necessarily predictive rather than determinative. The Court is not conducting a trial upon affidavit evidence, nor is it finally resolving disputed questions of fact, contractual construction or credibility. Equally, however, Parliament has required something more than the identification of a merely arguable case. The applicant must satisfy the Court that the proposed proceedings are more likely than not to succeed. The Court must, therefore, undertake a realistic assessment of the apparent strength of the proposed claims on the material presently available whilst recognising the inherent limitations of determining such issues without disclosure or cross-examination.

[116] In carrying out that assessment, I have considered each proposed cause of action separately before standing back to evaluate the cumulative strength of the proposed proceedings as a whole. Although individual claims may differ in their apparent merits, the statutory question ultimately requires an overall assessment of whether Swan has demonstrated that the proposed derivative proceedings, viewed collectively, are more likely than not to succeed.

[117] The applicable standard, as already noted, is whether the proposed proceedings are more probable than not to succeed: **Basab**, at [39]; and **Dekel**, at [30]–[40]. That assessment is provisional, made on the material available at the leave stage, and must not become a mini-trial of the merits. The proposed causes of action engage a director's duty to act in good faith in what he considers to be the Company's best interests, for a proper purpose, and to avoid conflicts of interest, reinforced by the strict no-conflict and no-profit rules in **Regal (Hastings)** and **Cook v Deeks**. Liability to account for profits made in consequence of a breach of fiduciary duty is strict and does not depend on any "but for" causal analysis: **Rukhadze**, applying **Regal (Hastings)** and **Boardman v Phipps**; and see **Song & Zhao v Smith** [2026] EWCA Civ 719. At this stage I am not required finally to choose between those competing constructions. The question is whether Swan has demonstrated that its preferred construction is more likely than not to prevail.

[118] The Court must, therefore, be astute not to determine disputed questions of fact finally, nor to resolve difficult issues of contractual construction where the answer depends upon a fuller evidential record. At the same time, **section 184C(2)(c)** requires more than identifying an arguable case. The Court must be satisfied, on the material presently available, that the proposed proceedings are more likely than not ultimately to succeed.

**(a) <u>The alleged scheme — the facts common to all heads of claim</u>**

[119] Swan's case is that, from late June/early July 2024, TINV, the TINV-appointed directors, and certain individuals associated with Tether and with Swan itself devised and implemented a scheme to transfer the Company's mining business to a new, wholly Tether-owned entity, Elektron. Swan relies on a sequence of contemporaneous documents: the "NxT Plan" of 19 July 2024, circulated by Mr Zagury, proposing to spin off the mining business into a new Tether-owned entity; the "Elektron Plan" of 30 July 2024, recording a transition programme already said to be underway, including the statement that "2040 [Energy is] no longer used for new opportunities"; and Mr Zagury's notes of a call on 6 August 2024 ("the rain and hellfire notes"), recording a "staged walk-out", an intention to "sue Cory and Swan", and reliance on "legal cover from Tether".

[120] On 8 August 2024, the Mining Team resigned *en masse*, having, on Swan's case, downloaded thousands of files including proprietary source code, site databases, financial models, and operational know-how in the preceding days. Proton, incorporated six days earlier, immediately assumed operational control using the same personnel. The Company's hashrate fell from approximately 12.8 EH/s in July 2024 to approximately 7.2 EH/s by March 2026, while Elektron, using the same personnel and methods, reached approximately 50 EH/s by November 2025. The Respondent's account is materially different: that the Company's own business and assets remained with the Company throughout; that the Mining Team simply changed employer to Proton while continuing, on its case, to serve the Company's mining operations; and that any spin-off discussions were open and consensual, said to have been proposed in part by Mr Klippsten himself, until Swan's position became more adversarial from around August 2024.

[121] It is unnecessary, at this stage, to determine which of these competing factual narratives is correct. The significance of the competing accounts lies in identifying the principal issues that would require determination at trial and assessing whether Swan has demonstrated that its version is presently more likely than not to be accepted. As leading counsel repeatedly emphasised, the Court should avoid determining disputed factual issues capable of resolution only after disclosure and cross-examination.

**(b) <u>The Related Party Sale</u>**

[122] On 7 December 2024, the TINV-appointed directors approved the sale to TINV itself of 26,048 ASICs and related infrastructure for approximately US$55.6 million ("the Related Party Sale"), applied in reduction of the Debt and not replaced. Three days later, Mr Holmes is said to have told a third party that assets were being moved out of the Company "so they are not encumbered

by the frivolous Swan lawsuit". Further sales of 25,875 ASICs followed in May and August 2025, also without replacement.

[123] It is important to distinguish two analytically separate questions. The first is whether the Related Party Sale was effected at an appropriate value. The second — and in my judgment the more fundamental question — is whether, assuming the assets were transferred at full market value, the SHA nevertheless authorised TINV to cause the Company to dispose of productive mining assets in the circumstances alleged by Swan. Those questions should not be conflated. A transaction may occur at full value yet still be impugned if it was undertaken without contractual authority or for an improper purpose. Equally, a transaction may be contractually authorised notwithstanding disagreement about its commercial wisdom.

***Applicant's case***

[124] Swan submits that the relevant counterfactual is not the forced-sale market price of the machines but the value the Company would have obtained by deploying them, relying on an analysis using Mr Zagury's own "ASIC Calculator" to show a lost profit of approximately US$120 million from the ASICs sold under the Related Party Sale alone.

***Respondent's case***

[125] The Respondent submits that three independent valuations were obtained for the December 2024 sale and that TINV paid above the highest of them, that later sales were at market price, and that deployment of the ASICs within the Company's own business was never realistically available without further TINV-approved capital which TINV was not obliged to provide.

**(c) <u>Abandonment or diversion of pipeline opportunities</u>**

[126] Swan alleges that opportunities identified for the Company before the Mass Resignation, including Ethiopia/ETxO, GeoBitMine, and Tasmania II, were thereafter abandoned or diverted to Elektron, without disclosure yet having taken place to establish the full scope of what occurred.

***Applicant's case***

[127] Swan relies on Mr Zagury's own contemporaneous descriptions of these opportunities as exceptionally promising, and on the Elektron Plan's statement that the Company was "no longer used for new opportunities", as showing that funded, near-complete opportunities were removed from the Company rather than abandoned for genuine commercial reasons.

***Respondent's case***

[128] The Respondent contends that the relevant sites were wound down for independent commercial reasons unconnected to any scheme (including a non-renewal of a site licence and a lightning strike affecting infrastructure), and that the Ethiopia opportunity was rejected by Proton on its own commercial merits rather than diverted to a Tether entity.

**(d) <u>Misuse of confidential Mining Assets</u>**

[129] The Mining Team is said to have downloaded, before the Mass Resignation, source code for the Company's proprietary analytics platform ("BNOC"), site databases, financial models, and operational know-how. Mr Zagury describes these assets as providing capabilities "unmatched in the industry" and accepts that Proton used BNOC after the Mass Resignation. In the English Proceedings, Henshaw J made an order declaring these "Business Assets" to be the Company's property.

***Applicant's case***

[130] Swan submits that it may be inferred, from the pace and scale of Elektron's growth and from Mr Zagury's own repeated emphasis on the value of these tools, that the Mining Assets — or materially similar tools derived from them — were used in building Elektron's competing business, and that clause 16.4 of the SHA, permitting disclosure to "Investor Associates", does not extend to disclosure for the purpose of building a competing, Tether-owned business.

***Respondent's case***

[131] The Respondent contends that the relevant information was not truly confidential, that its disclosure to Proton was, in any event, authorised by clause 16.4 of the SHA on the basis that Proton is an "Investor Associate", and that Proton did not, in fact, use the Company's confidential information in its own operations.

**(e) <u>The SHA defence: contractual entitlement to direct the Company's conduct</u>**

[132] It was common ground between the parties that the Shareholders' Agreement formed the contractual foundation of the parties' commercial relationship. Much, therefore, depends upon the proper construction of that agreement, an issue upon which the parties fundamentally disagree.

[133] Clause 2.3.1 of the SHA confines the Company's business and cash deployment to TINV-approved Investment Memos, with a wide range of further Reserved Matters requiring TINV's written consent under Schedule 2A; clauses 9.1 and 9.2 require each shareholder to act so as

to give effect to the spirit and intent of the SHA and to exercise its voting rights and powers of control so as to give full effect to its terms. In the Anti-Suit Judgment, the Deputy Judge rejected TINV's construction of a related clause — the litigation prohibition in paragraph 19 of Schedule 2A — as one which would be "surprising and unattractive" and would require "clear words" before being adopted.

[134] In my judgment, much of the parties' disagreement ultimately reduces to competing conceptions of the commercial purpose of the SHA itself. Those competing considerations illustrate why the Company's interests cannot be assessed by reference to the proposed recovery alone. Regard must equally be had to the practical burdens, risks and commercial consequences of authorising extensive litigation in the Company's name.

[135] Swan contends that the agreement established a long-term joint venture in which TINV's extensive governance powers were conferred for the purpose of advancing the Company's business, rather than enabling TINV to divert that business elsewhere. The Respondent contends that the SHA deliberately vested strategic control in TINV and that the Court should not imply restrictions upon the exercise of those powers which the parties themselves did not include. The proper construction of the SHA, therefore, lies at the heart of several of the proposed causes of action.

[136] I do not consider that the proper construction of the SHA can presently be resolved with confidence on affidavit evidence alone. The agreement must ultimately be construed objectively, having regard to its language, its commercial context and the surrounding circumstances known to the parties. Both parties advance substantial arguments capable of supporting their respective constructions. That very fact makes it difficult, at the leave stage, to conclude that Swan has established that its construction is more likely than not to prevail.

***Applicant's case***

[137] Swan submits that nothing in the SHA entitled TINV to cause the Company to act otherwise than in its own interests; that clause 2.3.1 is designed to prevent unapproved business harmful to TINV's own position as investor, not to license TINV to strip the Company of its business; and that the logical extension of the Respondent's construction — that TINV could wait until immediately before the Repayment Date and then cause the Company's assets to be sold to itself at nominal value — is untenable, a conclusion said to be supported by the Deputy Judge's reasoning in the Anti-Suit Judgment, albeit that reasoning was obiter and addressed to a different clause.

***Respondent's case***

[138] The Respondent submits that clause 2.3.1, read with Schedule 2A, gave TINV the contractual right to control whether and how the Company conducted business and deployed cash, such that the Company cannot complain of TINV's proper exercise of its own bargained-for rights, whatever the commercial consequences for Swan.

**(f) <u>The "no loss" defence</u>**

[139] The Respondent's case, supported principally by Zagury 2, is that the Company could not have repaid the Debt using its existing assets without further investment, which TINV was unwilling to provide, and that the decision to wind down the mining business was commercially appropriate and that the Company suffered no loss. Swan's reply, principally through Pritzker 1, contends that the Company could, using existing equipment, have reached approximately 20 EH/s and generated profits sufficient to repay the Debt, pointing to the NxT Plan's own modelling of a 19.6 EH/s case on the capital already contributed, and its record of "no further capital contributions" being required.

***Applicant's case***

[140] Swan submits that Zagury 2 is inconsistent with Mr Zagury's own contemporaneous documents, blurs the distinction between Swan's financial position and the Company's own prospects, and cannot be accepted at face value given Mr Zagury's personal interest in the outcome. Swan also relies on Elektron's own trajectory — approximately 50 EH/s, using the same personnel and a proportionate share of Tether's investment — as the best real-world comparator for what the Company could have achieved, and submits that, in any event, the account of profits claim does not depend on the Company being able to show that it could have earned the relevant profits itself: Rukhadze.

***Respondent's case***

[141] The Respondent submits that Mr Zagury's evidence should be preferred as that of the person with direct operational knowledge, that the pipeline sites were in truth unavailable or uneconomic, that the S19 machines sold were of limited value, and that Mr Pritzker's contrary analysis is new, in part unpleaded, and prepared by a witness without the same first-hand operational experience. It further submits that, because the Company's indebtedness substantially exceeds its present assets, any recovery would merely reduce the outstanding debt to TINV without generating any realistic surplus for shareholders.

**(g) The contractual defence under article 71**

[142] The proper construction and effect of article 71 became one of the principal issues argued before me. Swan contends that the provision cannot operate to exclude liability for breaches of fiduciary duty of the kind alleged. The Respondent contends that, properly construed, it provides a complete contractual answer to the claims advanced. The significance of that issue is addressed later in this judgment.

[143] The material terms of article 71 state:

> "Subject to the provisions of the Act, the Company may indemnify against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who:
>
> (a) is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director of the Company; or
>
> (b) is or was, at the request of the Company, serving as a director of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise."

[144] Article 71 of the Company's Articles of Association is described in the evidence and the parties' submissions as a provision, of a kind commonly found in the constitutional documents of BVI companies, which exempts a director from liability for any loss, damage or misfortune suffered by the Company in the execution of the duties of his office, save where the loss arises through the dishonesty, wilful default or fraud of that director. .

[145] Article 71 is to be distinguished from the statutory power of indemnification conferred on the Company by **section 132** of the Act. **Section 132** permits, but does not require, a company to indemnify a director against liabilities and expenses incurred in proceedings brought against him by reason of his office, but only where he acted honestly and in good faith and in what he believed to be in the best interests of the Company; an indemnity purporting to protect a director who did not act honestly and in good faith is void. Article 71, unlike **section 132**, does not merely provide for reimbursement after the event: it purports to prevent liability from arising in the first place.

[146] The Act contains no direct equivalent of section 232 of the UK Companies Act 2006, which renders void any provision, whether in a company's articles or otherwise, purporting to exempt a

director from liability for negligence, default, breach of duty or breach of trust owed to the company. The absence of such a provision in the Act does not, however, mean that a clause such as article 71 is necessarily effective according to its own terms in every circumstance in which a party seeks to rely on it.

[147] In my judgment, the distinction identified in **Dekel** is fundamental. Article 71 does not define the scope of directors' fiduciary obligations, nor does it render conduct lawful which would otherwise constitute a breach of duty. Rather, assuming its requirements are satisfied, it operates as a contractual defence to personal liability. The relevant question at this stage is, therefore, not whether Swan has pleaded conduct which, absent article 71, would arguably amount to a breach of fiduciary duty. It is whether Swan has demonstrated that its proposed claims are more likely than not to overcome the contractual defence under article 71 upon which the Respondent relies.

[148] As I held in **Dekel** (at [41]-[45]), where a provision of this character is expressed in sufficiently wide terms, it ought ordinarily to be given effect according to its plain and literal meaning and not to be read down by the court. The relevant provision in **Dekel** was article 14 of the respondent company's articles of association. The differences between the formulation of article 71 and article 14 considered in **Dekel** are immaterial. In **Dekel**, I applied the approach adopted **in Emerald Bay Worldwide Ltd v Barclays Wealth Directors (Guernsey) Ltd** (Guernsey CA, Judgment 02/2013, 9 January 2014) in reaching that conclusion.

[149] There is, however, one material qualification. Such a provision cannot, consistently with the public policy embodied in **section 132**, be construed so as to afford protection to a director who has not acted honestly and in good faith: see **Dekel**, at [44], [46], [57] and [61]. Subject to that qualification, I do not accept that article 71 should be read down merely because the impugned conduct is said to amount to a conflict of interest or a breach of the no-profit rule rather than to negligence.

***Applicant's case***

[150] Swan does not put forward any case that Mr Devasini or Mr van der Velde acted dishonestly, with wilful default, or fraudulently. Swan's case is, and remains, one of conflict of interest and improper purpose. More broadly, Swan submits that article 71 has no application because the pleaded breaches fall outside the protection it affords: the provision cannot, it argues, authorise directors to appropriate corporate opportunities, misuse confidential information or act otherwise than in good faith.

[151] Swan further submits that article 71 issue cannot properly be determined on this application because its construction depended upon the factual and contractual context in which it operated. Alternatively, even if capable of construction at this stage, Swan contends that the article does not exclude liability for the breaches of fiduciary duty alleged in these proceedings.

***Respondent's case***

[152] The Respondent submits that article 71 is drawn in wide terms, forms part of the constitutional bargain to which Swan itself is party, and expressly excludes only dishonesty, wilful default and fraud — each a distinct and serious form of wrongdoing which Swan has chosen not to plead. Swan's argument, it submits, confuses the existence of fiduciary duties with the availability of a contractual defence under article 71 to personal liability. The Respondent submits that the Court should not strain to read an unpleaded allegation of dishonesty into a claim Swan has itself framed in terms of conflict of interest and improper purpose, and that Swan cannot have it both ways: if it wishes to avoid article 71, it must plead, and ultimately prove, dishonesty, with the particularity that so serious an allegation requires.

[153] The Respondent submits that article 71 is capable of determination as a matter of contractual construction on the present application and that, properly construed, it defeats Swan's proposed claims irrespective of the disputed factual allegations.

[154] Standing back, and applying **Dekel**, I am satisfied that article 71 affords Mr Devasini and Mr van der Velde a defence to any personal claim against them for breach of duty, since Swan does not seek to advance any case founded on dishonesty, wilful default or fraud. I say no more than that; article 71 protects directors of the Company, and what this means for the wider claims pleaded against the other proposed defendants and against TINV is addressed in my Conclusion on this Issue below.

**<u>Conclusion on Issue 4</u>**

[155] For present purposes, it is unnecessary finally to determine the proper construction of article 71. It is sufficient to conclude that Swan has not satisfied me that it is more likely than not to overcome the substantive contractual defence which the Respondent advances under that provision.

[156] Applying the standard identified in **Basab**, and standing back to evaluate the proposed proceedings as a whole rather than any individual cause of action in isolation, I am not satisfied that Swan has demonstrated that the proposed proceedings are more likely than not ultimately

to succeed. I reach that conclusion after considering the cumulative effect of a number of independent considerations, none of which I regard as wholly determinative in isolation, but which together persuade me that the statutory threshold has not been crossed.

[157] First, for the reasons given in my discussion of the contractual defence under article 71, and applying **Dekel**, I am satisfied that article 71 affords Mr Devasini and Mr van der Velde a defence to any personal claim against them for breach of duty. Swan does not allege, and does not seek to allege, dishonesty, wilful default or fraud on the part of either director; its case against them is framed in terms of conflict of interest and improper purpose, and a clause in these terms is not to be read down merely because the underlying conduct might otherwise be so characterised. I am not satisfied that a personal claim against Mr Devasini or Mr van der Velde for breach of duty is more probable than not to succeed.

[158] That conclusion does not, however, dispose of the wider claims for unlawful means conspiracy, dishonest assistance, knowing receipt, misuse of confidential information, and breach of the SHA pleaded against the other proposed defendants and against TINV. Article 71 protects directors of the Company; it has no application to TINV, and does not, without more, answer claims which proceed on the footing that the TINV-Appointed Directors were in breach of duty to the Company, but require dishonesty only on the part of the assisting or receiving defendant, not the primary fiduciary. Whether such a breach of duty is established for these purposes is addressed in my discussion of the Related Party Sale, the abandonment or diversion of pipeline opportunities, the misuse of confidential information, and the SHA defence at sub-paragraphs (b) to (e) above. Article 71 accordingly narrows, but does not by itself resolve, the likelihood of success of the proceedings as a whole.

[159] Second, I consider that clause 2.3.1 of the SHA, read with Schedule 2A, gives TINV a wide and, on its face, largely unqualified contractual entitlement to control whether and how the Company conducts its business and deploys its cash. I accept that this construction, taken to its logical extreme, produces an uncomfortable result, but I am not persuaded that Swan's competing construction is sufficiently clearly correct, on this material, to found a finding that the Related Party Sale, the Further Sales, or the non-pursuit of the pipeline opportunities were unlawful as a matter of contract. The reasoning in the Anti-Suit Judgment, on which Swan places considerable reliance, was directed to a different clause — the litigation prohibition in paragraph 19 of Schedule 2A — and does not, in my view, resolve the distinct construction question raised by clause 2.3.1 in Swan's favour. These are substantial questions of contractual interpretation that

will ultimately require examination of the factual matrix and the commercial purpose of the SHA, and it would be inappropriate to express a definitive view on them now.

[160] I also accept that a distinction may exist between disclosure of confidential information for a contractually authorised purpose and its subsequent exploitation for an altogether different purpose. Whether that distinction ultimately assists Swan is a matter which can only be determined after the relevant facts have been established.

[161] I do not conclude that the Respondent's construction is necessarily correct. Nor do I conclude that Swan's construction is wrong. My conclusion is the narrower one required by **section 184C(2)(c)**: namely that the competing constructions are both realistically arguable and that I cannot presently conclude that Swan has shown its construction to be more likely than not to prevail at trial.

[162] Third, as to the confidentiality claim, I am not satisfied that Swan's narrower construction of clause 16.4 — that disclosure to an "Investor Associate" does not extend to disclosure enabling a competing business — is more probable than not correct, as against the Respondent's construction that Proton, as the entity through which TINV chose to have the Company's business conducted, falls within that clause. This is a genuine question of construction on which the contractual language does not obviously favour either side, and I am unable to resolve it in Swan's favour to the standard required.

[163] Fourth, on quantum and counterfactual deployment, I prefer, for present purposes, the Respondent's submission that Mr Pritzker's analysis, while carefully constructed, is new, in material respects unpleaded, and controverted by Mr Zagury's more directly-informed operational evidence as to the capital, site availability, and commercial viability of the machines and pipeline opportunities in question. Swan's own contemporaneous documents are said by the Respondent to be equivocal on the question of further capital requirements, and I am not satisfied, on the papers, that Swan's account is to be preferred.

[164] I have not overlooked the real force of the contemporaneous documents on which Swan relies — the NxT Plan, the Elektron Plan, and the rain and hellfire notes — which raise a legitimate question as to the circumstances in which the Mining Team's departure and the subsequent asset sales came about, and which a differently constituted claim, properly pleaded to meet the difficulties identified above, might overcome. But taking the evidence as a whole, and in particular the combined effect of the contractual defence under article 71, the contractual entitlement under

clause 2.3.1, the genuine construction dispute under clause 16.4, and the unresolved quantum dispute, I am not satisfied that Swan has shown the proposed claims to be more probable than not to succeed. This factor weighs against the grant of leave.

[165] Applying the approach adopted in **Dekel**, I am not persuaded that Swan has presently demonstrated that the proposed personal claims against Mr Devasini and Mr van der Velde are more likely than not to overcome the protection afforded by article 71. Swan has deliberately chosen not to plead dishonesty, fraud or wilful default against either director. Whether article 71 ultimately affords a complete defence will depend upon findings made at trial and upon the proper characterisation of the pleaded conduct. At the present stage, however, I regard article 71 as constituting a substantial obstacle to the success of those claims.

[166] Standing back, I am not persuaded that Swan has discharged the burden imposed by **section 184C(2)(c)**. That conclusion should not be understood as determining the underlying merits of the litigation. It reflects only my assessment that, on the present material and at the present stage of the proceedings, Swan has not demonstrated that the proposed proceedings are more likely than not to succeed.

## H ISSUE 5 — COSTS PROPORTIONATE TO RELIEF: SECTION 184C(2)(D)

### The Facts

[167] The parties' estimates of the likely costs of the proposed proceedings differ, but both accept that they would be substantial. Swan estimates the costs of taking the proceedings to trial at approximately US$7-9 million. The Respondent estimates that the costs are more likely to be in the region of US$12-15 million, reflecting the fact that Swan seeks permission to pursue claims against ten proposed defendants, involving allegations of breach of fiduciary duty, conspiracy, dishonest assistance, misuse of confidential information and related causes of action across several jurisdictions. Swan's case is that the potential value of the claims substantially exceeds those figures. On Mr Pritzker's conservative analysis, the Company is said to have suffered losses of approximately US$458 million by 2028 after repayment of the Debt, excluding any separate account of profits against Elektron.

### The Law

[168] **Section 184C(2)(d)** requires the Court to consider whether the costs of the proposed proceedings are likely to be proportionate to the relief expected to be obtained. The subsection is concerned with proportionality rather than absolute cost. Parliament plainly contemplated that derivative proceedings might in an appropriate case involve substantial expenditure. The question is whether, viewed objectively and prospectively, the anticipated burden of the litigation bears a reasonable relationship to the realistic benefit which successful proceedings may confer upon the Company.

[169] The assessment under **section 184C(2)(d)** necessarily involves a degree of prediction. The Court cannot know whether the proceedings will ultimately succeed, nor can it determine with precision what relief may ultimately be obtained. It must therefore evaluate proportionality by reference to the apparent merits of the proposed claims, the realistic value of the relief sought, the complexity of the proceedings and the practical burden which the litigation is likely to impose upon the Company.

[170] **Section 184C(2)(d)** requires the Court to weigh the costs of the proceedings against the relief likely to be obtained, as one of five non-determinative factors in the overall discretion: **Dekel**, at [22], [24]–[26]. The exercise is not simply a matter of comparing the estimated costs of litigation with the monetary value of the relief claimed: see **Minority Shareholders, Law Practice and Procedure**, *op cit*, at para. 2.99; commercial litigation of this kind frequently involves substantial expenditure when important corporate rights are at issue. Rather, the Court must evaluate whether, viewed objectively and commercially, the likely costs, risks, and management burden of the proposed proceedings are proportionate to the realistic benefits which successful litigation may be expected to produce for the Company.

## <u>The Rival Arguments</u>

### *Applicant's case*

[171] Swan submits that, even accepting the Respondent's higher costs estimate, the disparity between costs and the scale of the claimed loss and potential account of profits is substantial, and that this factor favours the grant of leave.

[172] Swan further submits that the Respondent's approach places undue emphasis upon litigation costs whilst ignoring the scale of the losses alleged to have been suffered by the Company. It argues that, if its valuation evidence is accepted, litigation costing several million dollars cannot

sensibly be regarded as disproportionate where the proceedings seek to recover assets and opportunities said to be worth several hundred million dollars.

***Respondent's case***

[173] The Respondent submits that the costs of litigating against ten defendants are disproportionate to a recovery it characterises as unquantified and illusory.

[174] The Respondent submits that proportionality cannot be assessed by comparing estimated costs with the pleaded value of the claims alone. Regard must also be had to the uncertainty of recovery, the complexity of the proposed litigation, the number of proposed defendants, the likely duration of the proceedings and the substantial management burden which they would impose upon the Company itself.

**Conclusion on Issue 5**

[175] In light of my conclusions elsewhere in this judgment, this factor does not require separate resolution. I note only that the scale of costs likely to be incurred in litigating against ten defendants across multiple causes of action itself reinforces the appropriateness of channelling this dispute, so far as it can properly be pursued at all, through the more contained vehicle addressed under Issue 6.

[176] Considered in isolation, I would not regard proportionality as decisive. It assumes significance principally because of the conclusions already reached on the apparent merits of the proposed proceedings and the availability of alternative remedies.

[177] The significance of this statutory factor, therefore, depends substantially upon the conclusions reached elsewhere in this judgment. Having concluded that Swan has failed to satisfy me as to good faith, has not demonstrated that the proposed proceedings are more likely than not to succeed, and has available to it an adequate alternative remedy, I regard the substantial costs and management burden associated with these proceedings as reinforcing the conclusion already reached under those statutory factors. Considered independently, **section 184C(2)(d)** carries only moderate weight. Considered together with the remaining statutory factors, however, it points firmly towards refusing leave.

[178] I emphasise that this conclusion should not be understood as establishing any general proposition that derivative proceedings involving substantial expenditure will rarely satisfy **section 184C(2)(d)**. Whether costs are proportionate will always depend upon the apparent strength of the proposed proceedings, the realistic value of the relief sought and the particular

commercial circumstances of the company concerned. My conclusion is confined to the facts of the present case.

[179] My conclusion under **section 184C(2)(d)** is, therefore, not an independent basis upon which I would refuse leave. Rather, it reinforces the conclusions already reached under the preceding statutory factors. I turn finally to consider whether Swan has available to it an adequate alternative remedy within the meaning of **section 184C(2)(e)**.

## I ISSUE 6 — AVAILABILITY OF AN ALTERNATIVE REMEDY: SECTION 184C(2)(E)

### The Facts

[180] **Section 184C(2)(e)** requires the Court to consider whether an alternative remedy is available to the applicant. The enquiry is directed to practical adequacy rather than formal equivalence. Parliament did not require the Court to identify an identical remedy capable of producing precisely the same juridical consequences as a derivative claim. Had that been the intention, the subsection would rarely have any practical operation. The question is whether, viewed realistically and in the commercial context of the dispute, another available remedy is capable of addressing the substance of the complaint such that authorising derivative proceedings is unnecessary.

[181] It is also important to distinguish between the nature of the cause of action and the adequacy of the available relief. A derivative claim and an unfair prejudice claim undoubtedly protect different legal interests and proceed upon different juridical foundations. It does not follow, however, that the latter cannot constitute an adequate alternative remedy for the purposes of **section 184C(2)(e)**. The statutory question is directed to practical sufficiency rather than conceptual identity.

[182] The parties identified three principal alternatives to the derivative proceedings now proposed. First, Swan could seek relief for unfairly prejudicial conduct under **section 184I** of the Act. Second, Swan has indicated an intention to advance a personal counterclaim in the English Proceedings, although that claim has been threatened since August 2025 and has not yet been pleaded. Third, Swan has already commenced arbitration proceedings in Florida against Mr Zagury alone. In the Anti-Suit Judgment, Mr Sean O'Sullivan KC, the Deputy Judge, observed, *obiter*, that an unfair prejudice claim would involve “a different type of complaint” and “different relief”, and that reflective loss principles were “potentially problematic” for a personal claim of

that kind. During argument, I also raised with counsel whether **sections 184B and 184G** of the Act might provide additional personal remedies relevant to the exercise of the Court's discretion.

[183] I do not understand the Deputy Judge's observations as deciding the question presently before this Court. They were directed to the juridical distinction between the two statutory causes of action. The question under **section 184C(2)(e)** is different.

[184] The statutory question is not whether the alternative remedy is identical to a derivative claim, nor whether it is capable of producing precisely the same forms of relief. If that were the test, **section 184C(2)(e)** would rarely have practical significance. Rather, the question is whether the alternative remedy is sufficiently adequate, viewed realistically and commercially, to address the substance of the complaint which the applicant seeks to pursue through derivative proceedings.

**<u>The Law</u>**

[185] **Section 184C(2)(e)** requires the Court to consider whether an adequate alternative remedy is available. The existence of an alternative remedy does not automatically preclude derivative proceedings; the relevant question is whether that alternative provides a substantially adequate means of protecting the Company's interests, bearing in mind that derivative relief is generally treated as a remedy of last resort: **Dekel**, at [22], [24]–[26]. Where the alternative remedy vindicates only the shareholder's personal rights, it may not provide an adequate substitute for proceedings seeking recovery of losses suffered by the company itself; but where it is capable of addressing the substance of the wrong complained of, its existence weighs heavily against the grant of leave.

[186] **Section 184I** permits a member who considers that the affairs of the company have been, are being, or are likely to be conducted in a manner that is oppressive, unfairly discriminatory, or unfairly prejudicial to that member to apply to the Court, which may make such order as it thinks fit, including an order requiring the company or any other person to acquire the member's shares, an order requiring the company or any other person to pay compensation to the member, or an order regulating the future conduct of the Company's affairs.

[187] The jurisdiction conferred by **section 184I** is deliberately broad. It is not confined to ordering the compulsory purchase of shares. The Court is empowered to make such order as it considers appropriate for remedying unfair prejudice, including orders regulating the future conduct of the Company's affairs, requiring compensation to be paid, or granting other forms of relief

appropriate to the circumstances. The breadth of the jurisdiction is itself relevant when considering whether it constitutes an adequate alternative remedy.

[188] In addition to the three alternatives addressed by the parties, I invited counsel's submissions on two further matters not raised in either skeleton argument. The first concerns **section 184G**, which provides for a member's personal action against the company "on the same grounds as would be available to that member at common law". The scope of such an action, and its relationship with the rule in **Foss v Harbottle**, was considered by the Privy Council in **Tianrui**. The Board held that a shareholder, including a minority shareholder, may have a personal cause of action against the company itself, as distinct from its directors, where directors have exercised a corporate power for an improper purpose to the shareholder's detriment. In that case, the impugned allotment of shares diluted the claimant's voting power. The claim was held to vindicate a personal right arising from the constitutional contract between the company and its members, and not merely a loss suffered by the company, with the result that it was not barred by either **Foss v Harbottle** or reflective loss principles: **Tianrui**, at [34]–[36], [65], [68].

[189] Second, **section 184B** permits a member, or a director, to apply to the Court for an order restraining the company from engaging in conduct that would contravene the Act or the Company's memorandum or articles, or compelling the company or its directors to comply with them, including, on one view, after a breach has already occurred.

[190] Both **section 184G** and **section 184B** share the feature that they are personal remedies, pursued and funded by the member in the member's own name, and neither requires the leave of the Court nor exposes the company to the costs and management burden of proceedings in the way that a derivative claim under **section 184C** necessarily does.

[191] Having received counsel's observations, I agree that neither "remedy" is applicable in the circumstances that apply in this case.

**<u>The Rival Arguments</u>**

***Applicant's case***

[192] Swan submits that none of the three alternatives identified by the parties would vindicate the Company's own corporate rights, recover profits for the Company's benefit, or restore its income-generating capacity as a going concern; that an unfair prejudice claim would typically result in a buy-out rather than restoration of the Company's business, and faces its own reflective-loss difficulties; that the threatened English counterclaim addresses Swan's personal loss, not the

Company's; and that the Florida Arbitration proceeds against only one of the ten proposed defendants and cannot vindicate the Company's rights against the others.

[193] Swan submits that the fundamental purpose of a derivative claim is to vindicate rights belonging to the Company itself. An unfair prejudice claim, by contrast, exists primarily to protect shareholders from unfair conduct. Swan, therefore, submits that **section 184I** could not constitute an adequate alternative remedy because the statutory jurisdictions served fundamentally different purposes. It argued that only derivative proceedings were capable of restoring assets said properly to belong to the Company.

***Respondent's case***

[194] The Respondent contends that Swan's complaints arise essentially from alleged departures from the parties' agreed commercial bargain embodied in the Shareholders' Agreement and therefore falls naturally within the unfair prejudice jurisdiction. The Respondent submits that an unfair prejudice claim is the natural vehicle for what is, in substance, a shareholder-exclusion complaint, and that the existence of two live, already-threatened or already-commenced alternative proceedings — the English counterclaim and the Florida Arbitration — shows that derivative relief is unnecessary.

[195] The Respondent further submits that Swan's complaint is, in substance, that the commercial bargain embodied in the SHA has been subverted by those exercising control of the Company. It argues that this is precisely the type of commercial unfairness for which Parliament enacted **section 184I**. Although the relief ultimately granted may differ from that available in derivative proceedings, the Respondent submits that the jurisdiction is sufficiently broad to address the substance of Swan's complaints.

[196] I readily accept that a derivative claim and an unfair prejudice claim are distinct statutory remedies. Different legal rights are engaged and different forms of relief may ultimately be granted. That proposition is uncontroversial. It does not, however, answer the question posed by **section 184C(2)(e)**. Parliament deliberately asked whether an alternative remedy exists, not whether another remedy would produce identical legal consequences. To read the subsection otherwise would deprive it of much of its practical operation.

[197] I, therefore, do not understand the Deputy Judge's observations as deciding the question now before this Court. His Lordship was concerned with the juridical differences between the two causes of action. I am concerned with a different statutory enquiry, namely whether one remedy

is sufficiently adequate that the exceptional derivative jurisdiction need not be invoked. The two questions are related, but they are not the same.

**Discussion: the unfair prejudice claim**

[198] Standing back, I am satisfied that Swan has available to it an alternative statutory remedy which is capable of addressing the essential substance of its complaint without requiring the Company itself to become the claimant in extensive derivative proceedings. I emphasise that I do not conclude that the remedies available under **section 184I** are identical to those obtainable through a derivative claim. Rather, I conclude that they are sufficiently broad and sufficiently effective that, viewed practically and commercially, they constitute an adequate alternative remedy within the meaning of **section 184C(2)(e)**. That conclusion provides a further and independent reason why leave should be refused.

[199] The relief available on an unfair prejudice claim is not confined to a share buy-out. The Court may make such order as it thinks fit, extending to orders regulating the future conduct of the Company's affairs, requiring the Company or those controlling it to account for benefits improperly obtained, or otherwise addressing the substance of the diversion of business and assets of which Swan complains — a juxtaposition of an account of profits and unfair prejudice not unlike that considered by the Court of Appeal in **Song & Zhao v Smith**. On that basis, the underlying wrong said to have been done — the diversion of the Company's mining business to Elektron — is capable of being remedied, so far as it can be established, without it being necessary for the Company itself to be exposed, as claimant, to the cost, delay, and management burden of derivative proceedings against ten defendants.

[200] Accordingly, whilst I fully accept that an unfair prejudice petition is not identical to derivative proceedings, I am satisfied that, in the circumstances of this case, it constitutes an adequate alternative remedy within the meaning of **section 184C(2)(e)**.

[201] I should add that this conclusion is reached on the particular facts of the present case. There will undoubtedly be cases in which the nature of the alleged wrongdoing, or the relief realistically obtainable through an unfair prejudice claim such that **section 184I** cannot properly be regarded as an adequate alternative to derivative proceedings. Nothing in this judgment should be understood as establishing any general rule to the contrary. The question will always remain one of evaluative judgment in the circumstances of the individual case.

[202] Having heard submissions from both counsel on the two further matters I raised, and for the reasons already given, I do not regard either **section 184B** or **section 184G** as available on the facts of this case: **section 184G** is confined to a personal action against the Company for breach of a duty owed by the Company to the member, which is not the case advanced here, and **section 184B** is, at least ordinarily, directed to restraining or compelling future conduct rather than to remedying a past breach. Neither provision, therefore, has any material bearing on the outcome of this Issue.

**<u>Conclusion on Issue 6</u>**

[203] The availability of the unfair prejudice claim under **section 184I** demonstrates that a derivative claim is not, in the circumstances of this case, the only or most appropriate route by which Swan's complaints may be addressed. Having heard counsel's submissions on the further avenues I raised of my own motion, I am not persuaded that either **section 184G or section 184B** itself provides an adequate alternative remedy on the facts of this case, for the reasons already given in my discussion of each; my conclusion accordingly rests on **section 184I** alone, though the discussion of those further avenues remains relevant to the "last resort" character of the derivative jurisdiction more generally.

[204] Standing back, I am satisfied that Swan has available to it, in the unfair prejudice claim, a remedy which is capable of addressing the substance of the commercial unfairness of which it complains, without requiring the Company itself to become the claimant in extensive litigation against those presently controlling it. Although that remedy is not identical to a derivative claim, it is, in my judgment, sufficiently broad and sufficiently flexible to constitute an adequate alternative remedy for the purposes of **section 184C(2)(e)**. A minority shareholder is not ordinarily entitled to use the company's own funds to bring proceedings against the majority, at the company's expense and risk, where the shareholder has available to it a remedy capable of addressing at least the core of its complaint. This provides a freestanding basis, independent of my findings under Issues 2 and 4, for refusing leave — a conclusion reinforced by those findings: the Application is, in substance, designed to have the Company itself fund and bear the risk of proceedings brought to vindicate Swan's own position as an excluded minority shareholder, rather than a claim which good faith requires, or the Company's interests warrant, being pursued at the Company's own expense.

[205] I emphasise that this conclusion is reached on the particular facts of this case. It should not be understood as establishing that an unfair prejudice claim will invariably constitute an adequate

alternative remedy whenever derivative proceedings are sought. Whether it does so will necessarily depend upon the nature of the complaint, the relief realistically available, and the extent to which the shareholder's grievance can properly be addressed without requiring the Company itself to litigate. Here, having regard to the nature of Swan's complaints and the breadth of the relief available under **section 184I**, I am satisfied that it can.

[206] Although my conclusions under **section 184C** — on good faith, the interests of the Company, the apparent merits of the proposed proceedings, and the availability of an adequate alternative remedy — are sufficient to dispose of the Application, I consider it appropriate, in deference to the careful submissions advanced by both parties, to address the further issue concerning **section 184D**. The point is of general importance, was fully argued before me, and may arise in future applications even where leave would otherwise be granted.

## J ISSUE 7 — THE COSTS INDEMNITY: SECTION 184D

### The Facts

[207] Swan seeks an order that the Company indemnify it against the reasonable costs of this Application and of the proposed derivative claim. The Respondent notes that Swan has not offered a reciprocal indemnity to the Company in the event the claim fails.

### The Law

[208] **Section 184D** is in the following terms:

> "(1) If the Court grants leave to a member to bring or intervene in proceedings under **section 184C**, it shall, on the application of the member, order that the whole of the reasonable costs of bringing or intervening in the proceedings must be met by the company unless the Court considers that it would be unjust or inequitable for the company to bear those costs.
>
> (2) If the Court, on an application made by a member under subsection (1), considers that it would be unjust or inequitable for the company to bear the whole of the reasonable costs of bringing or intervening in the proceedings, it may order:
>
> (a) that the company bear such proportion of the costs as it considers to be reasonable; or
>
> (b) that the company shall not bear any of the costs."

[209] **Section 184D** reflects Parliament's recognition that a shareholder authorised to litigate in the Company's name ordinarily ought not to bear personally the financial burden of proceedings

brought for the Company's benefit. The ordinary rule is therefore that the company, as the beneficiary of the proceedings, should bear their reasonable costs. The discretion conferred by **subsection (2)** recognises, however, that there will be cases in which it would be unjust or inequitable for the company to do so. The provision, therefore, operates as an important corollary to the statutory derivative jurisdiction. At the same time, Parliament deliberately preserved a discretion enabling the Court to refuse or qualify an indemnity where justice so requires.

[210] **Section 184D(1)** provides, as a default position, that the company will indemnify a member bringing derivative proceedings against the reasonable costs of doing so. **Section 184D(2)** allows the Court to depart from that default where it would be unjust or inequitable for the company to bear its own costs. Whether an indemnity is to be provided bears on the weight to be given to the merits in the Court's overall assessment, rather than operating as a threshold condition of leave: **Dekel**, at [26], [84].

<u>**The Rival Arguments**</u>

***Applicant's case***

[211] Swan submits that the merits of the proposed claim are sufficient to justify leave on the default basis in **section 184D(1)**; alternatively, if the Court is not so persuaded, the appropriate course is to refuse or limit the indemnity, or to reserve the question, rather than to refuse leave altogether.

[212] Swan further submits that questions concerning reciprocal protection, security for costs or the detailed terms of any indemnity should ordinarily be determined only after leave has been granted. It argues that those issues should not influence the anterior question whether the statutory conditions for derivative proceedings are satisfied.

***Respondent's case***

[213] The Respondent submits that no indemnity should be ordered, or that Swan should at least be required to fortify against adverse costs, given what it characterises as the weakness of the claim and the difficulty of the Company funding litigation against its own controlling shareholder.

[214] The Respondent asserts that the statutory indemnity cannot be divorced from the practical realities of the litigation which Swan proposes to pursue. If the Company is required to fund extensive proceedings against those presently controlling it, yet receives no meaningful

reciprocal protection should those proceedings fail, the statutory balance established by **sections 184C and 184D** would be materially undermined.

**Conclusion on Issue 7**

[215] Both parties referred me to my decision in **Dekel**, where the relationship between sections **184C and 184D** was considered in some detail. Since considerable reliance was placed upon those observations, it is appropriate to explain how they apply in the present case.

[216] At [99], in that case, I observed:

> "In my judgment, if the Claimant were, in addition to not seeking the indemnity in **s. 184D**, also be prepared to make good any costs awarded against CLL BVI, with sufficient security to ensure that this would be done, I would have been prepared to grant him leave, subject of course to hearing any further submissions the Respondent might wish to make. My provisional view, without having heard detailed argument from Mr Turner, was that the Applicant should not be precluded from pursuing an unmeritorious claim on behalf of CLL BVI if he wished to do so, provided he understood that it would be he, and not CLL BVI, who would bear the risk of any adverse costs order."

[217] Lest it be suggested otherwise, I do not accept that this passage laid down any universal proposition that an indemnity as to costs, even if supported by security where appropriate, would suffice in every case where leave was sought to pursue a weak or unmeritorious claim. It did not. The Court must assess the indemnity position as one of the relevant factors in the overall exercise of its discretion, just as it must assess all other material considerations. But where a proposed derivative claim is plainly unlikely to succeed, as appeared to be the case in **Dekel**, the Court may properly be prepared to grant leave if, and only if, the applicant is willing to indemnify the company against any costs incurred by it (including any adverse order for costs made against it) as a result of the claim being brought against them, and to fortify that indemnity with security where necessary. That is consistent with Roth J's observation in **Cinematic Finance Ltd v Ryder** [2010] EWHC 3387 (Ch), at [14]:

> "I would not go so far as to say that it could never be appropriate for a derivative claim to be brought by a shareholder holding the majority of the shares in a company. A judge must be cautious about using the word 'never' when faced with a statutory discretion and when this is not one of the enumerated circumstances in section 263(2) [of the Companies Act 2006] in which permission must be refused. And faced only with the facts of the instant case, it is impossible to envisage all the factual circumstances that might arise in other cases…"

[218] In my judgment, the discussion in **Dekel** remains applicable. **Section 184D** does not create an automatic entitlement to a full indemnity in every derivative action. Nor does it require the Company invariably to assume all financial risk associated with the litigation. The discretion

conferred by the subsection exists precisely because Parliament recognised that different cases may call for different financial arrangements in order to achieve a just result.

[219] I respectfully agree with Mr Midwinter that the absence of an indemnity does not, in itself, make leave impossible in every case. But that does not assist the Applicant's position. It is no answer to say that the court should simply overlook the absence of costs protection. To do so would be to strip the court's discretion of practical content. The correct approach, as **Dekel** makes clear, is that the availability or absence of indemnity against the costs of an unsuccessful unmeritorious claim may materially affect the weight to be given to the merits. If no such indemnity is offered, the Court may treat it as a serious adverse factor. If an indemnity is offered and properly secured, that may move the balance in the applicant's favour. The point is obvious: costs risk is not a peripheral consideration, but a central one. The Court is unlikely to be persuaded to grant leave in such a case, still less to make the default order under **section 184D**, unless it can be reasonably satisfied that, if the claim fails, the proposed defendants will be able to recover their costs from the company, without any resultant loss to the company, i.e., from the person at whose behest the claim was brought.

[220] I do not accept Mr Midwinter's further submission that the merits of the proposed claim are sufficient to justify leave on the "default" basis in **section 184D(1)** —namely on terms that the Company should be responsible for the costs of bringing the claim against the proposed defendants. That submission ignores the real force of the statutory scheme. The Court is not required to allow a derivative claim to proceed merely because the applicant can articulate a claim with a plausible surface. Where the claim is weak, the court is entitled — indeed, bound — to ask whether the company and the proposed defendants should be forced to bear the costs risk at all.

[221] Swan did not offer, and does not appear even to have contemplated offering, any reciprocal costs protection or indemnity to the Company in the event that the proposed claim failed. That omission is material. Had such an indemnity been offered, and had it adequately addressed the funding and costs-risk concern identified under Issue 3, the balance on that issue might have been affected. It would not, of course, have cured the defects identified under Issues 2 and 4 as to good faith and the likelihood of success, nor would it have displaced my conclusion under Issue 6 that an adequate alternative remedy exists. But it might have placed the Applicant in a stronger position to contend that leave should nevertheless be granted. In the absence of any such offer, the case against the grant of leave is compelling. It reinforces the conclusion already reached.

[222] Finally, I reject Mr Midwinter's suggestion that leave should be granted now, with the indemnity issue to be revisited only once the claim has been issued. That approach does not meet the point made in **Dekel**; it evades it. The court cannot sensibly grant leave first and worry about the costs position later where no adequate indemnity has been put forward in the meantime. Mr Midwinter is right that the practical effect of the proposed order would be to require the Company to absorb a risk akin to security for costs. But that is precisely why the matter must be addressed before leave is granted, not after. To defer the issue would expose the Company and the proposed defendants to costs that may not be recovered without any satisfactory safeguard. That would be unjust, and it would be wrong in principle, based on the merits of the proposed claim. But, in any event, even if the question of security for costs is left to the substantive claim, absent an indemnity of the type I have indicated, it is almost certain that the proposed defendants would apply for security for costs. It is difficult to see how such an application could be successfully resisted, though, other than providing context to my analysis, is not a matter for me to consider on this Application.

[223] Absent a proper indemnity now being in place to secure the Company's costs in the event that it succeeds in the claim, there is no proper basis to grant leave. If such an indemnity, fortified if necessary, is put in place, the Court might be minded to grant leave to enable the claim to be brought and review the position at a future date about whether the company should be ordered to pay the costs of the claim under **section 184D** and whether the costs indemnity given by the Applicant should be discharged.[2] The Court almost certainly has that power under **section 184E**, as appears to be clear from several English cases, albeit under the differently formulated provisions of section 261 of the UK Companies Act 2006: see, by way of examples, **Kiani v Cooper** [2010] 2 BCLC 427; **Iesini v Westrip Holdings Ltd** [2011] 1 BCLC 498; **Stainer v Lee** [2011] 1 BCLC 537; and **Abouraya v Sigmund** [2015] BCC 503. The Applicant contends that having oversight of the proposed claim could be achieved by limited permission with the Court then being able to judge for itself about whether the claim is likely to succeed. That, the Applicant asserts, would cause little prejudice to the Respondent. If, as Mr Hill KC submits on behalf of the Respondent, the claim is hopeless, that point should be capable of being resolved promptly, whether by way of strike out or summary judgment in early course, thus bringing an end to the

[2] The Court does not have power to grant conditional leave. It must either grant or refuse leave: **Boston Trust Co Ltd v Szerelmey Ltd** [2021] EWCA Civ 1176.

claim and ensuring that until it is concluded there is in place full protection to the Respondents against adverse costs. Otherwise, there is no principled basis for allowing the matter to drift.

[224] In the absence of such protection, the statutory presumption that the Company should finance the proceedings cannot sensibly operate. That conclusion reinforces, although it does not independently determine, my decision that leave should be refused.

[225] Nothing in this judgment should be understood as suggesting that the Court may use **section 184D** to defeat applications which would otherwise satisfy **section 184C**. The statutory sequence remains important. The Court must first determine whether leave ought to be granted. Only thereafter does the question arise whether, and if so upon what terms, an indemnity should be ordered. My observations concerning **section 184D** are, therefore, directed to the proper exercise of that separate statutory discretion.

[226] Since I have concluded that leave should be refused under **section 184C**, no question presently arises concerning the exercise of the discretion under **section 184D**. Nevertheless, had it been necessary to determine the point, I would have regarded the matters discussed above as strongly relevant to the form and scope of any indemnity ultimately granted.

## K CONCLUSION AND DISPOSAL

[227] The exercise required by **section 184C** is ultimately one of evaluation rather than arithmetic. No individual statutory factor is necessarily decisive. Nor is the Court required simply to count the number of considerations pointing in favour of, or against, granting leave. Its task is to stand back and determine whether, viewed as a whole, the exceptional jurisdiction conferred by **section 184C** should be exercised in the particular circumstances of the case. The Court is not presently concerned with whether the remedies sought by Swan should ultimately be granted. The present question is whether Swan should be authorised to pursue them on behalf of the Company.

[228] Each of the principal conclusions reached above is capable of supporting the refusal of leave independently. Taken together, however, they reinforce one another. My conclusion concerning Swan's good faith informs my assessment of the Company's interests. My conclusions concerning the apparent merits of the proposed proceedings bear directly upon proportionality. The availability of an adequate alternative remedy substantially reduces the practical necessity for authorising derivative proceedings. Considered cumulatively, the statutory factors point decisively towards the refusal of leave.

[229] No single statutory or additional factor is independently determinative; rather, the factors point consistently in the same direction. My conclusions on good faith, the Company's interests, the apparent merits of the proposed proceedings, proportionality, and the availability of an adequate alternative remedy all reinforce one another. None of the matters identified in **section 184C(2**) is, as a matter of construction, decisive on its own, and in principle a strong case on one factor may compensate for relative weakness on another. But no fine balancing exercise is required here, because I have reached firm and independent adverse conclusions against Swan on three separate matters, each of which is, on its own, sufficient to justify refusal of leave.

[230] First, I find that Swan has not established that this Application is brought in good faith within the meaning of **section 184C(2)(a)**, for the reasons given under Issue 2: in substance, the Application has the character of a means of generating leverage against TINV, rather than a claim pursued from a settled, consistently held belief that the Company itself has been wronged.

[231] Second, I find that Swan has not shown that the proposed claims are more probable than not to succeed, for the reasons given under Issue 4, in particular the potential application of article 71 absent any plea of dishonesty, TINV's wide contractual entitlement under clause 2.3.1 and Schedule 2A, the genuine and unresolved construction dispute under clause 16.4, and the contested state of the quantum and counterfactual deployment evidence.

[232] Third, and independently of those two findings, I am satisfied, for the reasons given under Issue 6, that a suitable and adequate alternative remedy is available to Swan in the form of a claim for relief from unfair prejudicial conduct under **section 184I**.

[233] Each of these three findings is, in my judgment, independently sufficient to warrant refusal of leave; together, they leave me in no doubt as to the correct outcome. My findings under Issues 2 and 4 are further reinforced by my finding under Issue 3 that the proposed litigation is not in the Company's interests, and by the absence, addressed under Issue 7, of any costs indemnity offered by Swan to the Company — the presence of which might have gone some way to meeting the Issue 3 concern, though it would not have overcome my findings on good faith or likelihood of success.

[234] Although each of these conclusions has been reached independently, they also reinforce one another. The absence of good faith informs the assessment of the Company's interests. The existence of an adequate alternative remedy reinforces the conclusion that exposing the Company to litigation is unnecessary. The weakness of the proposed claims informs the

proportionality of requiring the Company to finance them. Considered individually, each points against leave. Considered cumulatively, they admit of only one conclusion.

[235] Having regard to the scale of the proposed proceedings, the multiplicity of defendants, the likely duration of the litigation, and the extensive disclosure and expert evidence that would be required, I also conclude that the anticipated costs weigh materially against granting leave, for the reasons given under Issue 5. Expense alone would not justify refusing permission where a strong corporate claim otherwise exists; in the present case, however, it forms part of a broader commercial assessment which points firmly in the same direction as my findings on good faith, the merits, and the availability of an alternative remedy. The cumulative effect of these conclusions is significantly more compelling than any individual conclusion viewed in isolation.

[236] For these reasons, this Application is refused.

[237] Nothing in this judgment should be understood as determining finally the substantive disputes between the parties, or as expressing any concluded view on the credibility of any witness or on the truth or falsity of the underlying allegations against the proposed defendants, which have not been tested by cross-examination or resolved at trial. It reflects my assessment, on the material properly before me at this leave stage, that Swan has not shown the derivative procedure to be the appropriate route by which to pursue them. Those disputes remain capable of determination, if necessary, in proceedings brought through an appropriate procedural vehicle — including, without prejudice to Swan's position, a claim for relief from unfair prejudicial conduct brought by Swan in its own name, in which proceedings it will be open to Swan to seek relief addressing the substance of the matters raised in this Application, and to rely on the same evidence and contemporaneous documents referred to above.

[238] Unless the parties are able to agree, I will hear submissions on costs, including as to whether costs should follow the event, and about any consequential directions arising from this judgment. In the absence of agreement, any submissions on consequential matters should also address the appropriate form of order.

[239] While this Judgment does not address every point raised in the skeleton arguments and during the hearing on 8 July 2026, nor is it required to do so, I am satisfied that it deals with all substantive issues necessary for the determination of the Application.

[240] Finally, I record my gratitude to leading and junior counsel on both sides (and those instructing them) for the high quality of their written and oral submissions. They greatly assisted the Court

in resolving a number of difficult and important issues concerning the operation of the statutory derivative jurisdiction.

**Abbas Mithani KC**

High Court Judge (Ag)

**By the Court**

**Registrar**